UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RVC FLOOR DECOR, LTD.,

                      Plaintiff,

 - against -

FLOOR AND DECOR OUTLETS OF AMERICA,
INC.,

                      Defendant.
-------------------------------------------------------------------X

## MEMORANDUM AND ORDER

2:18-cv-6449 (DRH) (ARL)

**FILED**
**CLERK**

2:09 pm, Mar 18, 2021

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**APPEARANCES**

**BARSHAY SANDERS, PLLC**
Attorneys for Plaintiff
100 Garden City Plaza, Suite 500
Garden City, NY 11530
By:   David M. Barshay, Esq.
       Craig B. Sanders, Esq.

**KILPATRICK TOWNSEND & STOCKTON LLP**
Attorneys for Defendant
1114 Avenue of the Americas
New York, NY 10036
By:   R. Charles Henn Jr., Esq.
       Robert N. Potter, Esq.
       Bryan J. Wolin, Esq.
       H. Forrest Flemming III, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

Plaintiff RVC Floor Decor, Ltd. ("Plaintiff") brought this action against Defendant Floor and Decor Outlets of America, Inc. ("Defendant") for trademark infringement and unfair competition in violation of § 43(a) of the Lanham Act, New York General Business Law § 349 and New York common law, and for violations of New York General Business Law § 360-*l*.  Presently before the Court is Plaintiff's

motion for summary judgment and Defendant's cross-motion for partial summary judgment, both pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, Plaintiff's motion is DENIED and Defendant's cross-motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

The following facts, taken from the parties' Local Rule 56.1 statements, are undisputed unless otherwise noted.  (*See* Pl.'s Rule 56.1 Statement of Undisputed Material Facts ("Pl. 56.1") [DE 128]; Def.'s Loc. Rule 56.1 Response ("Def. Resp. 56.1") [DE 136]; Def.'s Loc. Rule 56.1 Statement of Undisputed Material Facts ("Def. 56.1") [DE 141]; Pl.'s Loc. Rule 56.1(b) Response ("Pl. Resp. 56.1") [DE 138]).

### A.   Plaintiff RVC Floor Decor, Ltd.

Plaintiff RVC Floor Decor, Ltd. is a New York State domestic corporation incorporated in 1974 that sells "carpet, vinyl and hard surface flooring for purchase and installation at customers' homes and/or businesses," (Pl. 56.1 ¶¶ 1, 7, 23), as well as "bedding, furniture, fabrics, barware, vases, mirrors, wall art, interior design services, and window treatments," (Def. Resp. 56.1 ¶¶ 7, 23).  In October of that year, Plaintiff opened its first store in Rockville Centre, New York, naming it "Floor Decor." (Pl. 56.1 ¶¶ 6, 8).

Plaintiff asserts that, from this point forward, its Rockville Centre location has continuously identified itself with the tradename "Floor Decor" mark in "all signage, advertising, and [for] other business purposes" – until spring 2014, when it opened a new a store in Syosset, New York under the name "Floor Decor & Design."  (*Id.* ¶¶ 9,

16–17, 19, 42, 52, 54).  According to Plaintiff, any other names used in this time were derivative marks.  (*Id.* ¶ 55).  Defendant disputes these facts.  Defendant says Plaintiff has used many other, similar names: RVC Floor Decor Ltd.; Floor Decor Direct; FD&D; Floor Decor & Design; Floor Decor Carpet One; Floor Decor Carpet One Floor & Home; and Floor Decor and Design Home Design Studio.  (Def. Resp. 56.1 ¶¶ 6, 9).  In support, Defendant annexes several advertisements for Plaintiff's Rockville Centre store that use a name other than "Floor Decor."  (Ex. 18–19, 21–22, 24, 32 [DE 133-18, -19, -21, -22, -24, -32] to Decl. of R. Charles Henn Jr. ("Henn Decl.") [DE 133]).

Plaintiff's business has grown since its inception and now currently serves customers in the New York State counties of Kings, Nassau, Suffolk, and Queens. (Pl. 56.1 ¶ 41).  In 1975 alone, Plaintiff spent roughly $10,000.00 in advertising with the Pennysaver, local newspapers, and the Nassau County Yellow Pages, all the while earning roughly $500,000.00 in sales.  (*Id.* ¶¶ 11–12).  In 1981, Plaintiff had an advertising budget of $100,000.00 and sales of $1,500,000.00.  (*Id.* ¶¶ 13–15, 18).  In the mid-1990s, Plaintiff spent roughly $150,000.00 per year in advertising, and its sales revenues "increase steadily year over year topping out in the mid 1990's at approximately" $3,800,000.00.  (*Id.* ¶¶ 37–38, 47).  In 2018, the advertising budget was roughly $80,000.00 and sales were $2,500,000.00.  (*Id.* ¶¶ 58–60; Answers to Second Set of Expedited Interrogatories ("Pl. Answers to 2d Interrog."), Ex. 43 [DE 133-43] to Henn Decl. (providing a yearly advertising budgets)).  Defendant contests the accuracy of these figures, noting that Plaintiff "does not have any business records

of sales made prior to 2011" nor "records concerning the publications it advertised in or circulation numbers [for] any year between 1974 and 2013." (Def. Resp. 56.1 ¶¶ 11–15, 17–18, 20, 25, 37, 38, 46–47).

In 1984, Plaintiff moved to a larger facility in Rockville Centre, prompting the town's mayor to attend the grand opening and to present Plaintiff "with an award for having the most improved building in Rockville Centre." (Pl. 56.1 ¶¶ 25, 28, 30). Since 1984, the store has used the same exterior lighted sign with its "Floor Decor" mark. (*Id.* ¶¶ 31–32). Defendant asserts the sign "appears only on the roof" and "is not prominently displayed" but rather "crammed in the middle of a string of descriptive text." (Def. Resp. 56.1 ¶¶ 31, 42).

 

(*See* Pl.'s Mem. of Law in Support at 16 ("Pl. Mem.") [DE 127] (left-hand image); Def.'s Mem. Law in Opp. at 6 ("Def. Opp.") [DE 135] (right-hand image)).

### B.   Defendant Floor & Decor Outlets of America, Inc.

Defendant Floor & Decor Outlets of America, Inc. was founded in 2000 in Atlanta, Georgia and has used the tradename "Floor & Decor" since 2003. (Def. 56.1 ¶¶ 1, 2, 5; Def. Resp. 56.1 ¶ 150). Defendant sells "hard surface flooring" along with "accompanying trim and decorative products" (*e.g.*, tile) in a warehouse-style store. (Def. Resp. 56.1 ¶¶ 163, 165). Defendant, however, does not "offer installation

services, nor does it sell carpet, bedding, furniture, fabrics, barware, vases, mirrors, wall art, or window treatments." (*Id.* ¶ 166). In 2006, Defendant registered its "Floor & Decor" mark with the United States Patent and Trademark Office. (*Id.* ¶ 7; Def. Resp. 56.1 ¶ 151).

Defendant's business has considerably expanded since its founding. (Def. Resp. 56.1 ¶¶ 135–37, 158). A Google search of the terms "floor decor," "floor and decor," or "floor & decor" each yield Defendant's website as the first advertised and first organic listing. (Pl. 56.1 ¶¶ 130–33). In its first three years in the New York metropolitan area, Defendant spent more than $3,500,000 in advertising alone. (Def. 56.1 ¶¶ 9, 10). In 2016 and 2017, Defendant opened two stores in New Jersey. (*Id.* ¶ 9).



(*See* Pl. Mem. at 16 (left-hand image); Pl.'s Reply Mem. of Law at 11 ("Pl. Reply") [DE 139] (right-hand image)).

