UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
RVC FLOOR DECOR, LTD.,

               Plaintiff,              <u>MEMORANDUM & ORDER</u>
                                            18-CV-6449 (JS)(ARL)

    -against-

FLOOR AND DECOR OUTLETS OF
AMERICA, INC.,

               Defendant.
--------------------------------X

APPEARANCES
For Plaintiff:      Craig B. Sanders, Esq.
                     Jonathan Mark Cader, Esq.
                     James H. Freeman, Esq.
                     Sanders Law Group
                     333 Earle Ovington Boulevard, Suite 402
                     Uniondale, New York  11530

                     Erica Carvajal, Esq.
                     Sanders Law LLC
                     100 Garden City Plaza, Suite 500
                     Garden City, New York  11530

For Defendant:      Bryan J. Wolin, Esq.
                     H. Forrest Flemming, III, Esq.
                     Robert Nathan Potter, Esq.
                     Kilpatrick Townsend & Stockton LLP
                     1114 Avenue of the Americas, 21st Floor
                     New York, New York  10036

                     Richard Charles Henn, Jr., Esq.
                     Kilpatrick Townsend & Stockton LLP
                     1100 Peachtree Street, Suite 2800
                     Atlanta, Georgia  30309

SEYBERT, District Judge:

    SEYBERT, District Judge:

        RVC Floor Decor, Ltd., (hereafter the "Plaintiff")

initiated this trademark infringement case against Floor & Decor

Outlets of America (hereafter the "Defendant") pursuant to Section 43(a) of the Lanham Act, New York common law, and New York General Business Law Section 360-l.[1]  Trial is scheduled to commence in this case on April 10, 2023.  Presently before the Court is Defendant's Omnibus Motion in Limine (hereafter the "Omnibus Motion").  (ECF No. 167.)  For the reasons that follow, Defendant's motion is GRANTED IN PART AND DENIED IN PART.

DISCUSSION

For a thorough recitation of the factual and procedural background of this case, the Court refers the parties to Judge Hurley's March 18, 2021, Memorandum & Order denying Plaintiff's motion for summary judgment and denying in part and granting in part Defendant's cross-motion for summary judgment.  See RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc., 527 F. Supp. 3d 305, 312-15 (E.D.N.Y. 2021).[2]

In its Omnibus Motion, Defendant seeks to exclude from trial all evidence, testimony and argument regarding: (1) "purported consumer 'confusion' that is non-actionable and therefore irrelevant;" (2) "[i]mproper expert opinion testimony by

---

[1] Plaintiff also brought claims pursuant to New York General Business Law Section 349, which were dismissed during the summary judgment stage of this case.  See RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc., 527 F. Supp. 3d 305, 321-22 (E.D.N.Y. 2021).

[2] Judge Hurley's Memorandum & Order is also available on the docket at ECF No. 147.  Going forward, the Court will refer to this case by its Reporter citation.

unqualified fact witnesses concerning, _inter alia_, reputational harm purportedly suffered by Plaintiff, . . . damages purportedly suffered by [Plaintiff], and the quality of products sold by the parties;" (3) "[h]earsay from, _inter alia_, social media posts, documents prepared by third parties, and documents prepared solely for discovery purposes;" (4) "[Defendant's new] stores that opened for business long after the close of discovery;" (5) "[t]he closure of [Plaintiff's] Syosset store location after the close of discovery;" (6) "[p]urported evidence of secondary meaning coming into existence after July 2015;" (7) "[p]urported consumer 'confusion' occurring after the close of discovery; and (8) Plaintiff's post discovery alterations "to the appearance of its logo and presentation of its trade name." (_See_ Support Memo, ECF No. 168, _in toto_.)  Plaintiff filed opposition to Defendant's Omnibus Motion.  (_See_ Pl's Opp'n, ECF No. 178.)  Afterwards, Defendant filed a reply.  (_See_ Def's Reply, ECF No. 182.)

I.   Legal Standard

        "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions _in limine_." Highland Cap. Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing Luce v. United States, 469 U.S. 38, 41 n.4 (1984)).  Motions _in limine_ "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set

for trial, without lengthy argument at, or interruption of, the trial." Mango v. BuzzFeed, Inc., 316 F. Supp. 3d 811, 812 (S.D.N.Y. 2018) (quoting Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996)). On a motion in limine evidence should be excluded, "[o]nly when [it] is 'clearly inadmissible on all potential grounds.'" United States v. Ceballo, No. 13-CR-0308, 2014 WL 4980554, at *1 (E.D.N.Y. Oct. 6, 2014) (quoting United States v. Paredes, 176 F. Supp. 192, 193 (S.D.N.Y. 2001)). In considering a motion in limine, the Court "may reserve judgment until trial, so that the motion is placed in the appropriate factual context." United States v. Chan, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002). Moreover, the Court's rulings on a motion in limine are "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer." Id. at 341 (quoting Luce, 469 U.S. at 41).

As an initial matter, pursuant to Federal Rules of Evidence (hereafter "Rule") 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED R. EVID. 401. However, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

4

cumulative evidence." FED. R. EVID. 403. With these general principles in mind, the Court addresses each of Defendant's arguments in turn.

II. Evidence Supporting Plaintiff's Theory of Reverse Confusion

As part of Plaintiff's Lanham Act claims and its New York common law claims for trademark infringement, Plaintiff is required to prove that Defendant's "use of its own mark will likely cause confusion with [P]laintiff's mark." RVC Floor Decor, 527 F. Supp. 3d at 316; see also Info. Superhighway, Inc. v. Talk Am., Inc., 395 F. Supp. 2d 44, 56 (S.D.N.Y. 2005) ("The elements necessary to prevail on common law causes of action for trademark infringement and unfair competition mirror Lanham Act claims."). "To establish a likelihood of confusion, a plaintiff must show that 'numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.'" O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 519 (S.D.N.Y. 2008) (quoting Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993)).

To establish confusion, Defendant anticipates that Plaintiff will seek to advance "the theory of reverse confusion." (Support Memo at 2.) "Reverse confusion exists when a [junior] user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the [senior] user

are produced by the [junior] user." On Site Energy Co. v. MTU Onsite Energy Corp., No. 10-CV-1671, 2012 WL 13113196, at *1 (E.D.N.Y. July 26, 2012) (quoting Lang v. Ret. Living Publ'g Co., 949 F. 2d 576, 585 (2d Cir. 1991)); see also RiseandShine Corp. v. PepsiCo, Inc., 41 F.4th 112, 119 (2d Cir. 2022). "In reverse confusion cases, consumers may believe that the senior user is 'an unauthorized infringer, and the [junior user's] use of the mark may in that way injure [the senior user's] reputation and impair its good will." Kelly-Brown v. Winfrey, 717 F.3d 295, 304-05 (2d Cir. 2013) (quoting Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 490 (2d Cir. 1988)); see also Mejia & Assocs. Inc. v. Int'l Bus. Machs. Corp., 920 F. Supp. 540, 546 (S.D.N.Y. 1996) ("The reverse confusion theory protects the mark of a [senior] user from being overwhelmed by a [junior] user, typically where the [junior] user is larger and better known and consumers might conclude that the senior user is the infringer."). The Second Circuit has "explained that the relevant confusion is that which affects the purchasing and selling of the goods or services in question." Lang, 949 F.2d at 583 (citations omitted). Consequently, "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally." Id. (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 20). For example, the Second Circuit has held that incidents in which customers looking for the junior user's products or store

6

mistakenly contact the senior user of a mark are irrelevant to the issue of reverse confusion since such calls reflect that the "consumers erroneously believed that the senior user [] was the source of the junior user's [product]." On Site Energy Co., 2012 WL 13113196, at *1; see also Codename Enters., Inc. v. Fremantlemedia N. Am, Inc., No. 16-CV-1267, 2018 WL 3407709, at *11 (S.D.N.Y. Jan. 12, 2018) (clarifying that "[e]vidence of reverse confusion that would support [a] [p]laintiff's claim would [include] customers seeking [p]laintiff's . . . services but reaching out instead to [d]efendant").

