Case 2:18-cv-06449-JS-ARL   Document 234   Filed 04/07/23   Page 1 of 15 PageID #: 6977

FILED
CLERK

4/7/2023 4:31 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
RVC FLOOR DECOR, LTD.,

                Plaintiff,                    MEMORANDUM & ORDER
                                              18-CV-6449 (JS)(ARL)
       -against-

FLOOR AND DECOR OUTLETS OF
AMERICA, INC.,

                Defendant.
---------------------------------X
```

APPEARANCES
For Plaintiff:      Craig B. Sanders, Esq.
                    Jonathan Mark Cader, Esq.
                    James H. Freeman, Esq.
                    Sanders Law Group
                    333 Earle Ovington Boulevard, Suite 402
                    Uniondale, New York  11530

                    Erica Carvajal, Esq.
                    Sanders Law LLC
                    100 Garden City Plaza, Suite 500
                    Garden City, New York  11530

For Defendant:      Bryan J. Wolin, Esq.
                    H. Forrest Flemming, III, Esq.
                    Robert Nathan Potter, Esq.
                    Kilpatrick Townsend & Stockton LLP
                    1114 Avenue of the Americas, 21st Floor
                    New York, New York  10036

                    Richard Charles Henn, Jr., Esq.
                    Kilpatrick Townsend & Stockton LLP
                    1100 Peachtree Street, Suite 2800
                    Atlanta, Georgia  30309

SEYBERT, District Judge:

RVC Floor Decor, Ltd. ("Plaintiff") initiated this trademark infringement case against Floor & Decor Outlets of America, Inc. ("Defendant") pursuant to Section 43(a) of the Lanham

1

Act, New York common law, and New York General Business Law Section 360-l.[1]  Trial is scheduled to commence in this case on April 10, 2023.  Presently before the Court is Plaintiff's motion to exclude the expert testimony of David T. Neal, Ph.D. ("Dr. Neal") (ECF No. 190).  For the reasons detailed below, Plaintiff's motion is DENIED.

BACKGROUND

I. Facts

For a thorough recitation of the factual and procedural background of this case, the Court refers the parties to Judge Hurley's March 18, 2021, Memorandum & Order denying Plaintiff's motion for summary judgment and denying in part and granting in part Defendant's cross-motion for summary judgment.  See RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc., 527 F. Supp. 3d 305, 312-15 (E.D.N.Y. 2021).[2]  The Court recites only those facts necessary to resolve the instant motion.

---

[1] Plaintiff also brought claims pursuant to New York General Business Law Section 349, which were dismissed during the summary judgment stage of this case.  See RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc., 527 F. Supp. 3d 305, 321-22 (E.D.N.Y. 2021).

[2] Judge Hurley's Memorandum & Order is also available on the case docket at ECF No. 147.  Going forward, the Court will refer to this case by its Reporter citation.

2

      A.    <u>Dr. Neal's Qualifications</u>

Dr. Neal is "an Executive in Residence at Duke University and Managing Partner of Catalyst Behavioral Sciences, LLC, a research consulting firm specializing in the analysis of human decision making and consumer behavior." (First Neal Report, Ex. 2, ECF No. 190-3, ¶ 1.1, <u>attached to</u> Motion.) Dr. Neal has previously "acted as a consultant" to various entities including, "Bayer, Microsoft, Proctor & Gamble, Intel, and Johnson & Johnson . . . the World Bank, The Bill and Melinda Gates Foundation, The Centers for Disease Control and Prevention, USAID, and the Surgeon General of the U.S. Army." (<u>Id.</u> ¶ 1.2.) Dr. Neal received his Ph.D. in "psychology from the University of Melbourne . . . and . . . completed [his] post-doctoral training at Duke University, working in the psychology department and Fuqua School of Business." (<u>Id.</u> ¶ 1.3.) At Duke, Dr. Neal has served "as the Director of the Interdisciplinary Social Science Research Laboratories" before serving as "an assistant professor of psychology at the University of Southern California ('USC')." (<u>Id.</u>) While at Duke and USC, Dr. Neal taught "advanced research methods (including survey design), consumer behavior, and marketing courses." (<u>Id.</u>) In terms of publications, Dr. Neal has "published extensively in the areas of consumer behavior and decision making." (<u>Id.</u>; <u>see also</u> Neal Curriculum Vitae, ECF No. 190-3, <u>attached to</u> Motion.)