### C.  Defendant Opens a Store on Long Island in November 2018

Defendant first became aware of Plaintiff's business in 2012. (Def. 56.1 ¶ 15). Six years later, in November 2018, Defendant opened its first store in New York – in the village of Farmingdale on Long Island. (*Id.* ¶ 13). According to Plaintiff,

Defendant did not advertise this location until ten days prior to the grand opening. (Pl. 56.1 ¶¶ 108, 126; Tr. of Dep. of Wendy Martin at 24:18–25:11 ("W. Martin Dep."), Ex. 13 [DE 130-1] to Decl. of David M. Barshay ("Barshay Decl.") [DE 129])). According to Defendant, however, it "specifically advertised its Farmingdale store at least as early as February 2018." (Def. Resp. 56.1 ¶ 126). Plaintiff asserts that, in the time since Defendant has opened it store, many people have mistaken its store and services with that of Defendant's. (Pl. 56.1 ¶¶ 73–105). Defendant contends that these "individuals were actually [Defendant] customers looking for [Defendant's store." (Def. Resp. 56.1 ¶¶ 76–78, 80–82, 86, 90–91, 99, 102; *see also id.* ¶ 84 (prospective Defendant employees looking for Defendant's store)).

### D.    Procedural Posture

Plaintiff filed its complaint on November 13, 2018 alleging violations of the Lanham Act, New York state common law, and New York General Business Law. (Compl. [DE 1]). At bottom, Plaintiff's case concerns Defendant's alleged trademark infringement of Plaintiff's mark in the New York State counties of Kings, Nassau, Suffolk, and Queens. (Pl. Resp. 56.1 ¶ 35). As to remedies, Plaintiff seeks a "permanent injunction, all profits wrongfully derived by Defendant, a treble award as to such profits pursuant to 15 U.S.C. § 1117(a) and New York law, punitive damages, and interest, costs and attorneys' fees pursuant to 15 U.S.C. §1117(b)." (Pl.'s Mem. of Law in Opp. at 7 ("Pl. Opp.") [DE 137]).

## LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The non-movant must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt

as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586–87), and "may not rely on conclusory allegations or unsubstantiated speculation," *id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210–11) (internal quotation marks omitted). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## DISCUSSION

### I.   Trademark Infringement under the Lanham Act

Section 43(a) of the Lanham Act "protect[s] an unregistered trademarks . . . against infringement." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997) (internal quotation marks omitted) (ellipses in original). A plaintiff alleging trademark infringement must prove (1) "its mark is entitled to protection" and (2) "the defendant's use of its own mark will likely cause confusion with plaintiff's mark." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993). Plaintiff's unregistered mark is the tradename "Floor Decor." *E.g.*, Pl. 56.1 ¶ 6; Def. 56.1 ¶ 167.

An unregistered mark merits protection under the Lanham Act if it "would qualify for registration as a trademark," *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 381 (2d Cir. 2005), meaning it "either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning," *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (emphasis removed). Plaintiff concedes its mark is not inherently distinctive. Pl. Mem. at 7.

A mark has secondary meaning if "in the minds of public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). "For unregistered marks, '[t]he crucial question' in determining secondary meaning is 'whether the public is moved in any degree to buy an article because of its source.'" *Travel Leaders Grp., LLC v. Corley*, 2019 WL 6647319, at *8 (S.D.N.Y. Dec. 5, 2019) (quoting *Genesee Brewing Co.*, 124

F.3d at 143 n.4).  To answer this question, courts consider: (1) length and exclusivity of use; (2) advertising expenditures; (3) consumer studies linking the product to the product source; (4) sales success; (5) unsolicited media coverage of the product; and (6) attempts to plagiarize.  *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, 2017 WL 3669625, at *11 (S.D.N.Y. Aug. 8, 2017) (citing *Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)).  "No single factor is determinative, and every element need not be proved."  *Thompson Med. Co.*, 753 F.2d at 217 (internal quotation marks and citation omitted).  Nevertheless, "courts have long held that consumer surveys are the most persuasive evidence of secondary meaning."  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638–39 (S.D.N.Y. 2016) (citing cases), *aff'd*, 720 Fed. App'x 24 (2d Cir. 2017).

## A.    Time Period to Determine Secondary Meaning

Before weighing the factors, the Court first addresses the proper time period for determining secondary meaning.  Plaintiff argues its mark must have acquired secondary meaning between 1974—"when [Plaintiff] opened its store"—and 2015— "when [Defendant] entered the market" by advertising in the New York City region.  Pl. Mem. at 8; Pl. Reply at 1–2 (citing Def. Resp. 56.1 ¶¶ 106, 126).  Defendant argues in favor of "assess[ing] secondary meaning as of November 2018—i.e., more than three years after [Plaintiff] transitioned away from [the tradename 'Floor Decor'] to 'Floor Decor & Design'" and the year in which Defendant opened its store on Long Island.  Def. Opp. at 11, 14 (emphasis removed); Def. Resp. 56.1 ¶ 126.

Secondary meaning must be acquired "by the time the allegedly infringing product came on the market." *LVL XIII Brands*, 209 F. Supp. 3d at 654 (citing *Thompson Med. Co.*, 753 F.2d at 217); *see also Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 2021 WL 247922, at *5 (S.D.N.Y. Jan. 26, 2021); *Hi-Tech Pharmacal Co., Inc. v. Hi-Tech Pharms., Inc.*, 2007 WL 1988737, at *10 (E.D.N.Y. July 5, 2007) (Gold, Mag. J.) ("[P]laintiff's burden is to establish that its mark acquired secondary meaning *before* defendant began using its allegedly infringing mark." (emphasis in original) (citing *Jewish Sephardic Yellow Pages, Ltd v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 344 (E.D.N.Y. 2007))). The relevant market here consists of the New York State counties of Kings, Nassau, Queens, and Suffolk – the four counties geographically comprising Long Island, New York (though two are also boroughs of New York City). *See* Pl. 56.1 ¶¶ 104, 109, 127, 140; Def. Opp. at 11.

Defendant "very publicly entered the New York market back in July 2015." Def. Opp. at 4; Def.'s Reply in Support at 5 ("Def. Reply") [DE 140]; Def. Resp. 56.1 ¶¶ 106, 126 ("[Defendant] advertised its brand in the New York market consistently for three years before November 2018."). That Defendant "specifically advertised its Farmingdale *store*" only as early as February 2018 does not contradict their concession that they entered the market in 2015. *Compare* Def. Resp. 56.1 ¶ 126 (emphasis added), *with* Def. Reply at 5.

As such, Plaintiff's mark must have achieved secondary meaning by July 2015. *Cf. Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir. 1980) ("[Plaintiff] could not successfully rely upon secondary meaning if [defendant]

obtained a mark established prior to the earliest time when [plaintiff's] mark could have acquired secondary meaning.").

## B.   Secondary Meaning Factors

The Court now turns to the secondary meaning factors in the order listed above, mindful that the exercise "is an inherently factual inquiry." *Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987); *see Thompson Med. Co.*, 753 F.2d at 217 ("[P]roof of secondary meaning entails vigorous evidentiary requirements."); *but see Jewish Sephardic Yellow Pages, Ltd.*, 478 F. Supp. 2d at 344–45 ("Although the Second Circuit has stated that district courts should be cautious in weighing these factors at the summary judgment stage, it has nonetheless supported summary judgment in cases where the proponent of the alleged trademark has failed to raise a material issue of fact on the question of secondary meaning.").  As neither party addresses the "attempts to plagiarize" factor, the Court omits it below.