Defendant argues that Plaintiff's reverse confusion evidence can be broadly categorized "into four buckets:"

> [1] testimony concerning instances of callers looking for [Defendant's store], or [Defendant's] products that [Plaintiff] does not [stock]; [2] [evidence relying] on instances in which individuals merely inquired about whether the parties were affiliated; [3] [evidence] offered by [Plaintiff] reflect[ing] confusion by non-consumers, [such as Plaintiff's owner's friends and landlord; and] [4] purported confusion evidence involving [Defendant's] [and] not [Plaintiff's] customers.

(Support Memo at 3-4.)

Defendant maintains that all four categories of evidence should be precluded under Rules 402 and 403 as irrelevant. (Id. at 4.) Plaintiff counters that the proffered testimony, contrary to Defendant's assertion, "does not rest on the testimony of

Defendant's customers [but] [r]ather . . . will consist of purchasers or prospective purchasers of the Plaintiff's products who believed that they were produced by or affiliated with Defendant's brand." (Pl's Opp'n at 7.) Plaintiff requests that "the Court . . . defer . . . ruling on th[ese] issue[s] until the evidence has actually been proffered at trial and the Court has . . . the opportunity to assess whether the [proffered] testimony refers to Plaintiff's customers, as opposed to Defendant's customers." (Id.)

A. Evidence of Defendant's Customers Contacting Plaintiff

The Court rules that any evidence Plaintiff may have sought to introduce pertaining to individuals contacting Plaintiff's store looking for either Defendant, or Defendant's products, and who did not mistakenly purchase goods from Plaintiff believing that they were dealing with Defendant, should be excluded as irrelevant under Rules 401, 402, and 403. See Lang, 949 F.2d at 583 (finding that evidence of four hundred misdirected phone calls to plaintiff from consumers was irrelevant to the theory of reverse confusion where plaintiff could not "show[] that [the] misdirected callers were prospective purchasers of [plaintiff's] products); SLY Mag., LLC v. Weider Publ'ns L.L.C., 529 F. Supp. 2d 425, 440 (S.D.N.Y. 2007) (finding evidence of consumers contacting plaintiff looking for defendants' magazine were irrelevant to plaintiff's theory of reverse confusion because "[t]here [was] no

evidence . . . that anyone . . . made a mistaken purchasing decision -- that is bought defendants' magazine thinking it was plaintiff's"); O'Keefe, 590 F. Supp. 2d at 524 (finding irrelevant to the theory of reverse confusion evidence from consumers who "mistakenly believed either that [plaintiff] was involved in creating [defendant's products'] tagline and campaign, or conversely, that [plaintiff] copied [defendant's] tagline and campaign" because there was no evidence that this confusion "affected [the potential customer's] determination to purchase [plaintiff's] product" (last two alterations in original) (internal citations omitted)).

To the extent Plaintiff's evidence does consist of purchasers or prospective purchasers of Plaintiff's products who made purchasing decisions based upon the mistaken belief that Plaintiff's products were produced by Defendant, the Court finds such evidence would be relevant to Plaintiff's reverse confusion theory and, therefore, not precluded. However, Plaintiff is precluded from introducing evidence of individuals contacting Plaintiff's store looking for either Defendant or Defendant's products where such individuals did not mistakenly purchase goods from Plaintiff believing that they were dealing with Defendant.

B. <u>Evidence Consisting of Inquiries Regarding Affiliation Between the Parties</u>

Defendant next moves to preclude as irrelevant any evidence concerning "individuals [who] merely inquired about whether the parties [were] affiliated."  (Support Memo at 3.)

Defendant cites to <u>Nora Beverages</u>, where the Second Circuit held that the district court did not err when it refused to weigh evidence "of distributor inquiries to [plaintiff's] sales managers regarding whether [plaintiff] was affiliated with other spring water sellers" in favor of the plaintiff.  <u>Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.</u>, 269 F.3d 114, 124 (2d Cir. 2001).  The Second Circuit held that such "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion."  <u>Id.</u>  Plaintiff distinguishes <u>Nora Beverages</u> on the basis that "the inquiries about potential affiliation" in that case "were directed at whether the plaintiff was affiliated 'with other spring water sellers'" generally, whereas here, "the inquiries were specific to the affiliation between Plaintiff and Defendant."  (Pl's Opp'n at 7.)

While <u>Nora Beverages</u> provides support for Defendant's proposition that inquiries regarding potential affiliation, without more, are irrelevant to the confusion inquiry, this Court is aware of a more recent case in which the Second Circuit held that inquiries into affiliation may properly be considered as

10

evidence weighing in a plaintiff's favor.  See Virgin Enters. Ltd. V. Nawab, 335 F.3d 141, 151 (2d Cir. 2003).  In Virgin Enterprises, plaintiff presented an affidavit from a former employee of defendant who worked at a mall kiosk, which stated that "individuals used to ask him if the kiosk was affiliated with plaintiff's [] stores."  Id.  The Second Circuit held that "[t]he district court correctly concluded that this evidence weighed in plaintiff's favor."  Id.; see also Gross v. Bare Escentuals Beauty, Inc., 641 F. Supp. 2d 175, 187 (S.D.N.Y. 2008) (highlighting that Nora Beverages and Virgin Enterprises are "in direct conflict with one another regarding the relevance of affiliation inquiries").

Given the conflict in the case law, the Court declines to preclude Plaintiff's purported affiliate evidence as irrelevant at this stage.  Instead, the Court will reserve decision on the issue until the evidence has been proffered at trial and the Court can assess its relevance in light of the factual context in which it is presented.  Should Plaintiff's affiliate evidence evince a link between customer confusion regarding the parties' affiliation and the customers' subsequent purchasing decisions, the Court believes that such evidence would likely be relevant to the reverse confusion inquiry.  See e.g., Lang, 949 F.2d at 583 (noting in that case that consumer inquiries regarding affiliation were irrelevant to the reverse confusion analysis because there was no evidence linking consumer confusion "to any potential or actual

11

effect on [the] consumers' purchasing decisions") (emphasis added)).