In his initial report, Dr. Neal designed a secondary meaning survey comprised of "600 U.S. adults who [were] likely consumers of flooring, upholstered furniture, wallpaper or cabinetry . . . [who] lived in one of the following four counties: Kings, Nassau, Queens or Suffolk." (First Neal Report, ¶ 2.1.) "After qualifying to complete the survey, respondents were randomly assigned to see" one of two FLOOR DECOR logos. (Id. ¶ 2.2.) "Both logos were presented using substantially the same font and color palette that is used by Plaintiff in their store-front signage." (Id.) "[A]fter viewing one of the two randomly assigned logos, respondents were probed as to whether they associated the presented logo with a particular company or companies." (Id. at ¶ 2.3.) Where respondents stated that they "did associate the logo with a particular company or companies," the respondents were "probed as to whether they associated the presented logo with 'one company,' 'more than one company,' or 'I don't know.'" (Id.) Dr. Neal next calculated the "'net secondary meaning' . . . [f]ollowing standard practice of surveys of this kind." (Id. ¶ 2.5.) In sum, Dr. Neal concluded that "the net association between FLOOR DECOR and a single source [was] 1.4%." (Id. ¶ 2.6.) Consequently, Dr. Neal concluded that "FLOOR DECOR's level of association with a single source . . . falls far below the threshold required for establishing secondary meaning or acquired distinctiveness." (Id. ¶ 2.7.)

4

A second, supplemental, report was authored by Dr. Neal after he determined that "there [were] two small business on Long Island that include 'Floor Store' in their name." (Neal Suppl. Report, Ex. 3, ECF No. 190-3, ¶ 3.2, attached to Motion.)  "To rule out any possibility that the results of [his] first study fielding were dependent upon the" Floor Store control cell, Dr. Neal included "a second control cell," which was "Floor Shop." (Id.)  As such, "between January 16 and 19, 2019, [Dr. Neal] collected data from an additional 300 U.S. likely consumers of flooring, upholstered furniture, wallpaper, or cabinetry in the same four counties." (Id.)  Dr. Neal states that "[i]n this second round of data collection, respondents completed an identical survey to round one, but were assigned instead" to the Floor Shop control cell. (Id.)  Ultimately, Dr. Neal concluded from the results of his survey that "regardless of whether we use Control 1 (FLOOR STORE) or Control 2 (FLOOR SHOP) as the control condition . . . Plaintiff's claimed FLOOR DECOR mark has, at most, achieved secondary meaning among . . . 2.5% of the relevant consuming public." (Id. ¶¶ 2.66, 2.7)

B. Plaintiff's Motion

According to Plaintiff, Defendant seeks to introduce evidence through Dr. Neal "for the purpose of establishing that the FLOOR DECOR trademark, by which Plaintiff has advertised its products since 1974, purportedly did not acquire a secondary

5

meaning for purposes of affording Plaintiff trademark rights in and protection of such mark" in the relevant geographical area. (Support Memo, Ex. 5, ECF No. 190-5 at 1, attached to Motion.) Plaintiff seeks to exclude Neal's report and anticipated testimony because: (1) "in conducting the consumer survey, Dr. Neal did not use the relevant time period as was determined by Judge Hurley in his summary judgment decision for his analysis;" and (2) "Dr Neal's customer survey did not present survey participants with a display of Plaintiff's design mark (i.e., logo) adjacent to its work mark." (Id.)  Defendant filed opposition to Plaintiff's Motion.  (See Opp'n, ECF No. 191).  Afterwards, Plaintiff filed a reply.  (See Reply, ECF No. 192.)

## DISCUSSION

I. Legal Standard

   A. Motions *in Limine*

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine." Highland Cap. Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing Luce v. United States, 469 U.S. 38, 41 n.4 (1984)).  Motions in limine "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." Mango v. BuzzFeed, Inc., 316 F. Supp. 3d 811, 812

6

(S.D.N.Y. 2018) (quoting Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996)).  In ruling on a motion in limine, evidence should be excluded, "[o]nly when [it] is 'clearly inadmissible on all potential grounds.'"  United States v. Ceballo, No. 13-CR-0308, 2014 WL 4980554, at *1 (E.D.N.Y. Oct. 6, 2014) (quoting United States v. Paredes, 176 F. Supp. 192, 193 (S.D.N.Y. 2001)).  In "considering a motion in limine, [the Court] may reserve judgment until trial, so that the motion is placed in the appropriate factual context."  United States v. Chan, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).  Moreover, the Court's ruling on a motion in limine is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer."  Id. at 341 (quoting Luce, 469 U.S. at 41).