### 1.   Length and Exclusivity of Use

Because "no absolute time span can be posited as a yardstick in cases involving secondary meaning," the length and exclusivity of use factor is "evaluated in light of the product and its consumers." *Centaur Commc'ns, Ltd. v. A/S/M Commc'n*s, 830 F.2d 1217, 1225 (2d Cir. 1987), *overruled on other grounds by Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993).  "[T]he longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning," *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 203 (S.D.N.Y. 2000), and "[c]ourts often point to five years of exclusive use of a mark as evidence of

secondary meaning," *Hello I Am Elliot, Inc. v. Sine*, 2020 WL 3619505, at *10 (S.D.N.Y. July 2, 2020) (citing cases).

Plaintiff says its Rockville Centre store has used the "Floor Decor" tradename since its founding in 1974, with the same street-facing exterior sign exhibiting its mark since 1984. Pl. 56.1 ¶¶ 6, 31–32. But Defendant's evidence, when viewed in Defendant's favor, which the Court must do on Plaintiff's motion, raises questions of fact on this issue. For example, Defendant has adduced evidence suggesting that Plaintiff used other marks before the secondary-meaning cutoff of 2015. *E.g.*, Def. Resp. 56.1 ¶ 9. Much of this evidence, however, dates to the tail-end of 2014 and beyond, *i.e.*, near or after the deadline for Plaintiff's mark to have obtained secondary meaning. *E.g.*, Ex. 20 [DE 133-20] to Henn Decl.; *cf. Easy Spirit, LLC*, 2021 WL 247922, at *6 ("As Skechers observes, several advertisements . . . postdate February 2018 and are therefore irrelevant.").

Defendant also argues Plaintiff's use was not exclusive. It adduces website printouts from, *inter alia*, the New York State Division of Corporations, Yelp.com, and YellowPages.com to identify companies in New York, New Jersey, Connecticut, and Pennsylvania with names "containing the terms 'floor' and/or 'decor.'" Def. Opp. at 14–15 (citing Ex. JJ [DE 37-36] to Decl. of R. Charles Henn Jr. [DE 37]). "[W]hatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's strength and is a factor weighing against a finding of exclusivity." *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 323 (S.D.N.Y. 2012). The problem is Defendant's third-party use evidence fails to

reflect "that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers." *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173–74 (2d Cir. 1976).  Additionally, the majority of the webpages reflect information as of late 2018 or 2019, with no basis to ascertain or infer the state of affairs in 2015.  And eight of twelve third parties are far distanced from the relevant geographic market: they are not located in the counties of Kings, Nassau, Suffolk, or Queens.  *See* Ex. JJ to Decl. of R. Charles Henn Jr. (hailing from Niagara County of New York, or the states of Connecticut, New Jersey, or Pennsylvania).

The evidence on the "length and exclusivity" factor supports secondary meaning, though this conclusion not cut-and-dried.

## 2. Advertising Expenditures

When considering advertising expenditures, "[c]ourt[s] should consider not only the total amount . . . , but also whether the plaintiff's advertising specifically directed consumers to the mark as an indication of source." *LVL XIII Brands*, 209 F. Supp. 3d at 655.  Hence "[t]he characteristics of the relevant market are important" when assessing this factor.  *Centaur Commc'ns*, 830 F.2d at 1222.  Plaintiff attests its advertising budget started at $10,000 in 1975, grew to $100,000 per year by 1981, and surpassed $100,000 per year ever since.  Pl. 56.1 ¶¶ 18, 38; *see* Pl. Answers to 2d Interrog. (providing a year-by-year breakdown of amounts spent on advertising).  Its efforts included direct mailings and advertising campaigns printed in the Long Island-newspaper Newsday.  *Id.* ¶¶ 58–59.

Much of the evidence to this end is testimonial, not documentary.  For example, only testimonial evidence "demonstrate[es] that the advertisements caused consumers to associate the [mark] with [the] [p]laintiff."  *See Rockland Exposition, Inc.*, 894 F. Supp. 2d at 319; *see also Easy Spirit, LLC*, 2021 WL 247922, at *5–6.  But "[a]ny weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment."  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  So while its testimonial nature diminishes the import, it nonetheless is evidence in support.

Defendant contends that Plaintiff cannot distinguish expenditures tracing solely to the specific "Floor Decor" mark at issue and other, similar marks it promoted, *e.g.*, "Floor Decor & Design."  Def. Opp. at 13; *see, e.g.*, *Grout Shield Distrib., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) ("[I]t is also apparent that . . . plaintiff has used a number of different marks in commerce to sell its products.  It is unclear whether plaintiff's advertising expenditures were made solely to promote the Grout Shield mark.").  But Plaintiff's interrogatory responses averred, "Prior to 2014, all advertisements exclusively contained the brand name 'Floor Decor' without the '& Design.'"  Pl. Answers to 2d Interrog.  As noted above, Plaintiff's mark had to have obtained secondary meaning by 2015, meaning that forty years' worth of advertising expenditures squarely pertained to the mark at issue.

The "advertising expenditures" factor weighs in favor of secondary meaning, though, as with the length and exclusivity factor, the inquiry is not airtight.

### 3.    Consumer Studies

"[C]onsumer surveys are the most persuasive evidence of secondary meaning," *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 638–39, but Plaintiff produces none, *see* Pl. Mem. at 12–13. Certain courts have found the failure to "muster survey evidence" to be "quite significant" when the plaintiff has adequate financial means to do so. *E.g.*, *Chum Ltd. v. Lisowski*, 198 F. Supp. 2d 530, 534–35 (S.D.N.Y. 2002) (citing *Info. Clearing House, Inc. v. Find Mag.*, 492 F. Supp. 147, 160 (S.D.N.Y. 1980)). Defendant proffers a survey performed by Dr. David Neal, who determined "Plaintiff's claimed 'Floor Decor' mark has, at most, achieved secondary meaning among a mere 2.5% of the relevant consuming public." Am. & Suppl. Expert Report of David Neal Ph.D. ¶¶ 2.6.6, 5.3 (capitalization omitted) [DE 41].

Plaintiff suggests the survey is of "suspect" value but concedes its argument goes to the "weight of the evidence." Pl. Opp. at 6–9. The argument is therefore inappropriate to consider on summary judgment. *See Rule*, 85 F.3d at 1011. The Court is not convinced any purported deficiencies with Dr. Neal's survey render the survey unfairly prejudicial and thus inadmissible under Federal Rule of Evidence 403. *See, e.g.*, *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (affirming a district court's exclusion of a survey evidence that "was little more than a memory test, testing the ability of the participants to remember the names of the shoes they had just been shown"). By way of example: the survey sample population including "people who buy [Plaintiff's] products" and excluding homeowners does not necessarily suggest Dr. Neal failed to consider "a representative sample" consumer

population.  Pl. Opp. at 6–9; *see Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 350 (S.D.N.Y. 1998) ("While this Court is well aware that the results from secondary meaning surveys are open to criticisms from party opponents . . . , such studies are helpful tools in assessing secondary meaning.").

The "consumer studies" factor weighs against secondary meaning because Plaintiff has not submitted any opposing study that supports its case.

### 4.    Sales Success

"The sales success of a product 'may be indicative of whether or not a substantial portion of the purchasing public associates the [mark] with the source of the goods.'" *Tri-Star Pictures*, 14 F. Supp. 2d at 351 (quoting *Ergotron, Inc. v. Hergo Ergonomic Support Sys., Inc.*, 1996 WL 143903, at *8 (S.D.N.Y. Mar. 29, 1996)).  In a similar manner to the growth in advertising expenditures, Plaintiff's sales grew over time.  In 1975, revenues exceeded $500,000; the mid-1990s saw revenues reach their zenith at approximately $3,800,000; and in 2018, revenues amounted to roughly $2,500,000.  Pl. 56.1 ¶¶ 11, 37, 60 (citing Decl. of Robert Smith ¶¶ 8, 13, 24 [DE 46]).