    C. <u>Plaintiff's Evidence Concerning Confusion on the Part of Non-Consumers</u>

        Defendant also seeks to preclude evidence offered by Plaintiff reflecting confusion amongst non-consumers. (Support Memo at 3-4.) Defendant asserts that evidence from Plaintiff's owner's friends and any confusion evidence from Plaintiff's landlord regarding whether Plaintiff was opening a new store in Farmingdale, New York should be excluded as irrelevant. (<u>Id.</u>) Plaintiff counters that "all of the evidence of reverse confusion which Plaintiff intends to present at trial relates to existing or potential customers of Plaintiff," and not to its owner's friends. (Pl's Opp'n at 8.) Plaintiff further contends that Defendant is inappropriately attempting to "characterize Plaintiff's fact witnesses as 'friends.'" (<u>Id.</u>)

        Since the confusion relevant to the issue at hand requires evidence "that a consumer's actual purchasing decision was impacted by a mistaken belief about the product's origin or an affiliation between brands," <u>Bonilla v. H&M Hennes & Mauritz L.P.</u>, 12-CV-6919, 2014 WL 12661621, at *14 (S.D.N.Y. April 16, 2014), confusion on the part of non-consumers is clearly irrelevant. <u>See e.g.</u>, <u>W.W.W. Pharm. Co., Inc. v. The Gillette Co.</u>, 984 F.2d 567, 574 (2d Cir. 1993) ("No evidence was proffered that [plaintiff's]

friend was a prospective purchaser or that confusion affected his determination to purchase [plaintiff's] product"); <u>Gameologist Grp., LLC v. Sci. Games Int'l, Inc.</u>, 838 F. Supp. 2d 141, 162-63 (S.D.N.Y. 2011) (finding that anecdotal confusion evidence "on the part of friends and family members of [plaintiff's] current or former members" did "not suffice to raise a genuine issue of material fact as to consumer confusion, especially given that this inquiry focuses on the consuming public as a whole, not interested parties already familiar with the plaintiff's mark through personal connections"). While Plaintiff represents that all of the evidence it intends to present at trial does come from existing and potential customers, and not friends, the Court is mindful that in its summary judgment motion, Plaintiff did seek to rely upon evidence "concern[ing] individuals who were not prospective customers" including, job applicants, friends and family, and Plaintiff's landlord. <u>See</u> <u>RVC Floor Decor</u>, 527 F. Supp. 3d at 326. Consequently, the Court rules that evidence from purely non-consumers, <u>i.e.</u> those who were not prospective customers of Plaintiff, is irrelevant and thus excluded pursuant to Rule 401.

   D. <u>Plaintiff's Evidence Supporting the Theory of Forward Confusion</u>

        Defendant next seeks to preclude Plaintiff from introducing any evidence of "consumers who shopped at Defendant's store -- even if they made a purchase -- but believed that they

were shopping (and buying from) Plaintiff" since this would be
evidence of forward and not reverse confusion. (Def's Suppl.
Letter, ECF No. 208, at 1-2; Support Memo at 4.) Since Plaintiff
is advancing a theory of reverse confusion, Defendant's position
is that this evidence would be irrelevant. (Def's Suppl. Letter,
at 1.) Plaintiff cites legal authority from this Circuit that
reverse and forward confusion are different theories of proving
actual confusion and not different claims. (Pl's Suppl. Letter,
ECF No. 209, at 1-2.) Plaintiff further asserts that since its
operative Complaint put Defendant on notice that Defendant was
"likely to cause confusion by marketing its infringing products"
in the relevant geographic area, Plaintiff therefore "reserved its
right to prove actual confusion by either available theory." (Id.
at 2.)

Troublé v. The Wet Seal, Inc. is instructive; there, the
court denied the defendant's motion in limine to exclude evidence
of reverse confusion where, from the filing of her complaint
through discovery, the plaintiff had framed her allegations as a
forward confusion trademark infringement claim. 179 F. Supp. 2d
291, 296 (S.D.N.Y. 2001). The court rejected the defendant's
argument that the plaintiff "was improperly altering the
underpinning legal theory of her case," finding that "allegations
of forward confusion and reverse confusion do not form distinct
claims" but "are alternative theories that can be used separately

14

or together in a trademark infringement claim under the Lanham Act." Id.  Since plaintiff had "given [defendant] full notice of her trademark infringement claim," the court determined that plaintiff's complaint could "be read to encompass both theories." Id.

Here, Plaintiff provided Defendant the requisite notice in its Complaint that it was pursuing a claim of trademark infringement pursuant to the Lanham Act, New York common law and the New York General Business Law.  Since the actual confusion aspect of Plaintiff's claim can be proven with either a reverse or forward confusion theory, and since "a complaint that gives 'full notice' of the circumstances giving rise to the plaintiff's claim for relief 'need not also correctly plead the legal theory or theories and statutory basis supporting the claim,'" id. (quoting Simonton v. Runyon, 232 F.3d 33, 36 (2d Cir. 2000)), the Court denies Defendant's request to preclude Plaintiff from presenting any evidence it may have of forward confusion.

III.  **Plaintiff's Fact Witness Providing Allegedly Unqualified Expert Opinion Testimony**

Next, Defendant moves to "exclude all unqualified expert opinion testimony offered by [Plaintiff]" regarding: "(i) the impact of advertising on consumers or on [Plaintiff's] 'goodwill;' and (ii) the relative quality of the parties' flooring products." (Support Memo at 6.)

Concerning goodwill, Defendant argues that "[c]onsumer goodwill is not easily measured . . . and is typically analyzed by damages, marketing, or brand experts." (Id. at 5.) Defendant highlights that Plaintiff's fact witness, Robert Smith (hereafter "Smith"), does not possess the "relevant expertise" to analyze how advertising has impacted Plaintiff's goodwill, nor has Smith offered a "'reliable methodology' that can be 'reliably applied' in measuring consumer perceptions." (Id.) Conversely, Plaintiff counters that expert opinion is not needed to provide admissible evidence on "how advertising impacts a company's goodwill in the marketplace." (Pl's Opp'n at 8.) Instead, Plaintiff avers that "the average juror understands the connection between commercial advertising and a company's favorable reputation." (Id. at 9.) Further, Plaintiff highlights that Smith has "in-depth knowledge of the company's operations" which he has accumulated over 30 years. (Id.)

Regarding testimony concerning the parties' respective products, Defendant avers that, prior to trial, Plaintiff's fact witnesses, Glenn Altarac, Christina Silvestri, Bari Seidon, and Wendy Lepkoff, have provided testimony regarding the quality of the parties' respective products. (Support Memo at 5.) Defendant contends that "[s]uch comparative assessments fall within the purview of expert, not lay, testimony [because] [t]he everyday, average person lacks the knowledge, experience, and know-how to

16

reliably assess the quality of specialized products like flooring." (Id.) As further proof highlighting its point, Defendant notes that Plaintiff has previously "admitted it attempted to obtain an expert opinion on [] this point, but never produced the results of that analysis." (Id. at 5-6.) Defendant speculates that Plaintiff's purported expert report "strongly suggests that it contradicts -- with science -- the unqualified opinions of [Plaintiff's] employees." (Id. at 6.) Plaintiff counters that "[i]n the age of DIY . . . home improvement projects, consumers are familiar with flooring products." (Pl's Opp'n at 10.) Similarly, Plaintiff contends that due to "access to the internet, a consumer can become quite knowledgeable about flooring products in short order, and become well-versed in certain product advantages and disadvantages." (Id.) Plaintiff posits that a lay consumer can "easily discern between high quality wood flooring made of oak versus a low quality product made of plywood." (Id.) Similarly, Plaintiff states that the lay consumer can differentiate between vinyl and ceramic tile. (Id.)

Pursuant to Rule 701, opinions of lay witnesses are limited to those that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. Due to the specialized

17

knowledge requirement, lay opinion testimony "must be the product of reasoning processes familiar to the average person in everyday life" as opposed to expert testimony which results "from a process of reasoning which can be mastered only by specialists in the field." United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005) (internal citations omitted).  However, "[l]ay witnesses may give testimony on matters with which they have special familiarity based on personal experiences."  Zhen v. Safety-Kleen Sys., Inc., No. 18-CV-6015, 2021 WL 4937888, at *1 (E.D.N.Y. May 27, 2021).