    B.    Expert Testimony

The admission of expert testimony is governed by Federal Rule of Evidence ("Rule") 702, which allows the testimony of "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

7

Fed. R. Evid. 702.

While the party seeking admission of the expert testimony bears the burden of demonstrating its admissibility, see In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 253 (2d Cir. 2016), under Rule 702, district courts perform "a 'gatekeeping' role' by 'ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" United States v. Napout, 963 F.3d 163, 187-88 (2d Cir. 2020) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)). In fulfilling its role as gatekeeper, the district court "should look to the standards of Rule 401 in analyzing whether [the] proffered testimony is relevant." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002). Pursuant to Rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. However, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

"Next, the district court must determine 'whether the proffered testimony has a sufficient reliable foundation' to

8

permit it to be considered." Amorgianos, 303 F.3d at 265-66 (quoting Daubert, 509 U.S. at 597). The Court, in making this determination "should consider the indicia of reliability identified in Rule 702." Id. "In short, the district Court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Id. at 266 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

In addition to the indicia of reliability identified in Rule 702, "Daubert enumerated a list of additional factors bearing on reliability that district courts may consider." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). These additional factors include, "(1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." Id. (quoting Daubert, 509 U.S. at 593-94). Importantly, the additional factors enumerated in Daubert are not intended to constitute "a 'definitive checklist or test.'" Amorgianos, 303 F.3d at 266 (quoting Daubert, 509 U.S. at 593). Instead, "[t]he inquiry envisioned by Rule 702

9

is . . . a flexible one, and 'the gatekeeping inquiry must be tied to the facts of a particular case.'" Id. (alterations in original) (first quoting Daubert, 509 U.S. at 593, then quoting Kumho Tire, 526 U.S. at 150).

## II. ANALYSIS

### A. Survey Evidence Measured After July 2015

Plaintiff first argues that Dr. Neal's consumer surveys must be excluded "because they rely on consumer survey evidence measured well after the July 2015 cut-off date set by the Court" for Plaintiff to establish that its mark achieved secondary meaning. (Support Memo at 7); see also RVC Floor Decor, 527 F. Supp. 3d at 317 ("Plaintiff's mark must have achieved secondary meaning by July 2015."). Plaintiff highlights that Dr. Neal's first report "indicates that [his] survey was conducted between November 29, 2018 and December 4, 2018." (Support Memo at 8.) Further, only those "persons who had purchased the products sold by Plaintiff within two years prior to the survey date (or who planned to purchase similar products within two years after the survey date) [were allowed] to participate." (Id.) Regarding Dr. Neal's second report, Plaintiff highlights that "the survey was conducted between January 16, 2019 and January 19, 2019," and that participation was limited "to persons who had purchased the products sold by Plaintiff within two years prior to the survey date (or who planned to purchase similar products within two years

10

after the survey date)." (Id.) Plaintiff avers that "[i]f Dr. Neal believed a four . . . year window [constituted] an appropriate sample period" based on the July 2015 cutoff date for Plaintiff to establish that its mark had achieved secondary meaning, "then the relevant sample period would be from July 2011 to July 2015." (Id. at 8-9.) Consequently, Plaintiff submits that Dr. Neal's survey reports are irrelevant pursuant to Rule 403. (Id. at 10-11.)

Defendant counters that "[c]ourts and commentators have recognized that a secondary meaning survey conducted during litigation is probative of whether a mark acquired secondary meaning sometime in the past." (Opp'n at 5.) Moreover, Defendant argues that "Dr. Neal conducted his surveys within . . . two months" of Plaintiff filing this case and that courts have held that "a secondary meaning survey conducted within five years of the relevant date is probative of secondary meaning." (Id. at 5-6.) Additionally, Defendant contends that because Plaintiff opened a new store in 2014 "and ramped up its advertising spend[ing] between 2015 and 2018," "the Asserted Name should have had a better chance of being associated with [Plaintiff] in 2018 . . . rather than in 2015." (Id. at 7.) Regarding Dr. Neal's decision to limit respondents, Defendant states that such issues go to the weight of the evidence and not its admissibility. (Id. at 7-8.)