Defendant repeats the caveat raised as to the advertising figures: the evidence is testimonial, not documentary, and actual sales records only go back to 2011.  *See* Def. Opp. at 12–13; Tr. of Dep. of Glenn Altarac, Ex. 2 [DE 133-2] to Henn Decl. ("Q. How far back do your sales records, actual documents go? A. Till 2011.").  Defendant is correct to note that the absence of documentary evidence may be problematic. *BigStar Ent., Inc.*, 105 F. Supp. 2d at 203 ("[T]here is no documentary support in the record regarding plaintiff's market share, sales volume or the number of visitors to

its website . . . , all important considerations in relation to sales success."). Further, and unlike that for its advertising budget, Plaintiff' interrogatory answers provide no year-over-year revenue breakdown. *See* Pl. Answers to 2d Interrog.

Based upon the testimonial evidence found in Robert Smith's Declaration, the "sales success" factor is either neutral or, at best, weak support in favor of secondary meaning. *See Rule*, 85 F.3d at 1011.

### 5.    Unsolicited Media Coverage

Precedent holds "*extensive*, unsolicited media coverage of a product is a strong indication that a mark has obtained secondary meaning." *Tri-Star Pictures*, 14 F. Supp. 2d at 350 (emphasis added); *see also Harlequin Enters. Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir. 1981) ("The fact that the enthusiasm and loyalty of Harlequin's readers have been the subject of *extensive*, unsolicited media coverage further supports the district court's finding of secondary meaning." (emphasis added)); *Scarves by Vera*, 544 F.2d at 1174 (noting "the *many* newspaper articles which plaintiff introduced" (emphasis added)). The only media coverage identified dates to one event in 1984, when the Mayor of Rockville Centre gave Plaintiff an award for "most improved building" at its new location's grand opening. Pl. 56.1 ¶ 30. This one occurrence falls short of the mark.

The *Tri-Star Pictures* decision provides a helpful contrast. The mark at-issue there, the 1956 film "Bridge on the River Kwai," obtained secondary meaning, in part because its "unsolicited media coverage" included "a variety of awards, including seven Academy Awards" as well as "hundreds of [newspaper and magazine] articles[]

published within the last few years," *i.e.*, circa 1998. 14 F. Supp. 2d at 350–51 (decided July 13, 1998).  Here, Plaintiff's award—"most improved building"—is unrelated to its mark and spawned comparatively modest coverage, only in 1984 and limited to local newspapers.  *E.g.*, *Jewish Sephardic Yellow Pages*, 478 F. Supp. 2d at 374 (finding that a single article did not support finding secondary meaning); *Ergotron, Inc.*, 1996 WL 143903, at *8.

The "unsolicited media coverage" factor, being *de minimis*, weighs against secondary meaning.

*       *       *

Based upon the evidence, there are genuine issues of material fact as to whether Plaintiff's mark obtained a secondary meaning by 2015.  A rational trier of fact could rely on the consumer study's conclusions and the absence of unsolicited media coverage to find in Defendant's favor on this issue.  *See Matsushita Elec. Indus.*, 475 U.S. at 587.  Therefore, granting summary judgment to Plaintiff is not appropriate.  *E.g.*, *New Colt Holding Corp. v. RJG Holdings of Fla., Inc.*, 312 F. Supp. 2d 195, 208 (D. Conn. Mar. 29, 2004) ("[B]ecause there are factual disputes with respect to some of the factors discussed, and a finding of secondary meaning can only be made by a careful consideration of all six factors, with no single factor being determinative, the question cannot be decided as a matter of law, but is properly to be decided by a jury.").

## II.   New York General Business Law § 349

New York General Business Law § 349 protects against "[d]eceptive acts or practices in the conduct of any business" in New York.  N.Y. Gen. Bus. L. § 349.

Plaintiff's prima facie case requires it to show: (1) Defendant directed its acts at consumers, *i.e.*, the acts were "consumer-oriented"; (2) Defendant's acts were misleading in a material way; and (3) Plaintiff was injured as a result. *Saggio v. Select Portfolio Servicing, Inc.*, 2015 WL 6760132, at *11–12 (E.D.N.Y. Nov. 5, 2015) (citing *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009)). "It is clear that 'the gravamen of the complaint must be consumer injury or harm to the public interest.'" *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (citing *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988)). Defendant cross-moves for summary judgment on this claim.

Plaintiff argues that the "'harm to the public' is premised on the underpinnings of the relief [Plaintiff] seeks: disgorgement of profits in the interests of deterrence." Pl. Opp. at 11–12. The Court is not persuaded. Plaintiff has cited no case law holding a party has standing to pursue a New York General Business Law § 349 claim simply by virtue of the relief it prays for. Disgorgement's "secondary effect of deterring public fraud," moreover, is insufficient because "a plaintiff must prove 'actual' injury to recover under [Section 349], though not necessarily pecuniary harm." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 612 (N.Y. 2000); *see Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 415–16 (S.D.N.Y. 2004) (analyzing *Small v. Lorillard Tobacco Co., Inc.*, 94 N.Y.2d 43, 720 N.E.892 (N.Y. 1999) (Wesley, J.)). Plaintiff implicitly concedes its case does not involve evidence of actual injury: "Second Circuit law is well-settled that disgorgement is an available remedy regardless of whether a plaintiff can prove actual damages or injury." Pl. Opp. at 7

(citing *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72 (2d Cir. 1998)); *see also id.* ("[Plaintiff] has consistently taken the position that a calculation of damages is not relevant as to whether Floor Decor is entitled to an injunction and equitable relief."); *see generally infra* Discussion Section V.  Without actual injury, Plaintiff has no standing to assert its New York General Business Law § 349 claim and the claim is thus dismissed.

## III.   New York Common Law Unfair Competition

Both Plaintiff and Defendant move for summary judgment on the New York common law unfair competition claim.  "The elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims,"[1] *Info. Superhighway, Inc. v. Talk America, Inc.*, 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005), except that proving secondary meaning is unnecessary, *Fraga v. Smithaven MRI*, 866 F. Supp. 107, 112 (E.D.N.Y. 1994) (citing *Coach Leatherware Co. v. Ann Taylor, Inc.*, 933 F.2d 162, 169 (2d Cir. 1991)).  New York common law requires plaintiff to show "(1) actual confusion or a likelihood of confusion; and (2) the defendant's bad faith."  *LVL XIII Brands*, 209 F. Supp. 3d at 678.  "Under New York law, the gravamen of an unfair competition claim is the bad faith misappropriation of a competitor's commercial advantage."  *MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013) (Sullivan, J.) (citing *Major League Baseball Prop., Inc. v. Opening Day Prod., Inc.,* 385 F. Supp. 2d 256, 268 (S.D.N.Y. 2005) and *Eagle Comtronics, Inc. v. Pico Prods., Inc.,* 256 A.D.2d 1202,

---

[1]     The parties cite exclusively to federal cases analyzing New York State unfair competition claims simultaneously with federal Lanham Act claims.

682 N.Y.S.2d 505, 506–07 (N.Y. App. Div., 4th Dep't 1998)), *aff'd*, 551 Fed. App'x 1 (2d Cir. 2013).  "Central to this notion is some element of bad faith."  *Saratoga Vichy Spring*, 625 F.2d at 1044.

"New York courts have noted the 'incalculable variety' of illegal practices falling within the unfair competition rubric, calling it a 'broad and flexible doctrine.'" *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting Sys.* ("*Roy Export*"), 672 F.2d 1095, 1105 (2d Cir. 1982) (quoting *Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co.*, 3 A.D.2d 227, 230–31, 159 N.Y.S.2d 606, 609 (N.Y. App. Div., 1st Dep't 1957) and *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 792, 101 N.Y.S.2d 483, 488–89 (N.Y. Sup. Ct., N.Y. Cnty. 1950)).