While the Court agrees with Defendant that, generally, consumer goodwill is a metric that is typically analyzed by damages, marketing or brand experts, the Court will not, at this stage, preclude Plaintiff from offering lay opinion testimony from Smith on the issue of how advertising has affected Plaintiff's business.  In deferring ruling this way, the Court acknowledges that Smith, as a co-founder and former owner of Plaintiff, may indeed be able to testify on the subject of goodwill at a general level due to his familiarity with Plaintiff's operations.  As such, the Court shall reserve decision on this matter.  Additionally, while the Court is cognizant of Defendant's concerns regarding lay testimony about the relative quality of its products, especially where the lay witness offers opinions on product quality between two similarly situated products, until it hears the lay witness testimony the Court will not preclude such testimony.

18

IV.  <u>Defendant's Hearsay Arguments</u>

Next, Defendant seeks to preclude several categories of "hearsay evidence" for which it contends no exception to the hearsay rules applies.  Defendant broadly categorizes Plaintiff's purported hearsay evidence into three categories: (1) "statements by unknown third parties about [Defendant] and its products;" (2) "documents prepared by the parties exclusively for discovery purposes;" and (3) "documents created by third parties."  (Support Memo at 6.)  The Court addresses each of Defendant's objections in turn.

Hearsay is defined as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  FED. R. EVID. 801(c).  Unless an exception to the general rule exists, "[h]earsay is not admissible."  FED R. EVID. 802.  With these general principles in mind, the Court turns to Defendant's hearsay arguments.

A. <u>Out-of-Court Statements Made by Diana Hyman to David Weiss</u>

First, Defendant highlights that the testimony of David Weiss, one of Plaintiff's witnesses, included an anecdotal story in which he referred a customer to Plaintiff's store and the customer responded that she would visit Plaintiff's store in Florida, despite Plaintiff not having any stores in Florida. (Support Memo at 6.)  This testimony was presented as evidence of

19

consumer confusion in Plaintiff's summary judgment briefs.  (Id.)
Defendant argues that "[t]estimony concerning statements made by
unknown third parties who cannot be cross examined is
quintessential, textbook hearsay" which should be excluded.  (Id.
at 6-7.)  Plaintiff notes that Weiss' testimony regarded a customer
named Diana Hyman, and counters that Hyman's experience "does not
constitute hearsay because Plaintiff is not proffering Weiss'
testimony for statements that Hyman made" but instead that Weiss'
testimony establishes that "he has direct personal knowledge of []
Hyman's experience because she was acting pursuant to his
instructions."  (Pl's Opp'n at 11-12.)  Plaintiff contends further
that even if Weiss' anecdote concerning Hyman's experience were
hearsay, the "statements made by Hyman to Weiss concerning her
visit to the [Defendant's] store constitute a present sense
impression because she contemporaneously related her impressions
to Weiss."  (Id. at 12 (citing FED. R. EVID. 803(1).)  Plaintiff
proposes that the Court defer ruling on this issue until trial so
as to "first hear the testimony . . . in context."  (Id.)

Pursuant to Rule 803(1), present sense impressions are
excluded from the general rule that hearsay statements are
inadmissible.  See FED R. EVID. 803(1).  A present sense impression
is "[a] statement describing or explaining an event or condition,
made while or immediately after the declarant perceived it."  Id.
"Statements fitting the present sense impression definition 'are

considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory.'" United States v. Chen Kuo, No. 10-CR-0671, 2011 WL 145471, at *3 (E.D.N.Y. Jan. 8, 2011) (quoting United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002)).

As an initial matter, if the Hyman anecdote were hearsay, the Court is unpersuaded that the present sense impression exception applies. Regardless, the Court is unconvinced that the statements made by Hyman to Weiss are in fact hearsay. Declarant Hyman is not scheduled to testify. However, Hyman's statement, that she would visit Defendant's store in Florida after Weiss recommended Hyman visit Plaintiff's store, is not being offered for the truth of the matter asserted, i.e., it is not being offered to prove that Hyman actually went, or intended to actually visit, Defendant's store in Florida. Instead, Defendant intends to offer the anecdote regarding Hyman as evidence of confusion generally on the part of one of Plaintiff's customers. This would be a permissible example of customer confusion, and, even if it were hearsay, would likely be admissible as a statement of the declarant's then-existing state of mind under Rule 803(3). See UPS Store, Inc. v. Hagan, No. 14-CV-1210, 2017 WL 3309721, at *3 (S.D.N.Y. Aug. 2, 2017) ("In Lanham Act cases, hearsay declarations can come in under Rule 803(3) to prove consumer confusion.").

## B. Plaintiff's Instagram Post Showing Customer Confusion

Next, Defendant seeks to preclude "a copy of an Instagram message purportedly sent by an unknown third party" to Plaintiff "concerning an alleged experience with" one of Defendant's products. (Support Memo at 7.) Plaintiff contends that the Instagram Post should be admitted under the Business Records Exception articulated in Rule 803(6) because "the message was sent to Plaintiff in the ordinary course of business." (Pl's Opp'n at 13.)

Pursuant to Rule 803(6), certain business records may be excluded from the rule against hearsay when:

> (A) the record was made at or near the time by--or from information transmitted by-- someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business . . . whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED R. EVID. 803(6).

The purpose of the business records exception "is to ensure that documents were not created for 'personal

22

purpose[s] . . . or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'" U.S. Underwriters Ins. Co. v. ITG Dev. Grp., LLC, 294 F. Supp. 3d 18, 28-29 (E.D.N.Y. 2018) (alterations in original) (quoting United States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010)). Similarly, the business records exception "is designed to capture records that are likely accurate and reliable in content, as demonstrated by the trustworthiness of the underlying sources of information." United States v. Hunt, 534 F. Supp. 3d 233, 254 (E.D.N.Y. 2021) (quoting United States v. Browne, 834, F.3d 403, 410 (3d Cir. 2016)). "A duty to report . . . 'has long been recognized as the principal means of establishing the reliability of a hearsay statement' offered under the Business Records Exception." Abascal v. Fleckenstein, 820 F.3d 561, 566 (2d Cir. 2016) (quoting United States v. Reyes, 157 F.3d 949, 952 (2d Cir. 1998)).

Here, the customer complaint contained in the Instagram Post is hearsay if offered to prove the truth of the matter asserted, i.e., that there is a difference in quality between Defendant's and Plaintiff's product, or that the customer making the complaint believed that there was a difference in product quality between the parties' products. The Court is unconvinced that the Instagram Post qualifies as a business record since the underlying source of the information, i.e., the customer

23

declarant, was not acting in the regular course of business when it made the complaint. See United States v. Baker, 693 F.2d 183, 188 (D.C. Cir. 1982) ("[I]f the source of the information is an outsider, Rule 803(6) does not, by itself, permit the admission of the business record. The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have."); see also Hunt, 534 F. Supp. 3d at 254 ("[T]o construe the substance of social media content as a business record would be to misunderstand the business-records exception under [Rule] 803(6).").

However, if the Instagram Post is offered for the limited purpose of demonstrating general confusion on the part of customers, the customer complaint would not be hearsay since it is not being offered for the truth of the matter asserted. Moreover, as discussed, infra Part IV.A, a customer complaint may also be admissible under Rule 803(3) as a statement showing the declarant's then-existing state of mind. See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 1003-04 (2d Cir. 1997) (holding that direct testimony from plaintiff's sales manager regarding customer complaints was not hearsay since "[t]he testimony in question was not offered to prove" the truth of the matter asserted "but was probative on declarant's confusion" and that Rule 803(3) was also applicable to show the declarant's then-existing state of mind).