11

"[C]ourts have long held that consumer surveys are the most persuasive evidence of secondary meaning." RVC Floor Decor, 527 F. Supp. at 317 (quoting LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 638-39 (S.D.N.Y. 2016)); see also Sports Traveler, Inc. v. Advance Mag. Publishers, Inc., 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) ("[C]onsumer surveys have become the usual way of demonstrating secondary meaning . . . ."). However, the date upon which the survey was taken can affect both the relevancy of the survey data and the weight a court should give it. See e.g., Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc., 909 F.3d 1110, 1122-23 (Fed. Cir. 2018) (holding that "[s]urveys that are conducted within five years of the relevant date [for assessing the existence of secondary meaning] may provide evidence of secondary meaning"); see also Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 419 (6th Cir. 2006) (holding that "[a] court may easily take into consideration the strength of recognition at the time of the survey in light of the amount of time passed between that date and the date of infringement," and that, consumer surveys conducted in 1999 and 2002 provided "strong statistical evidence" supporting secondary meaning in 1992); I.P. Lund Trading ApS v. Kohler Co., 118 F. Supp. 2d 92, 106-111 (D. Mass 2000) (considering consumer surveys conducted in 1999 and 2000, several years after the defendant

12

entered the relevant market in 1996, in its secondary meaning analysis).

Here, the Court finds that the timing of the survey reports and Dr. Neal's decision to limit the universe of respondents that were permitted to participate in the survey goes to the weight of the evidence rather than its admissibility. Furthermore, the Court finds that any of Plaintiff's perceived deficiencies in the survey reports may be explored during cross-examination. See On Site Energy Co. v. MTU Onsite Energy Corp., No. 10-CV-1671, 2012 WL 2952424, at *3 (E.D.N.Y. July 19, 2012 (declining to exclude a confusion survey on the basis that "its respondent universe was too broad" because "[e]rrors in survey methodology generally go to the survey's weight, not its admissibility"); In re Scotts EZ Seed Litig., No. 12-CV-4727, 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017) (finding that while defendants argued an expert's methodology was flawed because "he failed to survey the proper universe" such arguments "'ultimately go to the weight, not the admissibility, of [the expert's] testimony and are fodder for cross-examination, not exclusion'" (quoting In re Gen. Motors LLC Ignition Switch Litig., No. 14-CV-8317, 2017 WL 2664199, at *2 (S.D.N.Y. June 20, 2017))).

13

B.  <u>Failure to Present Survey Participants with a Display of Plaintiff's FD Design Mark</u>

Plaintiff next argues that Dr. Neal's survey reports must be excluded because "they did not furnish accurate materials to the survey respondents for the purposes of comparison." (Support Memo at 9.)  Specifically, Plaintiff highlights that the "FLOOR DECOR" mark which Dr. Neal presented to his respondents when "asking if they associated the mark with any particular business" failed to also include Plaintiff's lowercase "fd" insignia "alongside [its] word mark." (<u>Id.</u>)  Plaintiff concludes that since "[t]he surveys . . . omit a critical piece of information" they should be excluded on relevancy and helpfulness grounds. (<u>Id.</u> at 10-11.)  Defendant counters that "Dr. Neal was not required to include the FD Mark in his survey for the simple reason that [Plaintiff] is <u>not</u> claiming any rights in an 'fd' mark in this litigation and is <u>not</u> alleging that [Defendant] infringes an 'fd' mark." (Opp'n at 8-9.)  Defendant elaborates that Plaintiff's Complaint "alleges only that it operated a store under the trademark 'Floor Decor,' and that it uses the tradenames 'Floor Decor' and 'Floor Decor and Design.'" (<u>Id.</u> at 9.)  Defendant explains that to include the "fd" mark would have been to contaminate the survey since "the logo is a separate visual asset that is distinct from the name." (<u>Id.</u>)

14

Here, the Court agrees with Defendant that the mark at issue in this litigation is "FLOOR DECOR" and that Plaintiff must establish that its "Floor Decor" mark has achieved secondary meaning before July 2015. See RVC Floor Decor, Ltd., 527 F. Supp. 3d at 316 ("Plaintiff's unregistered mark is the tradename 'Floor Decor.'") Consequently, the fact that Dr. Neal's survey report presented respondents with only Plaintiff's "Floor Decor" mark independent of Plaintiff's design mark does not affect the admissibility of the survey. To the extent that Plaintiff has concerns about Dr. Neal's methodology, it will be permitted to probe those issues on cross-examination.

## CONCLUSION

For the stated reasons, **IT IS HEREBY ORDERED** that the Plaintiff's Motion to Exclude the Expert Report of David Neal, PHD, (ECF No. 190) is DENIED.

SO ORDERED.

JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: April 7, 2023
       Central Islip, New York

15