## A.    Likelihood of Confusion

To assess the likelihood of confusion, the same factors relevant to a federal Lanham Act claim "may be used . . . for the purposes of a New York unfair competition claim."  *Computer Assocs. Int'l, Inc. v. AJV Computerized Data Mgmt., Inc.*, 889 F. Supp. 630, 638 (E.D.N.Y. 1995) (citing *Bristol-Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1048 (2d Cir. 1992)); *George V Restauration S.A. v. Little Rest Twelve, Inc.*, 58 A.D.3d 428, 429, 871 N.Y.S.2d 65, 67 (N.Y. App. Div., 1st Dep't 2009) ("[T]he [New York State Supreme Court, New York County] should have applied the *Polaroid* test.").  In the seminal case, *Polaroid Corp. v. Polarad Elecs. Corp.*, Judge Friendly outlined eight considerations: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the

gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.  287 F.2d 492, 496 (2d Cir. 1961).  The "analysis is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Star Indus., Inc.*, 412 F.3d at 384.

### 1.    Strength of the Mark

The strength of a mark refers to (i) its inherent distinctiveness and (ii) its distinctiveness in the marketplace. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743–44 (2d Cir. 1998).  As noted, Plaintiff's mark is concededly not inherently distinctive.  Pl. Mem. at 7.  Distinctiveness in the marketplace turns on, *inter alia*, "third-party use of similar marks, duration of use, and sales volume." *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 583 (S.D.N.Y. 2018) (internal quotations omitted) (quoting *Nature's Best, Inc. v. Ultimate Nutrition, Inc.*, 323 F. Supp. 2d 429, 432 (E.D.N.Y. 2004)).  The parties' arguments on this factor incorporate arguments raised as to secondary meaning.  Plaintiff cites the extended forty-year use and "sales volume" of its mark. *See supra* Discussion Sections I.B.1 & 4; *see also* Pl. Mem. at 15.  Defendant contests the mark's strength with reference to Dr. Neal's survey as well as third-party use. *See supra* Discussion Section I.B.1 & 3; *see also* Def. Opp. at 15–16.

The evidence here is neutral, as a rational trier to fact could weigh it in either party's favor.

## 2. Similarity of the Marks

To assess the similarity of a mark, two questions are asked: (1) is the similarity between the two marks likely to cause confusion?, and (2) what effect does the similarity have upon prospective purchasers? *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 962 (2d Cir. 1996). The inquiry is not limited to "the typewritten and aural similarly of the marks, but how they are presented in the marketplace." *Id.* The marks here are patently similar and raise a strong likelihood of confusion.

The marks at issue—"Floor Decor" and "Floor & Decor"—are "strikingly similar, possessing a strong visual and phonetic resemblance and . . . are almost identically named." *See Syntex Labs., Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971) (internal quotation marks omitted). Both are colored red. Pl. 56.1 ¶¶ 71–72; Def. Resp. 56.1 ¶¶ 71–72. The Second Circuit has "observed that using two identical words in sequence to form a mark is 'extremely unusual' and therefore weighs in favor of finding confusing similarity." *Reply All Corp. v. Gimlet Media, LLC*, -- Fed. App'x --, 2021 WL 650488, at *2 (2d. Cir. Feb. 19, 2021) (citing *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 326 (2d Cir. 2020)).

It is true that the marks use different typefaces and have an adjacent symbol: Plaintiff draws its mark in lowercase "Bauhaus 93" font with an "fd" symbol to the left, while Defendant does so in uppercase "Frutiger" font with an "&" symbol to the right. Def. Opp. at 17–18. But courts assessing this factor must look "beyond the

logo to the [mark's] words," here "Floor Decor". *See Sports Auth., Inc.*, 89 F.3d at 962 (holding "The Sports Authority" and "sports authority" similar).   A court must consider the "overall impression" on a consumer, especially "the context in which the marks are displayed."  *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 528 (S.D.N.Y. 2011), *aff'd*, 511 Fed. App'x 81 (2d Cir. 2013).  Each is unmistakable across the façade of its building and is surrounded by similar, if not the same, descriptive words – like "tile":

 

 

When viewed as they appear in the marketplace, their general impressions are undeniably similar.  Even on the Internet, their similarity is evident:  the Google search algorithm does not account for the term "and" or the ampersand symbol "&," such that searches for "Floor Decor," "Floor & Decor," and "Floor and Decor" yield the same results.  Pl. 56.1 ¶ 133 (citing Tr. of Dep. of Martin Marion at 99:14–22 ("M. Marion Dep."), Ex. 8 [DE 129-1] to Barshay Decl.)

As such, this similarity factor favors a likelihood of confusion.

### 3. Competitive Proximity

The competitive proximity factor examines "market proximity" and "geographic proximity." *See Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 39–40 (2d Cir. 2016). Market proximity looks at "whether and to what extent the two products compete with each other," considering "the nature of the products themselves and the structure of the relevant market." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996) (internal quotation marks omitted) (citing *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 582 (2d Cir. 1991) and *Vitarroz v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981)). Geographic proximity, as the name implies, examines the "geographic separation of the products." *Brennan's Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004). The parties' geographic proximity is undisputed; the parties occupy the same geographic market. Pl. Mem. at 17 & n.4; *see* Def. Opp. at 18–19.

The parties dispute market proximity. Plaintiff asserts that it sells "carpet, vinyl and hard surface flooring for purchase and installation at customers' homes and/or businesses," Pl. 56.1 ¶¶ 23, 111, 118, a list which Defendant labels incomplete and adds "in-house fabrication, bedding, furniture, fabrics, barware, vases, mirrors, wall art, window treatments, and in-home full design services," *e.g.*, Def. Resp. ¶ 23. Defendant asserts that it "does not offer installation services, nor does it sell carpet, bedding, furniture, fabrics, barware, vases, mirrors, wall art, or window treatments." *Id.* ¶ 166. The parties agree that Plaintiff "is not a warehouse-style operation," unlike

Defendant, which is "a warehouse-style store" with "Lowes, Home Depot, and Menards" as competitors. *Id.* ¶¶ 116, 120.

Because these products "serve the same purpose [and] fall within the same general class," they have market proximity and thus are "likely to cause confusion." *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993) (internal quotations omitted) (quoting *Lang*, 949 F.2d at 582), *abrogated on other grounds by Deere & Co. v. MTD Prods., Inc.*, 41 F.2d 39 (2d Cir. 1994). Although their product catalogs are not coextensive and their operations vary in size, both are retail stores offering flooring, tile, and the like. *See Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 2015 WL 4033019, at *8 (S.D.N.Y. June 29, 2015) ("Although the [defendant] and [plaintiff] perform different functions and focus on different areas of advocacy—[plaintiff] focuses on aid to caregivers while [defendant] focuses on research as well as direct services—both organizations are charities serving a donor community with an interest in Alzheimer's disease." (citation omitted)).

Therefore, the competitive proximity factor supports a likelihood of confusion.

### 4. Bridge the Gap

"This factor inquires whether a plaintiff is likely to enter defendant's market, or 'bridge the gap.'" *Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C.*, 182 F.3d 133, 141 (2d Cir. 1999). Though the parties claim to agree on this issue, they in truth take opposing views. Plaintiff states that the parties occupy the same market, implying that Plaintiff has already entered Defendant's market. Pl. Mem. 18.

Defendant responds that neither party plans to "bridge the gap," implying that Plaintiff has not yet entered Defendant's market.  Def. Opp. at 19 (labeling it a "wide gap" and citing Def. Resp. 56.1 ¶ 198).   On reply, Plaintiff argues Defendant's assertion supports a likelihood of confusion.  Pl. Reply at 12.