24

C. <u>Plaintiff's Intention to Admit into Evidence Defendant's Privilege Log</u>

Next, Defendant seeks to preclude Plaintiff from offering into evidence Defendant's privilege log arguing that the privilege log is hearsay and is of no probative value on any fact in issue and that, even if it were, "such minimal, tenuous value is far outweighed by the dangers of confusing the issues and misleading the jury." (Support Memo at 7.) Plaintiff first argues that, as a matter of law, privilege logs are not hearsay because they qualify as admissions by a party opponent. (Pl's Opp'n at 13.) Moreover, the privilege logs are relevant, Plaintiff avers, since they "indicate that Defendant was aware of Plaintiff's mark as early as 2012, several years before Defendant entered the relevant market in 2015." (<u>Id.</u>) Plaintiff further argues that "[t]he issue as to whether Defendant conducted a sufficient trademark search in 2012, as indicated on Defendant's privilege log" is relevant on the issue of bad faith. (<u>Id.</u> at 13-14.)

Pursuant to Rule 801(d)(2), an opposing party's statement is not hearsay. FED R. EVID. 801(d)(2). An opposing party statement is a statement "offered against an opposing party" that, <u>inter alia</u>, "was made by the party in an individual or representative capacity." FED R. EVID. 801(d)(2)(A). A "privilege log may constitute [an] admission [by] a party opponent." <u>Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.</u>, No. 13-CV-0743,

2018 WL 3135847, at *13 (N.D.N.Y. June 27, 2018) (citing Mut. Ins. Co. v. Murphy, 630 F. Supp. 2d 158, 168 n.3 (D. Mass. 2009)). Contra Biggs v. Chicago Bd. of Educ., No. 18-CV-6183, 2022 WL 1591577, at *9 (N.D. Ill. May 19, 2022) (finding defendant's "privilege log is inadmissible hearsay to the extent [p]laintiff offers it for the truth of the matter contained in the log entries").

The bad faith factor in Lanham Act cases "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Easy Spirit, LLC v. Skechers U.S.A., Inc., 515 F. Supp. 3d 47, 74 (S.D.N.Y. 2021) (quoting Lang, 949 F.2d at 583); see also Artisan Mfg. Corp. v. All Granite & Marble Corp., 559 F. Supp. 2d 442, 452 (S.D.N.Y. 2008) (noting that a "defendant's awareness of plaintiff's mark may give rise to an inference of bad faith" and that this inference is "bolstered if the defendant offers no credible explanation for its adoption of the mark"). The Second Circuit "has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith even in the total absence of a trademark search." Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 388 (2d Cir. 2005). In assessing bad faith, persistence in using the allegedly infringing mark during the duration of the litigation can be a contributing factor when combined with other factors

evidencing a party's bad faith.  24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC., 447 F. Supp. 2d 266, 283-84 (S.D.N.Y. 2006). Additionally, unlike the Lanham Act, "New York's common law unfair competition cause of action is 'adaptable and capricious.'" RVC Floor Decor, 527 F. Supp. 3d at 328 (quoting Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc., 672 F.2d 1095, 1105 (2d Cir. 1982)).  The common law cause of action is "not confined to Defendant's decision to adopt its mark . . . [and] is assessed not by viewing acts in isolation but upon the totality of the evidence, including their timing." Id.

Here, the Court finds any evidentiary value that Defendant's privilege log might provide on the sufficiency of Defendant's trademark search in 2012 is de minimis; consequently, the privileges log's probative value is substantially outweighed by its prejudicial effect.  See FED. R. EVID. 403; see also Old Republic Ins. Co. v. Ness, Motlet, Loadholt, Richardson & Poole, P.A., No. 03-CV-5238, 2006 WL 3782994, at *12-13 (N.D. Ill. Dec. 21, 2006) (finding plaintiff's privilege log was inadmissible because its "probative value [was] substantially outweighed by the probability of jury confusion and noting that the "privilege log itself [was] not evidence; rather, the document named in the privilege log [was] the evidence").  Therefore, Plaintiff is

precluded from introducing the privilege log as evidence of the sufficiency of Defendant's trademark search in 2012.[3]

### D. Documents Prepared by Third Parties

Next, Defendant anticipates that Plaintiff will "offer into evidence . . . documents prepared by several third parties" including: (1) "data allegedly provided to Plaintiff by the Bureau of Labor" (hereafter the "Labor Data"); (2) "two office action letters from the U.S. Patent and Trademark Office concerning a [] [Defendant] trademark application" (hereafter the "Action Letters"); and (3) "an affidavit" from Plaintiff's witness Hadi Taffal (hereafter the "Taffal Declaration"). (Support Memo at 7.)

### 1. The Labor Data and the Action Letters

Defendant contends that neither the Labor Data nor the Action Letters qualify under the hearsay exception afforded to certain public records pursuant to Rule 803(8). (Support Memo at 8.) Specifically, Defendant contends that before admitting either the Labor Data or the Action Letters, Plaintiff would have to present "live testimony of a records custodian representing the agencies that produced the records" and that "[n]one of [Plaintiff's] prospective witnesses can authenticate" the records. (Id.)

---

[3] The Court notes that the law of this case establishes that Defendant became aware of Plaintiff's mark in 2012 (RVC Floor Decor, 527 F. Supp. 3d at 314, 327).

Additionally, Defendant argues that the Labor Data "does not speak for itself in simple terms that a lay person can comprehend without assistance from an expert." (Id.)  The Labor Data, Defendant contends, is further inadmissible because it "purports to present information regarding 'U.S. city average[s]' while [Plaintiff] asserts rights in" a specific geographical region confined to Long Island, New York. (Id.)  Defendant further notes that the Labor Data is untrustworthy in that it is presented as a "one-off screenshot[] of unidentified webpages . . . the source and genesis of [which] remains completely unknown." (Def's Reply at 5.)

Regarding the Action Letters, Defendant argues that the documents contain the hearsay statements of a trademark examiner that Defendant's mark was "merely descriptive." (Support Memo at 9.)  Defendant further posits that the Action Letters are irrelevant since "if it is [Plaintiff's] goal to call into question the validity of [Defendant's] marks, the mark at issue" has now become "incontestable and its distinctiveness 'conclusively established' as a matter of law." (Id. at 9.)

Plaintiff counters that, on Defendant's authentication argument, the Labor Data is self-authenticating under Rule 902(5). (Pl's Opp'n at 14.)  Additionally, Defendant contends that "if necessary, the Court may take judicial notice of the [Action Letters] at trial under" Rule 201(b) "because such correspondence

29

was issued by a federal government agency whose authenticity cannot be reasonably questioned." (Id.) While Plaintiff offers no explanation as to why the Labor Data is relevant in this action, it argues that the Action Letters are relevant on the issue of bad faith since both how and why the Defendant adopted its mark are part of the relevant inquiry. (Id. at 15 n.5.)