If the parties have already "bridge[d] the gap" and occupy the same market, this factor favors Plaintiff.  *E.g.*, *Edible Arrangements, LLC v. Provide Com., Inc.*, 2016 WL 4074121, at *9 (D. Conn. July 29, 2016).  If the parties have no intention to "bridge the gap" and do not occupy the same market, this factor favors Defendant. *E.g.*, *Sports Auth.*, 89 F.3d at 963 ("[W]e agree with the district court that this factor weighs against [plaintiff].  [Plaintiff] admits that it presently has no plans to enter [defendant's market.]").  For the same reasons explained the "competitive proximity" analysis, the parties serve the same market and any gap has already been bridged.

This factor supports a likelihood confusion.

### 5.    Actual Customer Confusion

Confusion that has actually occurred "is of course convincing evidence that confusion is likely to occur."  *Morningside Grp.*, 182 F.3d at 141.  Such evidence can be anecdotal or survey-based.  *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000).  At bottom, the inquiry concerns whether "there was confusion that could lead to 'a diversion of sales, damage to goodwill, or loss of control over reputation."  *Reply All Corp.*, 2021 WL 650488, at *3 (quoting *Lang*, 949 F.2d at 583).  For that reason, courts in the Second Circuit look for actual confusion among "prospective purchasers of [plaintiff's] products."  *Lang*, 949 F.2d at 583; *SLY Mag.*,

*LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 441 (S.D.N.Y. 2007) ("Those consumers whose emails plaintiff received by mistake were not purchasers or prospective purchasers of plaintiff's magazine.  There is no reason to believe that the confusion represented by the emails could inflict commercial injury in the form of either diversion of sales, damage to goodwill, or loss of control over reputation."); *see also W.W.W. Pharm. Co., Inc*, 984 F.2d at 574 (quoting *Freedom Sav. & Loan Assoc. v. Way*, 757 F.2d 1176, 1185 (11th Cir. 1985)).

The bulk of Plaintiff's evidence concerns prospective purchasers of *Defendant's* products, not *Plaintiff's* products.  *E.g.*, Pl. 56.1 ¶¶ 76–79, 87–93, 95 (calls or in-person inquiries to Plaintiff about items on Defendant's website); *id.* ¶¶ 80–82, 86, 98–99, 103 (walk-in customers believing they were visiting Defendant's store).  Other evidence concerns individuals who were not prospective customers at all.  *Id.* ¶ 84 (job applicants), ¶ 92 (friends), ¶ 94 (landlord), ¶ 95 (friends and family).  As the Second Circuit has explained, "such inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion."  *Reply All Corp.*, 2021 WL 650488, at *4 (internal quotation marks and alteration omitted) (quoting *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001)).

Plaintiff cites testimony from one customer, its owner and its employee to argue that "[c]ustomers mistakenly visited Defendant's store when intending to visit [Plaintiff's] store."  Pl. 56.1 ¶¶ 83, 105.  Their anecdotes of actual confusion, however,

are few and constitute "*de minimis* evidence insufficient to raise triable issues." *Nora Beverages*, 269 F.3d at 124.

"[T]he absence of surveys is evidence that actual confusion cannot be shown." *Reply All Corp.*, 2021 WL 650488, at *4 (internal quotation marks omitted) (quoting *Sports Auth.*, 89 F.3d at 964); *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 374 (S.D.N.Y. 2003) ("[T]he absence of actual confusion evidence, or of survey evidence showing a likelihood of confusion, dictates that this factor be resolved in defendants' favor."). As noted, Plaintiff presents no survey evidence. *See supra* Discussion Section I.B.3.

This factor suggests there was no likelihood of confusion and thus favors Defendant, or "is at best neutral." *Reply All Corp.*, 2021 WL 650488, at *4 & n.3.

### 6. Bad Faith

Unfair competition under New York common law requires "bad faith or intent to deceive." *See Genesee Brewing Co.*, 124 F.3d at 149 (citing *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980) ("[The Lanham Act] differs from the common law action for trade disparagement in two important respects . . . it does not require proof of intent to deceive . . . .")); *e.g.*, *Ivy League School, Inc. v. Danick Indus., Inc.*, 44 Misc.3d 1223(A), at *11, 999 N.Y.S.2d 797 (N.Y. Sup. Ct., Suffolk Cnty. Aug. 20, 2014) (citing cases). "Intent to deceive may be inferred by the absence of justification." *Ivy League School*, 44 Misc.3d 1223(A), at *11 (citing *Tiffany & Co. v. Tiffany Prods., Inc.,* 147 Misc. 679, 264 N.Y.S. 459 (N.Y. Sup. Ct., N.Y. Cnty. 1932), *aff'd,* 237 A.D. 801, 260 N.Y.S. 821 (N.Y. App. Div., 1st Dep't 1932), *aff'd,* 262 N.Y.

482, 188 N.E. 30 (N.Y. 1933)).   For example, "where the infringing marks are identical, defendant has the burden of persuading the court that there is a credible innocent explanation.  Failure by [d]efendants to do so further supports the inference of bad faith." *Tri-Star Pictures*, 14 F. Supp. 2d at 357 (citations omitted) (citing *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1101 (2d Cir. 1969), and *Int'l Star Class Yacht Racing Ass'n,* 80 F.3d at 753, and *Centaur Commc'ns,* 830 F.2d at 1228)).

Issues of bad or good faith "are generally ill-suited for disposition on summary judgment." *Lang*, 949 F.2d at 583–84 (internal quotation marks omitted); *Capitaland Heating & Cooling, Inc. v. Capitol Refrigeration Co., Inc.*, 134 A.D.2d 721, 722, 521 N.Y.S.2d 202, 203 (N.Y. App. Div., 3d Dep't 1987) (holding "[r]esolution of [an unfair competition claim] requires a complex factual analysis of a variety of factors including . . . the nature of the alleged unfair practices" and denying summary judgment because "[d]efendant's bad faith [was] not made out by th[e] record"); *see also EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 67–68 (2d Cir. 2000) ("Because the issue goes to defendants' intent, it 'is best left in the hands of the trier of fact.'" (quoting *Sports Auth.*, 89 F.3d at 964)).

Plaintiff premises its bad faith argument on (i) Defendant's discovery of Plaintiff's mark in 2012; (ii) its Google AdWords[2] purchase of the "floor decor" term

---

[2]    The Second Circuit has described Google AdWords as:

Google's program through which advertisers purchase terms (or keywords). When entered as a search term, the keyword triggers the appearance of the advertiser's ad and link.  An advertiser's purchase of a particular term causes the advertiser's ad and link to be displayed on

(among others) six years later, *i.e.*, in 2018; (iii) the "failure to use 'negative keywording'" in those AdWords; (iv) the decision to open a "Floor & Decor" store on Long Island in 2018; and (v) the failure to advertise this location until ten days before its opening.[3]  Pl. Mem. at 19–22; Pl. Reply at 13–14; Pl. Opp. at 10, 15–16.

Defendant asserts (i) it adopted the "Floor & Decor" mark in 2003, without knowledge of Plaintiff's mark; (ii) its "Floor & Decor" mark obtained federal trademark registration in 2006; (iii) Plaintiff never objected to Defendant's "highly-public activities" (*e.g.*, advertising) in the New York City area nor to the two New Jersey stores Defendant opened in 2016 and 2017; (iv) it "specifically advertised" Defendant's Long Island store "over a year-and-a-half before the opening"; (v) the Google AdWords purchase comprised of terms in Defendant's name.  Def. Opp. at 21–22; Def.'s Mem. of Law in Support at 19–22 ("Def. Mem.") [DE 132]; Def. Reply at 4–6.

In isolation, each act may not reflect bad faith.  For example, the Court agrees that Defendant's decision to embrace the "Floor & Decor" name likely was not made

---

the user's screen whenever a searcher launches a Google search based on the purchased search term.  Advertisers pay Google based on the number of times Internet users "click" on the advertisement, so as to link to the advertiser's website.

*Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 125 (2d Cir.2009) (internal footnote omitted).

[3]      Plaintiff alleges that Defendant "had previously been sued by, and settled with, another 'Floor Decor' in Texas."  Pl. Opp. at 10.  This assertion is entirely without citation and, to the best of the Court's ability to sift through, is not in the lengthy record.  The Court therefore has no way to verify its accuracy and does not consider it on either party's motion.

in bad faith.   The parties agree that Defendant "first learned" of Plaintiff and Plaintiff's Rockville Centre store in November 2012, Pl. Resp. 56.1 ¶ 15; Def. Resp. 56.1 ¶ 122, and that Defendant first sought to register the mark "Floor & Decor" nine years earlier, in 2003, Pl. Resp. 56.1 ¶ 5; Def. Resp. 56.1 ¶ 64.  "Th[e Second Circuit] has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search . . . ." *Star Indus.*, 412 F.3d at 388.

The Google AdWords purchase too may not alone evidence bad faith. Defendant's acquisition of the "Floor Decor" search term could simply reflect savvy business sense in the Information Age: it is self-explanatory why Defendant Floor & Decor purchased search terms for a permutation of its own tradename.  *Cf. Big Star Enter.*, 105 F. Supp. 2d at 193 ("[T]he basic ends trademark law . . . recognize and reward commercial creativity, investment, diligence, [and] initiative . . . ."). And the Defendant's failure to "negative keyword," *i.e.*, deactivate, the term "Floor Decor" from its AdWords could be viewed as a failure to self-flagellate – which does not entail bad faith.  *See* Pl. 56.1 ¶¶ 143–44; *cf. Nassau Diagnostic Imaging & Radiation Oncology Assocs., P.C. v. Winthrop-Univ. Hosp.*, 197 A.D.2d 563, 564, 602 N.Y.S.2d 650, 650 (N.Y. App. Div., 2d Dep't 1993) ("The defendants' actions were motivated by, *inter alia,* an economic self interest.  As such, the actions of which the plaintiff complains cannot be characterized as malicious.").

But New York's common law unfair competition cause of action is "adaptable and capricious."  *Roy Export*, 672 F.2d at 1105.  "It has been broadly been described

as encompassing 'any form of commercial immorality,' or simply as 'endeavoring to reap where (one) has not sown,'; it is 'taking the skill, expenditures and labors of a competitor,' and 'misappropriati(ng) for the commercial advantage of one person . . . a benefit or "property" right belonging to another.'" *Id.* (citations to New York state case law omitted). It is not confined to Defendant's decision to adopt its mark. *Id.*; *but see* Def. Mem. at 21 ("[Plaintiff] offers no evidence whatsoever that [Defendant] adopted its [Floor & Decor] mark for such a [bad faith] purpose."); Def. Opp. at 21–22. And it is assessed not by viewing acts in isolation but upon the totality of the evidence, including their timing. *See Tecnimed SRL v. Kidz-Med, Inc.*, 462 Fed. App'x 31, 34 (2d Cir. 2012) (finding "no clear error in the overall finding of bad faith" based upon the "totality of the evidence"); *cf. Sage Realty Corp. v. Proskauer Rose LLP*, 275 A.D.2d 11, 17, 713 N.Y.S.2d 155, 160 (N.Y. App. Div., 1st Dep't 2000) (inferring "bad faith" from facts "circumstantially supported by the nature of [defendants' client's] conduct and the timing").

Viewing the totality of the evidence in its most Plaintiff-friendly light, as the Court must do on Defendant's cross-motion, suggests that the manner in which Defendant opened its Long Island store reflects a strategy to confuse consumers. In a few short weeks, Defendant blitzed the Long Island market with Long Island-specific advertising, sudden Internet ubiquity, and a new Long Island store – all to Plaintiff's detriment. *See, e.g.*, M. Marion Dep. at 132:8–133:10. Even Defendant's expert described Defendant's "marketing campaign in the Long Island region" as "increas[ing] significantly beginning in October of 2018," separate and apart from its

already-existing New York metropolitan area advertising.  Expert Report of Jonathan E. Hochman ¶ 9 & n.1, Ex. 36 [DE133-36] to Henn Decl.  Defendant's Senior Vice President of Marketing (also self-described as the Chief Marketing Officer) testified that Defendant started advertising "[f]or Farmingdale specifically, about 10 days before the G.O., grand opening, which would have been November of 2018."  W. Martin Dep. at 24:18–25:11.

Defendant may have the better of the argument here, but this issue is best left for the jury.  When viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could weigh this factor in favor of Plaintiff and attribute bad faith to Defendant's conduct.  As a factor in the likelihood of confusion analysis, the evidence of bad faith favors Defendant's position; but as a matter of law, the presence of genuine issues of material fact counsel against a grant of summary judgment in either party's favor.

### 7.   Quality of the Products

The quality of a junior user's product can: (1) if of inferior quality, hurt the senior user "because people may think that the senior and junior products came from the same source," or (2) if of equal quality, "create confusion as to source because of this very similarity."  *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 505 (2d Cir. 1996).  This factor is not highly relevant and "goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion."  *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 152 (2d Cir. 2003).

The parties dispute whether Defendant's products are of low quality, and the evidence on this issue is conflicting. Testimony favorable to Plaintiff supports the view that Defendant provides "lower level quality product," Pl. 56.1 ¶¶ 113, 115; evidence favorable to Defendant demonstrates high customer satisfaction and economic success, Def. 56.1 ¶¶ 154, 199, 200. As such, this factor is neutral.

### 8. Sophistication of Consumers

This factor "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Sports Auth.*, 89 F.3d at 965 (internal quotation marks and alteration omitted) (quoting *W.W.W. Pharm.*, 89 F.2d at 965). "Generally speaking, greater sophistication of consumers reduces the likelihood of confusion." *Easy Spirit, LLC*, 2021 WL 247922, at *17 (internal quotations omitted) (quoting *SLY Mag., LLC*, 529 F. Supp. 2d at 442). Yet the Second Circuit has observed an exception: "where the parties' marks are identical and their goods are in very close competitive proximity, a highly sophisticated consumer may be the most vulnerable to confusion." *Kohler Co. v. Bold Int'l FZCO*, 422 F. Supp. 3d 681, 730 n.20 (E.D.N.Y. 2018) (citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)).

The marks here are identical or at least similar enough to trigger the exception. *See supra* Discussion Section III.A.2. And, as noted, the parties are in close proximity, geographically and market-wise. *See supra* Discussion Section III.A.3. Defendant's position accepts and emphasizes that Plaintiff's "*entire* business model

is premised on sophistication and careful purchasing decisions." Def. Opp. at 23 (emphasis in original).

As framed by the parties, this factor favors a likelihood of confusion.

\*       \*       \*

The likelihood of confusion presents far too many genuine questions of material fact to justify summary judgment in either party's favor. Two crucial considerations—the strength of Plaintiff's mark and Defendant's bad faith—have strong evidence in each party's favor and are best left for a jury to weigh.

## B.     Bad Faith

"Bad faith" is the second element of a New York unfair competition claim, despite also being a "likelihood of confusion" factor. *See LVL XIII Brands*, 209 F. Supp. 3d at 678, 680. The presence of genuine issues of material fact as to bad faith suffices as a basis to deny Plaintiff summary judgment on its unfair competition claim. Defendant moves for summary judgment in its favor too, and Defendant would warrant it if Plaintiff cannot show bad faith, regardless of the likelihood of confusion. As explained above, however, a reasonable juror viewing the evidence in a Plaintiff-friendly light could find bad faith. *See supra* Discussion Section III.A.6.