Pursuant to Rule 803(8), "[a] record or statement of a public office" may be excluded from the rule against hearsay if:

> (A) it sets out:
>     (i)    the office's activities;
>     (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>     (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

FED R. EVID. 803(8)

"Once the party seeking admission has met the minimum requirements and shows that the evidence contains factual findings and was made based on an investigation made pursuant to legal authority, the burden shifts to the opposing party to demonstrate a lack of trustworthiness." Harte v. Ocwen Fin. Corp., No. 13-CV-5410, 2018 WL 1830811, at *18 (E.D.N.Y. 2018). "[A]dmissibility of evidence covered under Rule 803(8) 'is generally favored' and

presumed." Id. (citing Gentile v. County of Suffolk, 962 F.2d 142, 148 (2d Cir. 1991)).

Regarding authentication, certain items of evidence "are self-authenticating" and "require no extrinsic evidence of authenticity in order to be admitted." FED R. EVID. 902. For example, pursuant to Rule 902(5), official publications such as "book[s], pamphlet[s], or other publication[s] purporting to be issued by a public authority" are considered to be self-authenticating in nature. FED. R. EVID. 902(5). Additionally, pursuant to Rule 201(b) the Court may take judicial notice of a fact that "is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accordance cannot reasonably be questioned." FED. R. EVID. 201(b).

### i. The Labor Data

Assuming without deciding that Plaintiff can in fact establish the authenticity of the Labor Data under either Rules 902(5) or 201(b), the Court agrees with Defendant insofar as it finds that the Labor Data is irrelevant to the extent that it offers information on cities or locations outside the narrowly defined geographical area germane to this case. Thus, subject to authentication which will be determined at trial, at this stage, the Court will not preclude Plaintiff from offering Labor Data

that is tailored to the geographical areas of Nassau County, Suffolk County, New York City, Queens, and Brooklyn.

            ii.    The Action Letters

       While the USPTO is an agency of the United States, within the Department of Commerce, that falls squarely withing the "public offices or agencies" requirement of Rule 803(8), even if the Action Letters fall within the public documents exception to hearsay, they remain subject to the rules of relevance articulated in Rules 401, 402, and 403.  To that end, the Court rules that Plaintiff is precluded from introducing the Action Letters on the ground that they are irrelevant to the issues that Plaintiff must prove at trial; moreover, their inclusion risks confusing both the issues and the jury.  Plaintiff's argument that the Action Letters are relevant because "[h]ow and why Defendant adopted its infringing junior mark is relevant to the issue of bad faith" is unavailing. (Pl's Opp'n at 15 n.5.)  The Action Letters are dated 2004[4], approximately eight years before Defendant learned of Plaintiff's mark and eleven years before it entered the relevant geographical area that is the subject of this litigation.  See Star Indus., 412 F.3d at 288 ("[The Second Circuit] has never held adoption of a mark with no knowledge of a prior similar mark to be in bad

---

[4] The Action Letters, designated in the parties' Amended Proposed Pretrial Order as PX166 and PX167, are described as being dated 2004.  (See Amended Proposed Pretrial Order, ECF No. 200 at 20.)

faith . . . .").  Additionally, the Court agrees with Defendant in that, even if the Action Letters were relevant, their probative value is substantially outweighed by the danger of unfair prejudice and confusing both the jury and the issues, see FED. R. EVID. 403, especially since Defendant's trademark application was ultimately approved.  Here, it is the Plaintiff that must establish that its mark achieved secondary meaning by July 2015.  Since Defendant's mark has been established as a matter of law, any evidence attacking its legitimacy or describing the process Defendant took to register it long before it became aware of Plaintiff's mark risks confusion of the issue and would prejudice Defendant.

### 2.  The Sworn Declaration of Hadi Taffal

According to Defendant, the Taffal Declaration is hearsay since it "consists entirely of out-of-court statements offered to prove the truth of the matters asserted."  (Support Memo at 9.)  Defendant further notes that there is no applicable hearsay exception that would make the Taffal Declaration admissible but that regardless, since Taffal is listed as a witness, Plaintiff's request on this issue is moot.  (Def's Reply at 6.)  Plaintiff argues that the Court should defer ruling on whether to exclude the Taffal Declaration since "if at trial [Taffal] confirms the statements made in the declaration, such statements would no longer be considered 'out-of-court.'"  (Pl's Opp'n at 15.)  Further, Plaintiff avers that "if Taffal were to

offer testimony at trial that contradicts the earlier sworn statement, then the declaration may be used for impeachment purposes." (Id.)

If offered for the truth of the matter asserted, sworn statements should be excluded as hearsay. See Sec. & Exch. Comm'n v. Am. Growth Funding II, LLC, No. 16-CV-0828, 2018 WL 6322145, at *9 (S.D.N.Y. 2018). However, sworn statements may not be hearsay when offered for a permissible purpose such as impeachment of a witness pursuant to Rule 801(d)(1) or to refresh a witness' recollection pursuant to Rule 803(5). Id.

Here, the Court rules that Plaintiff is precluded from entering into evidence the Taffal Declaration because it is hearsay if offered to prove the truth of the matters asserted therein. The extent to which the Taffal Declaration may be used for impeachment or rehabilitative purposes during Taffal's live testimony will be determined by the Court at trial.

V.   Testimony Concerning Newly Opened Long Island Floor & Décor Stores

Pursuant to Rule 403, Defendant next moves to preclude Plaintiff from introducing evidence at trial relating to new stores "opened by [Defendant] on Long Island [occurring] after the close of discovery in this action." (Support Memo at 10.) Defendant primarily advances two arguments as to why evidence of new stores should be excluded. First, Defendant notes that the store openings

34

"substantially post-date[] . . . the close of discovery" and the Court's decision on the parties' cross-motions for summary judgment. (Id.) Second, Defendant maintains such evidence is "irrelevant to the remaining issues to be tried" and that, further, even if relevant, the probative value of the evidence does not exceed the risk of confusion and unfair prejudice. (Id.)

A. Defendant's Argument That There was a Lack of Discovery Regarding New Stores

Defendant notes that, other than the Farmingdale location, no new stores were opened by Defendant on Long Island "until well after the end of fact discovery . . . and no supplemental discovery has been taken on this issue" since discovery closed. (Support Memo at 10.) Defendant argues that due to the lack of discovery "the parties will be entirely unable to prepare related testimony and evidence at trial." (Id.) Defendant further posits that if Plaintiff intended to offer evidence related to the new store openings it should have moved to re-open discovery. (Id. at 10-11.)

Plaintiff disputes Defendant's contentions and notes that "Plaintiff did ask Defendant during the discovery period to disclose any information regarding its plans for 'new stores' in the Long Island area." (Pl's Opp'n at 16.) Further, Plaintiff asserts that Defendant was under a "legal obligation under" Federal Rule of Civil Procedure 26(e) "to supplement its disclosures

35

regarding new stores as post discovery deadline information became available." (Id.) Plaintiff contends that Defendant's failure to disclose the new stores was in contravention of an order issued by Magistrate Judge Lindsay who directed Defendant to supply Plaintiff with information if a store actually opened during the pendency of this litigation. (Id.)