## IV.   New York General Business Law § 360-*l*

A New York General Business Law § 360-*l* requires plaintiff to prove "(1) that it possess[es] a strong mark—one which has a distinctive quality or has acquired a secondary meaning . . . and (2) a likelihood of dilution by either blurring or tarnishment." *Fireman's Ass'n of State of New York v. French American School of*

*New York*, 41 A.D.3d 925, 928, 839 N.Y.S.2d 238, 241–42 (N.Y. App. Div., 3d Dep't 2007) (internal quotation marks and citations omitted). The same factors relevant to secondary meaning under the Lanham Act are relevant to secondary meaning under New York General Business Law § 360-*l*. *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 280 (S.D.N.Y. 2006); *JJFM Corp. v. Mannino's Bagel Bakery*, 70 Misc. 3d 171, 176–77, 132 N.Y.S.3d 582, 590 (N.Y. Sup. Ct., Suffolk Cnty. 2020); *see also P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F. Supp. 662, 671–73 (S.D.N.Y. 1985).

For the reasons expressed above, whether Plaintiff's mark obtained a secondary meaning on this record cannot be decided on summary judgment. *See supra* Discussion Section I.

Defendant cross-moves for summary judgment on this claim, relying primarily on its survey evidence and the evidence as to third party use of similar marks. Def. Mem. at 23–24. Defendant's survey evidence is unrebutted, and though it may be "the most persuasive evidence," it is not "determinative" of secondary meaning. *Thompson Med. Co.*, 753 F.2d at 217; *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 638–39. Defendant's website printouts reflecting third party use of similar marks remain far from dispositive. *See supra* Discussion Section I.B.1 (quoting *Scarves by Vera, Inc.*, 544 F.2d at 1173–74). For the reasons discussed, a rational juror can find that Plaintiff's mark obtained secondary meaning through its forty-year history of use, sales success, and related advertising expenditures, despite the survey evidence to

the contrary.  *See supra* Discussion Section I.B.  The Court therefore will not grant Defendant summary judgment on this claim.

## V.   Damages

Under the Lanham Act, successful plaintiffs are entitled "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  Defendant cross-moves, in part, to preclude any award consisting of damages sustained by Plaintiff, *i.e.*, compensatory damages.  *See, e.g.*, Def. Mem. at 1–2.  Plaintiff's brief makes clear, however, that it seeks "a permanent injunction, all profits wrongfully derived by Defendant, a treble award as to such profits . . . , punitive damages, and interest, costs and attorneys' fees."  Pl. Opp. at 7.  Plaintiff is not seeking compensatory damages and disclaims as much.  *See* Pl. Opp. at 6, 9, 11 (arguing that the Lanham Act does not require Plaintiff to "prove any actual and compensable injury to be entitled to disgorgement of Defendant's profits" and that "disgorgement of profits is not compensatory in nature").  That is, the parties tacitly agree that Plaintiff is not seeking compensation for its sustained damages, so Defendant's cross-motion to preclude Plaintiff from obtaining such relief is unopposed.  Defendant is entitled to summary judgment on this issue.

The Lanham Act permits a plaintiff to recover, under certain conditions, disgorgement of profits and treble damages.  *Id.* § 1117(b); *e.g.*, *Rolls-Royce PLC v. Rolls-Royce USA, Inc.*, 688 F. Supp. 2d 150, 155–56 (E.D.N.Y. 2010).  Plaintiff must show Defendant's willful infringement to win treble damages, but it need not do so to win an award of Defendant's profits.  *Compare Romag Fasteners, Inc. v. Fossil, Inc.*,

140 S.Ct. 1492, 1497, 206 L.E.2d 672 (2020) (holding willfulness not an "inflexible precondition to" a profits award), *with* 15 U.S.C. § 1117; *Getty Petrol. Corp. v. Bartco Petrol. Corp.*, 858 F.3d 103, 114 (2d Cir. 1988) ("To the extent that deterrence of willful infringement is needed, the statutorily provided remedies . . . are sufficient: a district court is empowered to enhance a monetary recovery of damages.").

The Supreme Court recently decided in *Romag Fasteners* that disgorgement of profits is available under the Lanham Act regardless of willfulness.  140 S.Ct. 1492, 206 L.E.2d 672 (2020).  Defendant insists, nonetheless, that *Romag Fasteners* does not apply where disgorgement is sought only for deterrence, and, by seeking disgorgement solely for deterrence, Plaintiff still must show willfulness.  Def. Reply at 6–7.  The argument is unavailing.  The Supreme Court explicitly grounded its holding in the Lanham Act's "language, structure and history" and not "policy." *Romag Fasteners*, 140 S.Ct. at 1497.

Defendant's argument that the Lanham Act does not authorize trebling disgorged profits is also unconvincing.  Defendant cites only an unpublished Federal Circuit opinion from 2003.  Def. Reply at 3 (citing *Nutting v. RAM Southwest, Inc.*, 69 Fed. App'x 454, 458 (Fed. Cir. 2003)).  Yet the Second Circuit had previously held that the Lanham Act permits "[u]nlimited enhancement . . . of an award based on defendant's profits."  *Getty Petrol.*, 858 F.2d at 109.  And since 2003, the Second Circuit has approved a trebled disgorged profits award in *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262–63 (2d Cir. 2014).  In 2019, the Second Circuit likewise affirmed a district court's

> conclu[sion] that trebling the award of profits is not justified.  This is not because of defendants' contention that . . . the Lanham Act permits only the trebling of damages, not profits. . . .  The question is not whether a court can award an amount equal to three times a defendant's profits in general (it can), but whether doing so is justified here.

*4 Pillar Dynasty LLC v. New York & Co., Inc.*, 257 F. Supp. 3d 611, 623 (S.D.N.Y. 2017), *aff'd in part*, 933 F.3d 902, 217 (2d Cir. 2019); *e.g.*, *Chloe v. Zarafshan*, 2009 WL 2956827, at *3, 7 (S.D.N.Y. Sept. 15, 2009) (trebling a disgorged profits award of $2.4 million for a total of $7.2 million).

Plaintiff may obtain punitive damages under on its New York state law causes of action only if Defendant's conduct constitutes "'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree."  *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 371 (2d Cir. 1988) (quoting *Borkowski v. Borkowski*, 39 N.Y.2d 982, 983, 355 N.E.2d 287, 287 (N.Y. 1976)).  Punitive damages under New York law can be awarded "in addition to a treble damages assessment under the [federal] Lanham Act." *Am. Auto. Ass'n (Inc.) v. AAA Auto. Club of Queens, Inc.*, 1999 WL 97918, at *11 (E.D.N.Y. Feb. 8, 1999).

Defendant moves to preclude Plaintiff from recovering treble damages and punitive damages because Plaintiff cannot show bad faith.  *See Malletier v. Dooney & Bourke, Inc.*, 2007 WL 1498323, at *1 (S.D.N.Y. May 22, 2007) (explaining that the Second Circuit "has used both 'bad faith' and 'willful deception'" interchangeably); *e.g.*, *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 158 (E.D.N.Y. 2016).  As outlined above, the issue of bad faith presents genuine

questions of material fact; summary judgment cannot be granted to Defendant on that basis. *See supra* Discussion Sections III.A.6 & III.B.

Therefore, Defendant's cross-motion for summary judgment is granted only so far as to preclude Plaintiff from recovering its compensatory damages, which Plaintiff disavows seeking in this action. The balance of Defendant's cross-motion addressing damages is denied.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion is DENIED and Defendant's cross-motion is GRANTED IN PART and DENIED IN PART. Plaintiff's New York General Business Law § 349 claim is dismissed and Plaintiff may not recover sustained (*i.e.*, compensatory) damages.

**SO ORDERED.**

Dated: Central Islip, New York      s/ Denis R. Hurley
       March 18, 2021        Denis R. Hurley
                                      United States District Judge