The Court agrees with Plaintiff that Defendant was under a duty to supplement its disclosures up until the date of trial, and not merely up until the close of discovery, if it opened any new stores in the relevant geographical area. Star Direct Telecom, Inc. v. Glob. Crossing Bandwidth, Inc., 272 F.R.D. 350, 358 (W.D.N.Y. 2011) ("The obligation to update and supplement responses [to discovery requests] continues even after the close of discovery." (internal alterations omitted) (quoting Allen v. Colgate-Palmolive Co., No. 79-CV-1076, 1985 WL 191, at *1 (S.D.N.Y. Jan. 14, 1985))); see also McKinney v. Connecticut, No. 06-CV-2055, 2011 WL 166199, at *2 (D. Conn. 2011) ("The fact that discovery has closed has no bearing on [d]efendant's duty to supplement under Rule 26(e).")). Defendant was reminded of its continuing disclosure obligations on September 26, 2019, by Judge Lindsay. (Sept. 26, 2019 Hr'g Tr., ECF No. 113, 18:2-9.) Furthermore, Judge Lindsay's order expressly directed Defendant "to supply [Plaintiff] with information if a store actually open[ed] during the pendency of th[e] litigation." (Id. at 17:9-

36

12 (emphasis added).)  Defendant conceded during the motion hearing held before this Court on February 22, 2023, that it was aware of Judge Lindsey's directive and offered no explanation as to why it failed to provide Plaintiff with the information relating to new stores.  (Feb. 22, 2023 Hr'g Tr., ECF No. 212, 9:12-21.)  Instead, Defendant speculated that since the order "was a directive from Judge Lindsay during a hearing[,] that [Defendant] didn't follow up on [it]."  (Id. at 9:23-10:1.)  Defendant explicitly acknowledged that this "was a mistake on [its] part."  (Id.)

Therefore, the Court finds that any failure to take discovery relating to new stores is the fault of the Defendant, not Plaintiff.  Thus, the Court declines to preclude evidence of Defendant's new stores on this basis.

B. Defendant's Argument That the Opening of New Stores is Irrelevant

Additionally, Defendant argues that evidence of its new Long Island stores is irrelevant to the outstanding factual issues pertinent to Plaintiff's remaining claims.  (Support Memo at 11.) Defendant highlights that the Court has already dismissed Plaintiff's claim for actual damages in this case, and so, any contentions by Plaintiff that the new stores could result in additional damages is moot in light of the Court's summary judgment ruling.  (Id.)  Nevertheless, Defendant speculates that Plaintiff may seek to introduce this evidence as a means of "denigrat[ing]

[Defendant] in the eyes of the jury, [and] creating undue prejudice [] unrelated to the merits of [the] dispute." (Id.)  On the issue of potential bad faith, Defendant argues that the opening of new stores is irrelevant since the intent inquiry is limited to Defendant's "initial adoption of its . . . registered mark[]." (Id. at 13.)

Plaintiff, while acknowledging that the Court has previously excluded it from collecting an award of actual damages, notes that "a [d]efendant's profits are distinct from compensatory damages . . . [and that] as a matter of law, the profits that Defendant garnered from the operation of the new stores are relevant to the calculation of overall profits to be awarded under section 1117(b) of the Lanham Act." (Pl's Opp'n at 18.) Additionally, Plaintiff contends that Defendant's opening of new stores during the pendency of this case and its continued use of its trademark, despite having notice of the existence of Plaintiff's senior mark, is evidence of bad faith. (Id. at 19-20.)  Moreover, Plaintiff refutes Defendant's assertion that bad faith is measured from the date a defendant initially adopts a mark; instead, Plaintiff asserts that bad faith may be found where a defendant continues to use a senior mark and that regardless, each time Defendant opens a new store, it is "re-adopting the mark for that location." (Id. at 20.)

Pursuant to 15 U.S.C. Section 1117(a), a prevailing plaintiff in a trademark infringement case may recover: "(1) defendant's profits; (2) any damages sustained by the plaintiff,[5] and (3) the costs of the action."  15 U.S.C. § 1117(a).  Additionally, "under certain conditions, disgorgement of profits and treble damages" may also be obtained pursuant to 15 U.S.C. Section 1117(b).  RVC Floor Decor, 527 F. Supp. 3d at 331. A showing of willful infringement is required to win a treble damages award, but Plaintiff need not make this showing "to win an award of Defendant's profits."  Id.  "Punitive damages under New York law can [also] be awarded 'in addition to a treble damages assessment under the [federal] Lanham Act.'"  Id. (second alteration in original) (quoting Am. Auto. Ass'n Inc. v. AAA Auto. Club of Queens, Inc., No. 97-CV-1180, 1999 WL 97918, at *11 (E.D.N.Y. Feb 8, 1999)).  Bad faith and willful infringement have been used interchangeably by the Second Circuit in this context. Id. (citing Malletier v. Dooney & Bourke, Inc., No. 04-CV-2990, 2007 WL 1498323, at *1 (S.D.N.Y. May 22, 2007)).  Contrary to Defendant's assertions, in determining bad faith, the Court "is

---

[5] The Court has previously ruled that Plaintiff cannot recover compensatory damages.  See RVC Floor Decor, 527 F. Supp. 3d at 330-31 ("[T]he parties tacitly agree that Plaintiff is not seeking compensation for its sustained damages, so Defendant's cross-motion to preclude Plaintiff from obtaining such relief is unopposed.  Defendant is entitled to summary judgment on this issue.")

required to consider a defendant's conduct after being notified of an infringement claim." 24 Hour Fitness USA, Inc., 447 F. Supp. 2d at 284 (emphasis in original) (citing Int'l Start Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc., 80 F.3d 749, 753 (2d Cir. 1996)); see also Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 492 (5th Cir. 1992) ("When there is no evidence of bad faith in the adoption of the mark, all post-notification conduct must be analyzed to determine if the defendant's continuing actions were unreasonable and amounted to bad faith.").

The Court finds that evidence of new store openings by Defendant in the geographical location occupied by Plaintiff during the pendency of this litigation are relevant to the issue of bad faith. See 24 Hour Fitness USA, 447 F. Supp. 2d at 284; Moore Bus. Forms, 960 F.2d at 492. Additionally, as noted by Plaintiff, the information regarding new stores in the relevant geographical location is necessary to any calculation of Defendant's profits, should Plaintiff establish that it is entitled to recover such profits under the Lanham Act.

VI.  Plaintiff's Introduction of Evidence Regarding the Closure of its Syosset Store Location

Next, pursuant to Rule 403, Defendant seeks to preclude Plaintiff from introducing evidence that Plaintiff closed its Syosset store sometime in 2021 during the COVID pandemic. (Support Memo at 14-15.)  Defendant expects Plaintiff to attribute this

closure to Defendant despite Plaintiff allegedly not having any evidence of causation on this issue. (Id. at 15.) Additionally, Defendant notes that the Syosset store closed approximately eleven months after the close of discovery in this case. (Id.) Defendant argues that Plaintiff failed to notify Defendant about the closure of the Syosset store until April 27, 2022, and that "neither party took any discovery with respect to [the] matter." (Id.) Consequently, Defendant maintains it would be prejudiced if evidence of the Syosset store closure were introduced at trial since it "has had no opportunity to examine any documents or witnesses on this issue." (Id.) Defendant avers that if Plaintiff intended to enter evidence of the Syosset store closure it should have "called for supplemental discovery, amended its initial disclosures to identify it as a topic of discovery" and disclosed all witnesses with relevant knowledge of the store closure who Defendant could have deposed. (Id.)

Plaintiff counters that the fact that Defendant was unable to take discovery is irrelevant since the store closure itself is undisputable and does not require discovery. (Pl's Opp'n at 21.) Plaintiff further avers that it is not required to "show that Defendant was the direct cause of the closure[,] [b]ut [that] a jury [may] infer, based on the fact of the store closure itself and Defendant's aggressive marketing push into [] Long

41

Island . . . that Defendant's expanding presence in the area has had a detrimental impact on Plaintiff's business." (Id.)

The Court notes that Plaintiff has been aware of the Syosset store closure since sometime in 2021 and that it has failed to provide this information to Defendant or supplement any of its disclosures to alert Defendant to any new evidence or witnesses supporting its theory as to why the store closed. The Court agrees with Defendant that Plaintiff's failures in this regard have prejudiced Defendant and hampered its ability to prepare its defense on this issue. Although the store closure may have been relevant if Plaintiff had any evidence on the causes of the closure, Plaintiff's frank concession that it has no evidence regarding causation and that it merely wishes to present the store closure to the jury and have them infer that the closure was the fault of the Defendant is highly prejudicial to Defendant. Consequently, because of Plaintiff's own failures in discovery and because it has no evidence to support its theory that Defendant was in some way responsible for the closure, the Court finds that the evidentiary value of Plaintiff's Syosset store closure is substantially outweighed by the danger of unfair prejudice to Defendant and the Court precludes it for this reason.

## VII. Evidence of Plaintiff's Mark Gaining Secondary Meaning After July 2015

The Court has previously held, as a matter of law, that if Plaintiff's mark has achieved secondary meaning, it must have been achieved by July 2015. RVC Floor Decor, 527 F. Supp. 3d at 318. Relying upon this ruling, pursuant to Rules 401 and 403, Defendant seeks to preclude any evidence or testimony concerning secondary meaning "relating to events occurring after July 2015." (Support Memo at 16.) Defendant contends that even if relevant, such evidence's probative value is "far exceeded by the risk of confusion and undue prejudice." (Id.) Plaintiff has no objection to the exclusion of such evidence.[6] (Pl's Opp'n at 21.) Consequently, the Court finds that any evidence or testimony concerning secondary meaning that relate to events occurring after July 2015 are precluded as irrelevant pursuant to Rules 401, and 403.

## VIII. Evidence of Consumer Confusion Occurring Since the Close of Discovery

Defendant's seventh request is moot in light of the rulings made by the Court at the February 22, 2023 motion hearing,

---

[6] To the extent Plaintiff suggests that Defendant "should be equitably estopped from contesting points II and III of Plaintiff's Omnibus Motions in Limine, as well as Plaintiff's Daubert motion to exclude expert testimony and untimely consumer surveys" based on Defendant's arguments in the instant motion, the Court will consider this argument in deciding that motion along with all other arguments presented in the moving papers.

when the Court ruled that, from Plaintiff's list of confusion witnesses which included those new witnesses it sought to include in the Amended Proposed Pretrial Order, Plaintiff would be permitted to present testimony from four witnesses in total. (Feb. 22, 2023 Hr'g Tr. 18:8-15.) The Court reasoned that any more than four confusion witnesses would likely become cumulative. (Id. at 13:23-14:3.) Further, the Court permitted Plaintiff to present its confusion evidence through whichever four witnesses best conveyed its points on this issue. (Id. at 18:8-15.)

IX. Evidence Regarding Recent Changes to the Appearance and Presentation of Plaintiff's Name and Logo

Finally, Defendant notes that it has recently discovered that Plaintiff has "modified its branding, adopting . . . another name and logo design." (Support Memo at 18.) Defendant highlights that Plaintiff's newly adopted logo design "is visually far more similar to [Defendant's] longstanding design mark than any of [Plaintiff's] prior logos." (Id.) Defendant seeks to preclude, pursuant to Rules 401 and 403, evidence relating to Plaintiff's new mark since all of Plaintiff's claims in this case "arise from [the] purported likelihood of confusion between the parties' names and logos as they existed at the time [Plaintiff] filed its complaint in November 2018." (Id. (emphasis in original.)) Plaintiff offers no opposition to Defendant's request on this issue

44

and in fact "has no objection to the exclusion" of this evidence.[7]
(Pl's Opp'n at 22.)  Consequently, Plaintiff is precluded from
entering evidence relating to its new mark pursuant to Rule 401.

<u>CONCLUSION</u>

For the stated reasons, **IT IS HEREBY ORDERED** that the
Defendant's Omnibus Motion <u>in limine</u> (ECF No. 167) is GRANTED IN
PART and DENIED IN PART.

A. The Defendant's first request is **GRANTED**.  Pursuant to Rules
   401, 402, and 403, Plaintiff is precluded from introducing
   evidence pertaining to individuals merely contacting
   Plaintiff's store looking for either Defendant, or
   Defendant's products, who did not mistakenly purchase goods
   from Plaintiff under the belief they were dealing with
   Defendant;

B. The Defendant's second request is **DENIED**.  Plaintiff's
   affiliate evidence may be admissible if it can show that
   confusion regarding whether the parties were affiliated
   actually affected customers' purchasing decisions;

---

[7] To the extent Plaintiff suggests that Defendant "should be
equitably estopped from contesting Point II of Plaintiff's Omnibus
Motions <u>in Limine</u> which seeks to exclude any reference to
derivative marks used by Plaintiff prior to July 2014" based on
its arguments in the instant motion, the Court will consider this
argument in deciding that motion along with all other arguments
presented in the moving papers.

C. The Defendant's third request is **GRANTED.** Evidence from purely non-consumers who were not prospective customers of Plaintiff is excluded as irrelevant pursuant to Rule 401;

D. The Defendant's fourth request is **DENIED** to the extent that Plaintiff has evidence of forward confusion; it may prove actual confusion under either a forward or reverse confusion theory;

E. The Court **RESERVES DECISION** on Defendant's fifth request;

F. The Defendant's sixth request is **DENIED.** Evidence of customer confusion is admissible as non-hearsay so long as it is not offered for the truth of the matter asserted;

G. The Defendant's seventh request is **DENIED.** Evidence of customer confusion is admissible as non-hearsay so long as it is not offered for the truth of the matter asserted;

H. The Defendant's eighth request is **GRANTED.** Plaintiff is precluded from entering into evidence Defendant's privilege log pursuant to Rule 403;

I. The Defendant's ninth request is **GRANTED IN PART AND DENIED IN PART.** If Plaintiff can establish authenticity at trial, to the extent that the Labor Data is relevant and is limited in scope to the geographically relevant location pertinent to this case, it is admissible. Plaintiff is precluded from introducing into evidence the Action Letters pursuant to Rules 401, and 403;

J.  The Defendant's tenth request is **GRANTED**.  Plaintiff is precluded from entering into evidence the Taffal Declaration. The extent to which the Taffal Declaration may be used for impeachment or rehabilitative purposes will be determined at trial;

K.  The Defendant's eleventh request is **DENIED**.  Evidence of Defendant's post-notification conduct, including the opening of new stores is admissible on the issue of Defendant's bad faith, and in measuring Defendant's profits, if necessary;

L.  The Defendant's twelfth request is **GRANTED**.  Plaintiff is precluded from entering into evidence its Syosset store closure for failure to timely disclose the closure to Defendants and pursuant to Rule 403;

M.  The Defendant's thirteenth request is **GRANTED**.  On consent of the parties, Plaintiff is precluded from entering into evidence testimony concerning secondary meaning relating to events occurring after July 2015 pursuant to Rule 401;

N.  The Defendant's fourteenth request is **DENIED AS MOOT** in light of the Court's rulings on this matter at the February 22, 2023, hearing; and

O.  The Defendant's fifteenth request is **GRANTED**.  On consent of the parties, Plaintiff is precluded from entering any evidence relating to its new mark pursuant to Rule 401.

SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: March 7, 2023
       Central Islip, New York