UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
RVC FLOOR DECOR, LTD.,

                Plaintiff,              MEMORANDUM & ORDER
                                     18-CV-6449 (JS)(ARL)

    -against-

FLOOR AND DECOR OUTLETS OF
AMERICA, INC.,

                Defendant.
-------------------------------X
APPEARANCES
For Plaintiff:       Craig B. Sanders, Esq.
                    Jonathan Mark Cader, Esq.
                    James H. Freeman, Esq.
                    Sanders Law Group
                    333 Earle Ovington Boulevard, Suite 402
                    Uniondale, New York  11530

                    Erica Carvajal, Esq.
                    Sanders Law LLC
                    100 Garden City Plaza, Suite 500
                    Garden City, New York  11530

For Defendant:       Bryan J. Wolin, Esq.
                    H. Forrest Flemming, III, Esq.
                    Robert Nathan Potter, Esq.
                    Kilpatrick Townsend & Stockton LLP
                    1114 Avenue of the Americas, 21st Floor
                    New York, New York  10036

                    Richard Charles Henn, Jr., Esq.
                    Kilpatrick Townsend & Stockton LLP
                    1100 Peachtree Street, Suite 2800
                    Atlanta, Georgia  30309

SEYBERT, District Judge:

        RVC Floor Decor, Ltd. ("Plaintiff") brought this action

against Floor and Decor Outlets of America, Inc. ("Defendant") for

violations of the Lanham Act, New York state common law, and New York General Business Law.  (See generally Complaint, ECF No. 1.)[1]

This case initially proceeded as a jury trial; however, on April 18, 2023, after dismissing Plaintiff's New York common law unfair competition claim as a matter of law, this Court granted Defendant's Motion to Strike the Jury since the Court found that the only remaining remedy which Plaintiff sought--an accounting of profits under the Lanham Act--was an equitable remedy which did not create a jury-trial right.[2]  (Reconsideration Order, at 22-24.) This Memorandum, Decision, and Order contains the findings of fact and conclusions of law required by Federal Rule of Civil Procedure

---

[1] Plaintiff's New York General Business Law § 349 claim was dismissed during summary judgment by then-presiding Judge Hurley. RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc., 527 F. Supp. 3d 305, 332 (E.D.N.Y. 2021).   Judge Hurley reasoned Plaintiff's § 349 claim should be dismissed because, inter alia, Plaintiff implicitly conceded its case did not involve evidence of actual injury.  Id. at 322.  Additionally, Judge Hurley precluded Plaintiff from seeking compensatory damages as part of its Lanham Act claim.  Id. at 332.

Similarly, at the close of Plaintiff's case, upon reconsideration, this Court granted in part and denied in part Defendant's Motion for Judgment as a Matter of Law and dismissed both Plaintiff's New York common law unfair competition claim and its claim for punitive damages pursuant to same.  (See Apr. 26, 2023 Mem. & Order, ECF No. 258, in toto (hereafter the "Reconsideration Order").)   The Court reasoned, in sum, Plaintiff had not introduced sufficient evidence of bad faith to sustain its New York common law unfair competition claim.  (Id. at 8-16.)

[2] See also supra n.1.

52(a)(1)[3] as to Plaintiff's remaining claims, to wit: (1) trademark infringement and unfair competition in violation of § 43(a) of the Lanham Act; and (2) violations of New York General Business Law § 360-l.  After carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, the Court finds in favor of Defendant on all remaining counts.

### FINDINGS OF FACT[4]

Based on the evidence presented, the Court makes the following findings of fact.  They are drawn from witnesses' testimony at trial, and the parties' trial exhibits.

---

[3] Rule 52(a)(1) provides:

> In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

FED. R. CIV. P. 52(a)(1).

[4] To the extent any of the findings of fact may be deemed conclusions of law, they shall also be considered conclusions. Likewise, to the extent any of the conclusions of law may be deemed findings of fact, they shall be considered findings. See Miller v. Fenton, 474 U.S. 104, 113-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

I.   <u>General Background: Plaintiff</u>

    A. <u>Plaintiff's Corporate Name and its Asserted Mark</u>

       Plaintiff is a New York corporation, incorporated on October 4, 1974, with its principal place of business in Rockville Centre, New York. (Tr. 178:24-179:1, 482:12-22.) Glenn Altarac ("Altarac") is the current, sole, owner of Plaintiff. (<u>Id.</u> 178:20-23.) Robert Smith ("Smith") was one of Plaintiff's original founders and owned fifty percent of the company. (<u>Id.</u> 113:15-114:2.) Smith sold his interest in Plaintiff sometime in 2000. (<u>Id.</u>)

       Plaintiff's corporate name is RVC Floor Decor, Ltd. (<u>Id.</u> 178:13-14.) Nevertheless, Plaintiff asserts from its inception to present it has operated under the name "Floor Decor" (the "Asserted Name") within the geographic region of Nassau, Suffolk, Kings, and Queens County (the "Four-County Area"). (<u>Id.</u> 116:11-22; 117:11-19; 185:25-186:6; 482:25-483:1.) Plaintiff added "RVC" to its corporate name on the advice of its attorney, who advised it "would be easier for [Plaintiff] to get the name that [it] wanted", <u>i.e.</u>, "Floor Decor", if it included "RVC". (<u>Id.</u> 117:13-19; 149:23-150:4.) Plaintiff included the words "Floor Decor" in its name because it accurately "described the [products] that [Plaintiff was] going to be selling." (<u>Id.</u> 150:5-7.) In formulating its corporate name, it was understood by Smith that "somebody might [already] have" the name

"Floor Decor". (Id. 117:20-118:1.)  From its inception to present, Plaintiff has neither applied to register the Asserted Name with the United States Patent & Trademark Office, nor applied to register it at the state level. (Id. 150:12-19; 346:20-347:12.)

Notwithstanding Plaintiff's corporate name, when operating the business, Smith, Altarac, and Plaintiff's employees have consistently referred to Plaintiff as "Floor Decor." (Id. 118:4-9; 182:23-25; 222:20-22; 417:2-17.)  Nevertheless, historically, Plaintiff has been inconsistent with its presentation of the Asserted Name in various advertisements, and online. (See PX017; PX019; DX1005; DX1006-DX1009; DX1018; see also infra-Part I.D.)

   B. Plaintiff's Business Operations, Generally

In 1984, Plaintiff relocated to its present location at 456 Sunrise Highway, Rockville Centre (the "Rockville Location"). (Tr. 121:15-20; 183:1-14; 482:23-24.)  During this period, the Rockville Location was approximately 11,500 square feet to which 6,000 square feet was allocated to warehousing, 2,000 square feet was allocated to storage and fabrication of rugs, and the remainder was allocated to the showroom. (Id. 135:6-16.)  In the late 1980s this was increased to approximately 13,500 square feet. (Id. 183:12-19.)

The Rockville Location is approximately 3,000 feet from the Long Island Railroad and Plaintiff has generated business from

commuters who saw the Rockville Location whilst commuting through Rockville Centre.  (Id. 137:10-139:13.)   The Mayor of Rockville Centre may have attended the grand opening of the Rockville Location.  (Id. 139:20-22.)

The Rockville Location features an exterior sign on the fascia of the building which displays the Asserted Name alongside the words: "carpet, tile, rugs", in lowercase, font. (Id. 136:3-16; 137:4-9; see also PX049.)  Historically, the text font of letters in Plaintiff's sign was colored white. (Id. 163:5-19.)  Additionally, Plaintiff's exterior sign includes a stylized "fd" logo to the left of the Asserted Name.  (PX049; see also Tr. 155:4-12.)  Plaintiff used variations of the "fd" logo in certain of Plaintiff's advertisements throughout this period.  (Compare e.g., PX006 with PX007; see also Tr. 155:4-156:16.)  In other advertisements, Plaintiff omitted the "fd" logo entirely and instead presented a design in which the Asserted Name was displayed at a right angle on the upper left-hand side of the advertisement.  (See PX007.)  Notwithstanding these design choices, Plaintiff's advertisements from 1974-1996 consistently referred to Plaintiff by the Asserted Name.

Today, the exterior sign is largely similar; however, the lettering on the sign is colored red. (Tr. 163:5-21; 184:7-25.)  Further, sometime in 2014, in conjunction with Plaintiff's plans to open a new store in Syosset,

Plaintiff added "& Design" to its name and adopted a new "FD&D" logo which was affixed to Plaintiff's exterior sign above the entrance of the Rockville Location.[5]  (Id. 377:18-378:5; see also PX049.)  The "FD&D" logo became Plaintiff's main logo from 2014 onwards and featured on all its subsequent advertising.  (Id.; see also DX1020.)

C. Plaintiff's Target Customers and Asserted Market

At inception, Plaintiff sold "carpet, vinyl tile, linoleum, wood floors and ceramic."  (Id. 116:23-117:1.)  From 1975-1980, 75 to 80 percent of Plaintiff's business consisted of "mostly carpet, vinyl, tile, wood flooring and ceramic, in that order."  (Id. 122:13-19.)  Upon moving to the Rockville Location, almost immediately, Plaintiff began selling decorative products in addition to those products identified above. (Id. 121:15-122:5.) Advertisements from the 2010s confirm Plaintiff's contemporary product offerings remain consistent with those offered in the past. (See, e.g., DX 1009 (stating Plaintiff offers "the largest selection of carpet, hardwood, ceramic, laminate and vinyl flooring" and customers can "[v]isit [the] . . . showroom . . . for all of [their] flooring, kitchen,

_____

[5] By referring to itself as "Floor Decor & Design", Plaintiff intended to eliminate concerns the Asserted Name, standing alone, would not properly inform customers about the range of design products Plaintiff intended to offer at its new Syosset store location.  (Tr. 223:15-226:1.)

bath, and interior design needs"); see also DX 1046 (stating, in addition to those categories of products previously identified, Plaintiff also offers "Fabrics Trim and Wall Covering Draperies . . . Window Treatments[,] Custom upholstery . . . Vinyl Sliding Windows[,] Roofing[,] General Contracting[,] Interior and Exterior Painting[,] Custom Built Cabinetry Kitchens and Bathrooms" and provides installation services which are performed by Plaintiff's "own craftsman").)

Historically, Plaintiff's customer base has extended from Nassau County into Brooklyn, Queens, and Suffolk County. (Tr. 133:16-24.)  Plaintiff's company policy is to have its employees personally show customers around its showroom and to discuss design options with them. (Id. 436:3-20.)  The amount of time Plaintiff's employees will spend with any client varies; however, some clients can spend up to two or three hours at Plaintiff's store. (Id. 435:8-436:2.)  Generally, even clients engaging in small projects will spend thousands of dollars with Plaintiff. (Id. 438:5-14.)

Since 1996, Plaintiff has served approximately 18,000 customers. (Id. 283:8-10.)  As much as 70 to 80 percent of Plaintiff's business consists of satisfied, repeat customers, and referrals. (Id. 420:3-421:12; 437:13-16; see also PX115 ("Korner

Tr.") 11:4-7; PX116 ("Lepkoff Tr.") 7:18-24; 22:25-23:3; PX156 ("Venier Tr.") 8:11-24; 20:12-18; 27:14-28:3.)

    D. <u>Plaintiff's Advertising Efforts and Gross Sales Revenue</u>

From 1975-1980, Plaintiff's advertising budget was approximately $10,000 to $12,000 per year; Plaintiff "tried to keep [the advertising budget] to a minimum" because of the expense. (Tr. 128:14-20.) The parties dispute whether Plaintiff's advertising was continuous in nature. What cannot be disputed is that throughout 1974-1980, Plaintiff's advertising campaign was limited to small, local newspapers, including Pennysaver and the Yellow Pages; Plaintiff's advertising was targeted at the South Shore of Long Island and into Suffolk County. (<u>Id.</u> 124:14-25; 125:5-8.) During this time Plaintiff advertised itself using the Asserted Name. (<u>Id.</u> 125:23-25.) As to sales, Smith testified Plaintiff's first year sales in 1974 were approximately $500,000; this figure later rose in 1978 to an estimated $1 million.[6] (<u>Id.</u> 119:12-14; 126:4-10.)

Around 1982, Plaintiff began advertising in Newsday. (<u>Id.</u> 126:24-127:18.) Likewise, Plaintiff utilized various other forms of print media including pamphlets, direct brochures, and

---

[6] Plaintiff's historical sales numbers were wholly based upon Smith's recollection. Consequently, the Court accepts these numbers with trepidation, and affords them less credence than it would have had Plaintiff substantiated Smith's estimations with documentary evidence. (<u>See id.</u> 153:21-154:6.)

mailings to former customers.  (Id. 127:19-128:7.)  Sales in 1982 were estimated to be $1.5 million; this figure increased to $2 million in 1984.  (Id. 126:4-10.)

Smith testified that, in the 1990s, Plaintiff's advertising budget was approximately $100,000.[7] (Id. 139:25-140:5.)  Around 1990, Plaintiff entered a business relationship with Karastan Carpets ("Karastan"). (Id. 142:20-143:13.)  Subsequently, Plaintiff's advertising budget increased to approximately $125,000 per year.  (Id. 144:13-17.) To advertise its association with Karastan, Plaintiff began prominently featuring the Karastan logo in some of its advertisements. (Id. 154:19-22.)  Throughout this period, Newsday remained Plaintiff's main source of advertisement (id. 140:3-9; 144:2-5), but Plaintiff did advertise "on TV at some point", including Channel 12 and some cable channels.  (Id. 140:3-9.) However, between 2000 and July of 2015, Plaintiff engaged in no television advertising.  (Id. 383:5-9.)  Likewise, Plaintiff ran a very limited amount of radio advertisement due to difficulty tracking its effectiveness and the cost.  (Id. 153:7-20.)  While Plaintiff did run some limited radio advertisement between

---

[7] Smith's estimations of Plaintiff's historical advertising budgets, like his estimations as to its historical sales volumes, were based entirely upon his recollection.  Plaintiff did not introduce documentary evidence substantiating these figures.  (See id. 152:2-5.)

2012-2013, this was the total extent of Plaintiff's radio advertisement during the relevant period. (Id. 383:10-24.)[8]

Sometime in the 1990s, Plaintiff entered a business relationship with Carpet One. (Id. 144:21-24.) Carpet One is a membership buying group. (Id. 144:25-145:8.) Plaintiff's membership in Carpet One provided it with "advantages that other stores" did not have, including, inter alia, rebates on products Plaintiff purchased, and help from Carpet One in developing advertisements. (Id. 145:9-18.) Plaintiff continued to operate under the Asserted Name notwithstanding its membership in Carpet One. (Id. 146:10-17.) Nevertheless, beginning in 1996, Plaintiff began to include Carpet One's brand-name "in a smaller font or logo" on some of Plaintiff's advertisements. (Id. 146:15-21; 159:3-163:4.) In exchange, Plaintiff received "a greater level of reimbursement from Carpet One for the ad[vertisement]." (Id. 162:5-163:4.) Additionally, Plaintiff began running advertisements in which Carpet One's brand-name was featured "more centrally, such as including their name after [Plaintiff's] in the title of the ad[vertisement]". (Id.; see also id. 159:13-19; PX019 (2011 advertisement which Smith agreed was demonstrative of what he meant when he testified Plaintiff ran advertisements featuring

---

[8] Plaintiff's 2020 radio advertisement campaign is irrelevant considering the secondary meaning cutoff date of July 2015.

"Carpet One" centrally with the Asserted Name).)  Smith estimated that by 1990, Plaintiff's sales had risen to $3 million and peaked at $3.8 million in 1995.  (Id. 126:14-20.)

From 1996-2001, Altarac testified Plaintiff's sales remained above $3 million, grossing between approximately $3.1 million and $3.5 million.  (Id. 284:24-285:1.)

On February 20, 1997, Plaintiff was featured in the "RVC News Owl" in recognition of various donations of carpet it had made to a local senior living project.  (Id. 130:7-131:8; see also PX027.)

From 1996-2011, Plaintiff's advertising budget was estimated to be consistently above $100,000.  (Id. 284:24-286:13.)  From 2001-2002, Plaintiff began advertising in the Long Island section of the New York Times, which covered the Four-County Area, using the Asserted Name.  (Id. 200:11-21.)  Plaintiff discontinued advertising in the New York Times shortly thereafter because the expense was not worth the return on investment.  (Id. 200:22-201:4; 384:2-15.)

Regarding online advertising, Plaintiff did not maintain its own internet domain name as of 2004; however, during this time Carpet One developed a website for Plaintiff with the URL: www.CarpetOne.com/FloorDecor.  (Id. 208:2-15; see also PX013.)  A later domain name, developed in 2012 for Plaintiff by Carpet One, identified Plaintiff's website as floordecorrockvillecentre.com.

(Id. 220:5-15; 359:12-361:6; see also DX1005.)  This later iteration of Plaintiff's website referred to Plaintiff as "Floor Decor Carpet One Floor & Home®" and referred to Altarac as the owner of same.  (DX1005.)[9]

As of July 2015, Plaintiff did not maintain any social media accounts. (Tr. 381:22-382:8.)  Likewise, prior to July 2015, Plaintiff did not run any paid advertisements on Google. (Id. 384:19-25.)

From 2012 onwards, Plaintiff's advertising expenditures and gross sales revenues are each substantiated by accounting records.  (Id. 385:3-10.)  These records reveal that Plaintiff's advertising budgets from 2012-2015 were considerably lower than those historical budgets estimated to by Smith.  For example, in 2012, Plaintiff's advertising expenditures were $56,381 (see id. 385:24-386:11; see also DX1037 at 58); this figure fell modestly in 2013 to $48,037 (see id. 386:18-387:1; see also DX1037 at 50), before falling precipitously to $23,497 in 2014 (see id. 387:4-9;

---

[9] Record evidence further establishes that many of Plaintiff's own suppliers refer to Plaintiff on their websites as "RVC Floor Decor" and that third-party listings, likewise, refer to Plaintiff using names other than the Asserted Name.  (See DX1010, DX1014-DX1017; Tr. 372:14-375:2.)

see also DX1037 at 42.)   In 2015, Plaintiff spent $44,654 on advertising expenditures. (Id. 387:19-25; DX1037 at 34.)[10]

As to sales revenue, Plaintiff's accounting records show Plaintiff grossed: (1) $2,002,450 in 2012; (2) $2,573,759 in 2013; (3) $2,072,294 in 2014; (4) $2,206,660 in 2015; (5) $2,793,872 in 2016; (6) $2,392,584 in 2017; and (7) $2,530,070 in 2018. (See DX1037, in toto.)

## II.   General Background: Defendant

### A. Defendant Owns a Registered Trademark For its Floor & Decor Mark

Defendant is a Delaware corporation with its principal place of business in Atlanta, Georgia. (Tr. 483:2-4.) Defendant adopted its Floor & Decor mark (hereafter, Defendant's "Mark") in 2003 and applied to register same with the United States Patent and Trademarks Office the same year. (Id. 663:19-23.) Defendant's Mark was first registered on June 13, 2006, under U.S. Registration Number 3,102,586.   (Id. 664:8-19; see also DX1100 at 2.)[11]

---

[10] While Altarac disbelieved Plaintiff's advertising expenditures could be this low, the Court notes these accounting records were prepared by Plaintiff's own accountant.   (Tr. 387:12-18.) Moreover, Altarac's admission he does not even review Plaintiff's financial records renders all his testimony as to Plaintiff's financials incredible.   (See id. 408:16-409:12.)

[11] Defendant's application for protection of its "Floor & Decor" name was registered on July 4, 2006, under U.S. Registration Number 3,110,827.   (See DX1100 at 12.)   Both the June 2006, and July 2006 applications were filed July 14, 2003.   (Id.)

Defendant's Mark covers "retail store services featuring flooring materials and related home improvements [and] accessories." (DX1100 at 2.)  Defendant was unaware of Plaintiff's existence at the time it adopted its Mark.  (Tr. 662:12-16.)  Plaintiff never objected to any of Defendant's applications or registrations. (Id. 664:16-25.)

B. Defendant's General Business Operations

Defendant's brand proposition is "top quality floors at everyday low prices."  (Id. 660:6-10.)  Defendant maintains it holds the "largest in stock position in the marketplace."  (Id.)

Defendant does not offer carpet or rugs but instead sells hard surface flooring, to wit: "tile, wood, [and] stone." (Id. 660:14-17.)  Similarly, Defendant does not offer furniture, upholstery, window treatments, wall coverings, custom kitchens, custom bathrooms, vinyl siding, windows, roofing, general contracting, or painting.  (Id. 746:5-748:13; 750:5-751:21.) Defendant offers only limited design services such as helping customers "make decisions on . . . matching color." (Id. 746:22-747:4.)

Defendant opened its Farmingdale store in November 2018. (Id. 483:8-9.)  Defendant's Farmingdale store is approximately 80,000 square feet; this is typical of Defendant's stores nationwide, which, on average, measure 75,000 square feet. (Id. 691:23-692:5;  734:19-735:3.)  Customers entering the

Farmingdale store are confronted with multiple cash registers, "high ceilings, bright lights, a lot of product, [and] a lot of displays." (Id. 735:18-23.) Customers purchasing product from one of Defendant's stores can take the product home that day. (Id. 663:9-15.)

Since 2009, Defendant has maintained a retail website which is accessible to residents of Long Island. (Id. 671:18-672:4; see also DX1130.) Members of the public accessing Defendant's website can shop, purchase product, and have goods shipped directly to them. (Id. 666:20-669:24; see also DX 1103.) Between January 1, 2014, and December 31, 2017, prior to launching its Farmingdale Store, 38,436 users in the Four-County Area visited Defendant's website. (DX1130.) This traffic culminated in 435 transactions, which generated $109,091.80 in revenue for Defendant. (Id.)

C. Defendant's Target Customer Base

Defendant's customer base consists predominantly of professional contractors ("Pros") and homeowners. (Tr. 713:25-714:4.) Defendant estimates Pros comprise 85 percent of its business, either directly or through their client homeowners, with only "15 percent of [Defendant's] business being . . . customer[s] who buy[] and install[]" Defendant's products themselves. (Id. 714:7-16.) Defendant holds Pro-only events and sends out teams to meet local Pros before the grand

16

openings of its stores. (Id. 741:15-25.) Defendant provides Pros with private parking, and a separate entrance, as well as a "Pro-Desk", and dedicated "Pro Services" to help Pros manage and grow their businesses. (Id. 739:8-740:6.) To avoid competing with Pros, Defendant does not personally provide installation services; however, Defendant does offer opportunities for customers to connect with third-party installers. (Id. 709:16-18; 709:22-710:16.)

As to average revenue per customer, Defendant estimated each Pro, individually, spends approximately "$20,000 plus annually" at Defendant's stores. (Id. 740:18-20.) Comparatively, non-Pro customers, on average, spend approximately $5,000 per project with Defendant. (Id. 742:24-743:2.) Customers typically conduct research for approximately six months before making a flooring purchase with Defendant. (Id. 742:9-22.) Before a customer makes a purchase, Defendant expects the customer to shop around at competitor stores and make multiple visits to Defendant. (Id.) Defendant posits customers predominantly choose to purchase from Defendant because of the quality and pricing of its products. (Id. 743:6-10.) None of Defendant's customers have affirmatively stated the strength of Defendant's name motivated their purchase; Defendant speculates this is because flooring customers do not shop by brand. (Id. 743:11-23.)

D. <u>Defendant's Advertising and Marketing Channels</u>

Defendant advertises through "traditional channels" including "TV, radio, print, [and on] Billboard[s]" and various digital channels like "Google search, banner ads . . . [s]ocial media" and "email." (<u>Id.</u> 666:2-15.)

Further, Defendant bids on approximately 8,000 keywords as part of its Google Adwords campaign, including the search term "Floor Decor". (<u>Id.</u> 699:5-23.) Defendant bids on the term "Floor Decor" nationally, not simply in the Long Island market. (<u>Id.</u>) Defendant continued to bid on the "Floor Decor" ad term through 2018-2023. (<u>Id.</u> 700:2-701:8; 708:3-709:1.) Defendant does not purchase or bid on negative keywords. (<u>Id.</u> 706:20-23.)

E. <u>Entrance into the Four-County Area</u>

In 2012, Defendant became aware of Plaintiff's existence when Defendant's attorney, Paul Owens ("Owens"), prepared a list of potential competitors that included "Floor Decor" in their name. (<u>Id.</u> 680:3-681:10.) Despite this awareness, when Defendant opened its Farmingdale Location it did not contact Plaintiff to alert it of the opening. (<u>Id.</u> 291:5-20; 681:24-682:4.)

Wendy Martin ("Martin") is Defendant's Chief Marketing Officer. (<u>Id.</u> 659:19-660:2.) Martin explained Defendant was not worried about causing potential confusion when it opened its Farmingdale Location because of the difference in the parties' brand propositions (<u>id.</u> 717:7-19). Likewise, Martin stated

18

Defendant did not foresee any public confusion between the Defendant's Mark and Plaintiff's Asserted Name because Defendant owned a registered trademark for its Mark, had consistently used it on its website since 2009, and had been advertising using the Mark in the marketplace for several years prior to the grand opening of the Farmingdale Location.  (Id. 690:5-12.)

Martin estimated Defendant invested approximately $3.5 million in advertising ahead of the opening of its Farmingdale Location.  (Id. 678:5-8.)  From July 2015 to the end of 2017, Defendant spent approximately $1.1 million on radio advertisement. (Id. 675:20-22.)

After deducting the reasonable and undisputed costs and expenses incurred in connection with the sale of products and services, Defendant has made approximately $10.9 million in profits from sales at its Long Island stores.  (See Id. 771:5-17; 774:1-5; see also DX1135.)

III.   The Findings of Dr. Neal's Secondary Meaning Survey

Dr. David Neal ("Neal") is a qualified expert with extensive experience in consumer psychology and the design of surveys, including in the context of trademark litigation. (Id. 484:23-486:12; see also DX 1111.)  As part of its rebuttal case, Defendant offered Neal as an expert witness to opine about the results of two surveys he had conducted in December 2018 and January 2019, the key takeaway of which was that only three percent

19

of the relevant consuming public in the Four-County Area identified the Asserted Name with a single company.  (Id. 488:9-489:3.)

Neal testified his survey methodology was "conservative" and that he "err[ed] on the side of what would be logically beneficial to [Plaintiff]."  (Id. 493:23-501:25; 521:15-522:3.) In designing his survey, Neal utilized a large panel company, "Survey Sampling International" ("SSI"), to find a representative sample of 900 residents from the Four-County Area who had purchased the kinds of products sold by Plaintiff in the past two years, or would, in the next two years, be in the market for those types of products.  (Id. 490:23-496:7.)  SSI paid the participants of Neal's survey a small sum in points which could be exchanged for products or money.  (Id. 544:22-545:4.)

Potential respondents were asked a series of screening questions to ensure their suitability for the survey. (Id. 531:5-17; see also DX 1112, DX1113.)  Qualified respondents were shown the Asserted Name and a control cell, each presented in the same typeface and red coloring as that emblazoned on the exterior sign of Plaintiff's Rockville Location. (Id. 497:12-498:6; 518:12-20; see also DX 1112, DX1113.) Qualified respondents were then asked questions to assess whether they associated the Asserted Name with: (1) one company; or (2) more than one company.  (DX1112, DX1113.)  Likewise, qualified respondents were asked whether they associated the Asserted Name

20

with a particular company, or particular companies.  (Id.)  Both
questions also allowed qualified respondents to respond, "I don't
know", to either question.  (Id.)

Neal conceded, notwithstanding his survey results, that
he did not have data on consumers' perceptions as to secondary
meaning as of July 2015; further, Neal acknowledged he could not
opine as to whether the Asserted Name had attained secondary
meaning at any time between 1975-2006.  (Tr. 570:4-574:21.)

IV.   Plaintiff's "Likelihood of Confusion" Evidence

A. Geographic Proximity

Defendant's Farmingdale store is approximately 14 miles
from Plaintiff's Rockville Location; the Farmingdale Location was
approximately 8.2 miles from Plaintiff's Syosset Location.
(Id. 320:15-321:17;  324:12-18.)   Since the launch of its
Farmingdale Store, Defendant has opened several other locations in
the Four-County Area including: (1) Garden City (in March 2021);
(2) Commack; and (3) Bohemia.  (Id.)  From the Rockville Location,
Defendant's: Garden City store is approximately 6.2 miles away;
Commack store is an estimated 27 miles away; and, Bohemia store is
around 34 miles from said Location.  (Id.)

B. Consumer Confusion

1. Craig Cosgrove

Craig Cosgrove ("Cosgrove") is presently the store
manager at Plaintiff's Rockville Location.  (Id. 416:11-14.)  At

21

the time of trial, Cosgrove had worked for Plaintiff for almost three years.  (Id. 416:15-16.)  Cosgrove's duties as store manager include serving and greeting clients.  (Id. 418:7-16.)  Cosgrove has known Altarac his whole life having "gr[own] up with [him]." (Id. 416:7-10.)  Cosgrove testified he has never heard Plaintiff's business referred to by any name other than the Asserted Name. (Id. 417:2-17.)

Cosgrove's first recounted instance of consumer confusion involved his roommate "Alicia."  (Id. 421:13-422:7.) Cosgrove testified he became aware Alicia had installed new flooring in her upstairs apartment and, when he inquired as to where she had purchased it, Alicia responded, "I bought it from [Plaintiff's] store in Farmingdale."  (Id.)  Alicia only knew Cosgrove worked at a company called "Floor Decor". (Id.)  Cosgrove subsequently explained to her that Plaintiff did not own the Farmingdale store.  (Id.)

Next, Cosgrove recalled working with a client he referred to as "Jaime from Massapequa" ("Jamie").  Cosgrove spent many hours assisting Jaime in finding bathroom tile at the Rockville Location.  (Id. 423:3-424:15.)  Jaime later left the Rockville Location and returned with a sample tile she had purchased from Defendant's Farmingdale store, which she believed was owned by Plaintiff.  (Id. 428:11-20; 431:6-16.)  Jamie was attempting to match the tile she purchased at Defendant's

Farmingdale store with the samples she had initially viewed at Plaintiff's Rockville Location.  (Id. 428:4-20.)  Jaime told Cosgrove she intended on "return[ing] it and buy[ing] it from [Cosgrove], so that [he] could get credit".  (Id.)  Cosgrove informed Jamie that the Farmingdale Location was not associated with Plaintiff's store.  (Id. 431:17-22.)

Cosgrove could not recount any other specific instances of confusion, but testified generally that he had to deal often with situations in which customers informed him that they purchased products from, what they believed to be, Plaintiff's "other store in Farmingdale".  (Id. 445:17-446:3.)  Specifically, Cosgrove testified:

> I can't even tell you how many times I lend the samples out.  Client disappears.  I call them.  Where are my samples?  Oh, I'll bring them back.  They come back in like a drive-by, the shadiest thing.  They come in.  They wait 'til like no one is there to drop it at the counter and try to escape out the door.
>
> Always, like, hey.  How did it work out?  Oh, I got tiles somewhere else.  Where else?  Oh, your other location.
>
> I have heard it plenty of times.  People think that that's our location -- we have other locations. . . . It actually blows my mind the loyalty that people have to our stores, because people are not loyal anymore. . . . We have such loyal clients[.]

(Id. 432:25-433:25.)  Cosgrove estimated that for every ten people he helped, approximately two to four customers, after Cosgrove followed up with them, would respond thusly.  (Id. 434:15-24.)

### 2. Lauren Korner

Lauren Korner ("Korner") is a resident of Port Washington, New York, who grew up in Rockville Centre. (See Korner Tr. 8:13-9:2.)  Korner learned of Plaintiff through her parents' recommendation.  (Id. 11:4-7.)  Korner first became aware of Defendant sometime in October 2018 when she was driving with her husband on Route 110 and saw the Farmingdale store. (Id. 19:14-24.)  Korner testified Defendant's name "rang a bell from [her] parents' conversation", that she thought the Farmingdale store "must be the place" and so she spontaneously opted to visit Defendant's store.  (Id.)  Korner purchased approximately $1,300 of vinyl flooring from Defendant when she made this initial visit.  (Id. 27:12-21.)  The flooring purchased from Defendant was installed sometime in December.  (Id. 28:2-7.) Korner subsequently returned to Defendant's Farmingdale store to purchase carpet but, when she learned Defendant does not sell carpet, she realized Plaintiff and Defendant were not affiliated stores.  (Id. 30:14-18.)  Later, in January 2019, while at her parents' house, Korner informed her parents of her experience at Defendant's store, including her failed attempt to purchase carpet.  (Id. 24:5-23.)  Korner's parents then guided, and

24

accompanied, Korner to Plaintiff's Rockville Location. (Id. 24:5-23.)

At her deposition, Korner testified, while the two stores did not look similar, she experienced confusion because she had no context for what Plaintiff's store was meant to look like, that her parents had just recommended "Floor Decor", and that it was those two words which stuck in her mind. (Id. 39:9-22.)

### 3. Wendy Lepkoff

Wendy Lepkoff ("Lepkoff") is an interior designer who has resided on Long Island for more than 40 years. (Lepkoff Tr. 5:4-23.) Lepkoff's customers are in Nassau and Suffolk County, with an emphasis on Nassau County. (Id. 6:4-14.) During those 40-plus years, Lepkoff has been familiar with Plaintiff and has made purchases from Plaintiff for both her personal use and business use. (Id. 8:14-17; 11:10-16; 27:8-19.) Lepkoff learned of Plaintiff from her neighbors. (Id. 7:14-24.) Lepkoff only refers to Plaintiff's business using the Asserted Name. (Id. 18:6-16.) Lepkoff was unaware of any instances in which clients she referred to Plaintiff ended up at Defendant's stores. (Id. 29:10-20.)

### 4. Mary Venier

Mary Venier ("Venier") is a resident of Syosset. (Venier Tr. 5:13-19.) Venier has known of Plaintiff for more than 38 years and has been a repeat customer during this time span.

(Id. 8:6-24.)  Venier has repeatedly hired Plaintiff to do work at her place of business, purchased several of Plaintiff's products, and has consistently referred people to Plaintiff, including personal and professional referrals. (Id. 8:11-9:15; 20:12-21:9.) When making these referrals, Venier refers to Plaintiff using the Asserted Name.  (Id. 20:12-15.)

V.   Plaintiff's Evidence of "Blurring"

Altarac testified to several purported instances of "blurring" including the receipt of multiple reviews from Defendant's customers, not meant for Plaintiff, on Google and/or Yelp which mentioned Defendant's Farmingdale store and/or products.  (Id. 787:17-788:9; 792:20-793:8.)  Similarly, Altarac testified to instances in which Defendant's employees, or former disgruntled employees, left negative reviews on websites associated with Plaintiff, rather than with Defendant. (Id. 788:10-23.)  Altarac also recounted an instance in which a job applicant initially applied to Plaintiff's store for part-time work, who later told Altarac she "went to [Plaintiff's] Garden City store and [was] working there now."  (Id. 788:24-789:18.)

Finally, Altarac generally testified to instances in which Defendant's call centers would send Defendant's customers into Plaintiff's store to pick up merchandise they had purchased from Defendant.  (Id. 789:19-790:8.)  Further, on two occasions, Plaintiff's customers mistakenly ended up on Defendant's website

and were confused into believing that Plaintiff no longer sold carpet.  (Id. 790:9-791:6.)

CONCLUSIONS OF LAW

I.   Violation of § 43(a) of the Lanham Act

"Section 43(a) of the Lanham Act 'protect[s] an unregistered trademark[] . . . against infringement.'"  RVC Floor Decor, Ltd., 527 F. Supp. 3d at 316 (quoting Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997)).  To prevail under Section 43(a) on a trademark infringement claim, "a plaintiff must show, first, that he or she has a valid mark that is entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods."  LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016); see also Gruner + Jahr USA Publ'g., a Div. of Gruner + Jahr Printing and Publ'g. Co. v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993) ("[T]o succeed in a Lanham Act suit for trademark infringement, a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark.").

An unregistered mark merits protection under the Lanham Act only where it "would qualify for registration as a trademark".

<u>Star Indus. v. Bacardi & Co. Ltd.</u>, 412 F.3d 373, 381 (2d Cir. 2005).  A mark qualifies for registration as a trademark if it "<u>either</u> (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning". <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 769 (1992) (emphasis in original). The Court previously found, and Plaintiff conceded, that Plaintiff's mark is not inherently distinctive.  See <u>RVC Floor Decor, Ltd.</u>, 527 F. Supp. 3d at 316 ("Plaintiff concedes its mark is not inherently distinctive."); (<u>see also</u> Tr. 150:5-7 (Smith testifying that Plaintiff chose the name Floor Decor because it "described the stuff that [Plaintiff was] going to be selling")). Nevertheless, "if a mark is not inherently distinctive, it may 'acquire' distinctiveness by achieving 'secondary meaning' among the relevant consumer market." <u>LVL XIII Brands, Inc.</u>, 209 F. Supp. 3d at 649-50 (citing <u>Two Pesos</u>, 505 U.S. at 769).

A mark acquires "secondary meaning" when, "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." <u>Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.</u>, 696 F.3d 206, 216 (2d Cir. 2012) (quoting <u>Inwood Labs., Inc. v. Ives Labs., Inc.</u>, 456 U.S. 844, 851 n.11 (1982)).  "The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source." <u>Easy Spirit, LLC v. Skechers</u>

U.S.A., Inc., 515 F. Supp. 3d 47, 61 (S.D.N.Y. 2021) (quoting Genesee Brewing Co., 124 F.3d at 143 n.4).  The Second Circuit has articulated six non-exclusive factors that are relevant in determining secondary meaning; they are: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use." Christian Louboutin S.A., 696 F.3d at 226 (quoting Genesee Brewing Co., 124 F.3d at 143 n.4). "No single factor is determinative, and every element need not be proved." RVC Floor Decor, Ltd., 527 F. Supp. 3d at 317 (quoting Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985)).

"[P]roof of secondary meaning entails vigorous evidentiary requirements." Easy Spirit, LLC, 515 F. Supp. 3d at 61 (quoting Thompson Med. Co., 753 F.2d at 217 (alteration in original)). "[P]laintiff bears the burden of proving that [its] mark acquired secondary meaning by the time the allegedly infringing product came on the market." LVL XIII Brands, Inc., 209 F. Supp. 3d at 654 (citing Thompson Med. Co., 753 F.2d at 217); see also Saratoga Vichy Spring Co., Inc. v. Lehman, 625 F.2d 1037, 1043 (2d Cir. 1980) ("[Plaintiff] could not successfully rely upon secondary meaning if [defendant] obtained a mark established prior to the earliest time when [plaintiff's] mark could have acquired

secondary meaning."). The time by which Plaintiff must have established secondary meaning was previously determined by Judge Hurley to be July 2015.[12] See RVC Floor Decor, Ltd., 527 F. Supp. 3d at 317 ("Plaintiff's mark must have achieved secondary meaning by July 2015.").

Having considered the record evidence and for the reasons articulated herein, the Court concludes Plaintiff's Asserted Name, i.e., "Floor Decor", has not achieved Secondary Meaning in the Four-County Area and, thus, is not entitled to protection under the Lanham Act.

A. Plaintiff Has Not Proven that its Predominantly Local, Low-Budget, Advertising Was Effective in Reaching its Target Audience

"Advertising expenditures are regarded as 'indirect evidence of the possible effect that advertising may have on consumers' association of the [trademark] with the source of the product.'" Capri Sun GmbH v. Am. Beverage Corp., 595 F. Supp. 3d 83, 150 (S.D.N.Y. 2022) (quoting LVL XIII Brands, Inc., 209 F. Supp. 3d at 654-55). "When considering advertising expenditures,

---

[12] Notwithstanding Judge Hurley's previous determination of this issue, Defendant argues that Plaintiff should be required to prove that its name attained secondary meaning "on the date [Defendant] entered the Four-County Area." (See Def. Proposed Findings & Conclusions of Law, ECF No. 259, at 11-12.) Effectively, Defendant argues Plaintiff should not be permitted to establish historical secondary meaning without also establishing such historical secondary meaning persisted until July 2015. Since the Court finds Plaintiff has not established the Asserted Name achieved Secondary Meaning at any time, it need not resolve this issue.

'[c]ourt[s] should consider not only the total amount . . . but also whether the plaintiff's advertising specifically directed consumers to the mark as an indication of source.'" RVC Floor Decor, Ltd., 527 F. Supp. 3d at 319 (quoting LVL XIII Brands, Inc., 209 F. Supp. 3d at 655); see also Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 371 (E.D.N.Y. 2007) ("[M]erely showing that a certain amount was spent on advertising provides little support for secondary meaning.  It must be shown that there was promotion of the mark as an identifier for the product.").  Indeed, "targeted albeit low-cost advertising may establish this factor, but only if the plaintiff can show that it was successful in reaching the targeted audience." Easy Spirit, LLC, 515 F Supp. 3d at 62 (quoting LVL XIII Brands, Inc., 209 F. Supp. 3d at 655); see also Jewish Sephardic Yellow Pages, Ltd., 478 F. Supp. 2d at 345 ("[P]laintiff has not submitted any concrete evidence showing that these efforts succeeded in reaching the Jewish phonebook users who are plaintiff's target audience.").

As an initial matter, the Court finds the unsubstantiated modest, historical sums Plaintiff contends it spent on advertising, from 1974-2000, are insufficient to support a finding of secondary meaning, especially in the absence of some demonstration that Plaintiff's advertising was effective in reaching the target audience.  See LVL XIII Brands, Inc., 209 F. Supp. 3d at 655 (finding $82,000 spent in a single year on

marketing and promotion was insufficient to support secondary meaning). This conclusion is buttressed by the Court finding that, while Smith testified Plaintiff's advertising expenditures exceeded $100,000 every year from approximately 1990-2000, documentation from 2012-2015 highlighting Plaintiff spent significantly less in advertising expenditure, thereby rendering Smith's estimated figures of suspect value.[13]

Of greater significance, Plaintiff adduced no evidence at trial regarding the effect its advertising efforts had on consumers' perceptions of the Asserted Name during the relevant time period. In fact, the record evidence establishes Plaintiff's advertising outreach was ineffective in reaching its target audience. For example, Smith, a resident of Suffolk County, who became a customer of Plaintiff's after retiring, admitted on cross-examination he had never seen any of Plaintiff's advertisements run from 2005 through 2011. (See Tr. 164:20-165:12; 169:6-18; 170:3-14.) Similarly, McVeigh, Defendant's Farmingdale store manager, testified, notwithstanding having resided on Long Island for approximately 35 years and having held positions in the flooring industry his entire career, he had never seen any of Plaintiff's advertisements. (Id. 745:7-9.) Moreover, much of the

---

[13] Smith's testimony on Plaintiff's historical advertising figures carries little persuasion because they were unsubstantiated with documentary evidence.

testimony of Plaintiff's own witnesses emphasized the importance of repeat customers and referrals to Plaintiff's business model. Significantly, none of these customer witnesses testified they became customers of Plaintiff because they had seen one of its advertisements.

Finally, the evidence shows Plaintiff has been inconsistent in its presentation of the Asserted Name post-1996, when it began including the Carpet One brand name on certain of its advertisements.[14] Plaintiff did not establish which percentage of its advertisements bore only the Asserted Name versus those which bore the Asserted Name alongside Carpet One's branding; given this void, it is reasonable to conclude the effectiveness of Plaintiff's advertising on the consumers' perception of the Asserted Name was limited. See Grout Shield Distrib., LLC v. Elio E. Salvo, Inc., 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) (finding where plaintiff sold goods under several different marks, it was not clear how much was actually spent on the mark at issue, and, as such, plaintiff's advertising expenditures did not weigh in favor of finding secondary meaning); see also Jewish Sephardic Yellow Pages, Ltd., 478 F. Supp. 2d at 345 ("[M]any of the marketing efforts undertaken by plaintiff . . . did not exclusively showcase the [Asserted Name]. Rather, these materials

---

[14] This is also true as to the post-2014 advertisements bearing the Floor Decor and Design, "FD&D", mark.

display the [Asserted Name] alongside and sometimes less prominently than [plaintiff's] other identifying marks.").

For the foregoing reasons the Court concludes this factor weighs against finding secondary meaning.

### B. The Neal Survey Establishes Plaintiff's Mark Has Not Achieved Secondary Meaning in the Four-County Area

"While consumer surveys are 'not necessary to establish secondary meaning,' they offer 'the most direct and persuasive evidence of secondary meaning.'" Easy Spirit, LLC, 515 F. Supp. 3d at 63 (first quoting MZ Wallace Inc. v. Fuller, No. 18-CV-2265, 2018 WL 6715489, at *11 (S.D.N.Y. Dec. 20, 2018); then quoting Lopez v. Gap, Inc., 883 F. Supp. 2d 400, 426 (S.D.N.Y. 2012)); see also RVC Floor Decor, Ltd., 527 F. Supp. 3d at 319 ("[C]onsumer surveys are the most persuasive evidence of secondary meaning". (quoting LVL XIII Brands, Inc., 209 F. Supp. 3d at 638-39)). Indeed, "the ultimate determination of whether a particular trademark . . . has acquired secondary meaning remains an 'empirical question of consumer association.'" LVL XIII Brands, Inc., 209 F. Supp. 3d at 639 (quoting Two Pesos, Inc., 505 U.S. at 770-71). "In the Second Circuit, survey data showing 50 percent or greater recognition has generally been required to establish secondary meaning." Jackpocket, Inc. v. Lottomatrix NY LLC, No. 22-CV-5772, 2022 WL 17733156, at *39 (S.D.N.Y. Dec. 7, 2022) (citing Empresa Cubana del Tabaco v. Culbro Corp., No. 97-CV-8399,

2004 WL 602295, at *36 (S.D.N.Y. Mar. 26, 2004) (collecting cases), aff'd in part, rev'd in part on other grounds, 399 F.3d 462 (2d Cir. 2005)); see also id. (finding survey results showing 14.9 percent awareness of plaintiff's asserted mark was "far below what would be necessary to establish acquired meaning").

The Neal Survey concluded that a mere 3 percent of the relevant consuming public associate the Asserted Name with Plaintiff.  Of note, Neal's findings were unrebutted by Plaintiff who presented no counter survey evidence of its own, despite the importance of this factor as part of the secondary meaning analysis.  While Plaintiff argues the Court should consider this factor neutral due to various "deficiencies" in the Neal Survey, the Court finds Neal's Survey to be, on the whole, fairly designed. Cf. Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 350 (S.D.N.Y. 1998) ("While this Court is well aware that the results from secondary meaning surveys are open to criticisms from party opponents . . . such studies are helpful tools in assessing secondary meaning."). Likewise, the Court finds Neal was credible and highly qualified to opine on this issue.

Recognizing the Neal Survey "does not have any relevan[ce] to a secondary meaning determination as of 1975, 1980, 1990, 2000, 2003, 2005 or . . . 2006", the Court, nonetheless, concludes the Survey does provide relevant evidence, i.e., that from approximately 2016, whatever percentage of consumer

recognition Plaintiff's Asserted Name may have accumulated at some indeterminate point in the past had since faded to almost nothing.[15] This is significant regarding the issue of establishing secondary meaning. See Capri Sun GmbH, 595 F. Supp. 3d at 153 (disregarding historical consumer surveys conducted between February 1983 and June 1984 where cut-off date to establish secondary meaning was November 2017 because "[c]onsumer association may fade over time, when one generation of consumers has given way to another"); J.T. Colby & Co., Inc. v. Apple Inc., No. 11-CV-4060, 2013 WL 1903883,

---

[15] Further, as highlighted by Neal on cross-examination, because Neal's survey included both a two-year-forward-looking and a two-year-backward-looking window, even if the Survey had been conducted in 2015--before Plaintiff initiated this case--utilizing the same parameters and methodology, such hypothetical, earlier, study would result in certain overlap with respondents eligible to take the hypothetical study and the December 2018 study--the study Neal actually conducted. Indeed, a portion of the hypothetical respondents taking a hypothetical 2015 survey, who intended on purchasing the type of products sold by Plaintiff two years in the future--and who did so--could have qualified as participants in Neal's December 2018 survey, since they would have been part of the group that purchased the relevant products two years previously. (Tr. 573:9-574:5.) Consequently, the Neal Survey does have relevance regarding the potential state of affairs as of July 2015.

In any event, and as highlighted above, any deficiencies in the survey's methodology simply go to the weight of the evidence. Even if the Court were to afford minimal evidentiary weight to the Survey, Plaintiff's failure to present any contrary survey evidence means this factor would still weigh in Defendant's favor. Cf. LVL XIII Brands, Inc., 209 F. Supp. 3d at 657-58 (acknowledging plaintiff's argument that survey evidence measured secondary meaning from the wrong point in time as having "merit", but highlighting this deficiency merely went to the weight of the evidence before finding this factor favored defendant).

at *11 (S.D.N.Y. May 8, 2013) ("Just as secondary meaning can be built-up over time, it can also diminish over time.  That which the market has learned can be unlearned.") (citing <u>Landers, Fray & Clark v. Univ. Cooler Corp.</u>, 85 F.2d 46, 48 (2d Cir. 1936)).

Consequently, this factor weighs in Defendant's favor.

C. <u>The Single Instance of Unsolicited Media Coverage in the Record is <em>De Minimis</em> and Fails to Support a Finding of Secondary Meaning</u>

"Precedent holds '<u>extensive</u>, unsolicited media coverage of a product is a strong indication that a mark has obtained secondary meaning.'" <u>RVC Floor Decor, Ltd.</u>, 527 F. Supp. 3d at 320 (quoting <u>Tri-Star Pictures</u> 14 F. Supp. 2d at 350).

Here, the Court finds the single instance of unsolicited media coverage in the record, namely Plaintiff's coverage in the RVC Owl in 1984, is <u>de minimis</u> and far too temporally attenuated to support a finding of secondary meaning.  <u>Accord</u> <u>Jewish Sephardic Yellow Pages, Ltd.</u>, 478 F. Supp. 2d at 374 (finding evidence of a single instance of unsolicited media coverage insufficient and, consequently, this "weigh[ed] against a finding of secondary meaning").

D. <u>Plaintiff's Sales Figures Are Unreliable and Lack Context</u>

"The sales success of a product 'may be indicative of whether or not a substantial portion of the purchasing public associates the [mark] with the source of the goods.'" <u>RVC Floor</u>

Decor, Ltd., 527 F. Supp. 3d at 320 (quoting Tri-Star Pictures, 14
F. Supp. 2d at 351).   "In assessing sales success, courts have
considered sales volume, market share, whether sales grew over
time, whether sales data was broken down by year, and whether sales
data was convincingly linked to the mark-bearing product".   Focus
Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc., 647 F. Supp. 3d
145, 213-14 (S.D.N.Y. 2022) (internal citations omitted).

        As an initial matter and like Plaintiff's historical
advertising figures, the Court emphasizes the historical revenue
figures Smith testified to at trial were entirely unsubstantiated
with  documentary  evidence.[16]    Further,  Smith  conceded,
notwithstanding he was asked to opine as to sales figures from

---

[16] This lack of documentary evidence diminishes any persuasive
value Smith's testimony could offer, especially considering
Smith's testimony that such records apparently existed at the time
he left the Company in early 2000. (Tr. 154:3-6.)  Cf. Chum Ltd.
v. Lisowski, 198 F. Supp. 2d 530, 535 (S.D.N.Y. 2002) (finding the
lack of "hard numbers in the record" to substantiate plaintiff's
revenue figures "glaring" where plaintiff "undoubtedly ha[d] such
numbers at its fingertips").

Likewise, the Court rejects Plaintiff's attempts to bolster
Smith's testimony by emphasizing the testimony was credible and
uncontradicted.   The mere fact Smith's testimony was unrebutted
has no bearing upon whether it was credible. Cf. Latin Am. Music
Co., Inc. v. Spanish Broad. Sys., Inc., 232 F. Supp. 3d 384, 390
(S.D.N.Y. 2017) (stating the Second Circuit has held "that a
district court is not obligated to accept the truth of trial
testimony from an 'interested' witness merely because the
testimony is 'uncontradicted, unimpeached by anything appearing in
the record, and not inherently improbable'" (quoting Broad. Music
v. Havana Madrid Rest. Corp., 175 F.2d 77, 79-81 (2d Cir. 1949))).

decades previous, he had not looked at Plaintiff's financials in approximately 23 years. (Tr. 149:17-22.) These considerations seriously denigrate the evidentiary value of Smith's testimony, which the Court finds unpersuasive on this matter.

Furthermore, Plaintiff failed to place its sales figures into context; for example, the record evidence neither shows Plaintiff's market share in the Four-County Area, nor does it frame Plaintiff's "sales success" with reference to similarly situated competitors. Therefore, Plaintiff's level of historical "sales success" is unclear. See EBIN N.Y. Inc. v. SIC Enter., Inc., No. 19-CV-1017, 2023 WL 6141275, at * 9 (E.D.N.Y. Sept. 20, 2023) ("Raw sales figures need to be put into context to have any meaning. That is, if a company says that its sales of goods or services under the mark are $x, that number cannot be said to be 'impressive' or 'persuasive' evidence of secondary meaning without knowing how $x compares with the norms of that industry." (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:49 (5th Ed. 2023))); Nulux, Inc. v. Ramirez, No. 01-CV-3023, 2008 WL 11411300, at *7 (E.D.N.Y. Oct. 31, 2008) ("Evidence defining the size of the market and the plaintiff's share of that market bolsters raw sales figures by providing the context out of which the figures are derived."); BigStar Ent., Inc. v. Next Big Star, Inc., 105 F. Supp. 2d 185, 203 (S.D.N.Y. 2000) ("[T]here is no documentary support in the record regarding plaintiff's market

share, sales volume or the number of visitors to its website . . . all important considerations in relation to sales success.").

Further, and as previously highlighted, post-1996, Plaintiff began featuring Carpet One branding prominently alongside the Asserted Name in an indeterminate number of its advertisements. Consequently, for all Plaintiff's sales revenues post-1996, substantiated or unsubstantiated, the Court cannot conclusively determine the true volume of sales that are attributable solely to the Asserted Name. Cf. Erchonia Corp. v. Bissoon, 410 F. App'x 416, 418 (2d Cir. 2011) ("These non-itemized sales and advertising figures are insufficient to raise a triable issue of fact because Erchonia's laser has been known by different names at different times, so none of these data convey any information about consumers' relationship with the 'lipolaser' mark.").

To the extent there is documentary evidence in the record establishing that for the years 2012-2018 Plaintiff has consistently grossed more than $2 million in revenue each year, such evidence would ordinarily support a finding of secondary meaning. See, e.g., Easy Spirit, LLC, 515 F. Supp. 3d at 65 (describing sale of 396,090 units of product which "likely reflect[ed] millions-of-dollars in sales revenue" a "not insignificant" sum for purposes of determining sales success in

the context of secondary meaning analysis); R.F.M.A.S., Inc. v. Mimi So, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) (stating $4 million in sales was indicative of secondary meaning); Metrokane, Inc. v. The Wine Enthusiast, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2001) (describing $3 million in sales as "indisputable sales success"). However, like Plaintiff's historical figures which fail to differentiate between revenue attributable solely to the Asserted Name versus to the "Floor Decor Carpet One" branding, the gross sales receipts for the years 2014 through 2018 do not separate out the percentage of sales which are attributable solely to the Asserted Name versus those attributable to Plaintiff's Floor Decor & Design "FD&D" mark, which, by Plaintiff's own admission, became its main logo post-2014.

Additionally, the record evidence establishes Plaintiff's sales revenues actually represent a low total volume of sales since: (1) Plaintiff has only served approximately 18,000 paying customers in the Four-County Area since 1996; and (2) a large percentage of Plaintiff's customer base is comprised of repeat customers. See Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc., 46 F. Supp. 3d 255, 277 (S.D.N.Y. 2014) (stating despite "high" sales revenues totaling $167 million, the number of units sold in the United States "each year hovers around 3,000", and that this "low volume favors Defendants").

In view of the foregoing, the Court concludes the Sales Success factor does not support a finding of secondary meaning.

E. <u>There is No Evidence of Any Attempts by Third-Parties to Plagiarize Plaintiff's Mark</u>

"Evidence that a mark has been widely copied is persuasive evidence of secondary meaning because it demonstrates that the mark has become a 'strong source identifier in the eyes of the purchasing public.'" <u>LVL XIII Brands, Inc.</u>, 209 F. Supp. 3d at 660 (quoting <u>Lopez</u>, 883 F. Supp. 2d at 428).  "The key question is 'whether the copying was done deliberately, so as to benefit from [the plaintiff's] name and good will.'" <u>Id.</u> (quoting <u>Cartier, Inc. v. Four Star Jewelry Creations, Inc.</u>, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004) (alteration in original)).

Defendant highlights Plaintiff failed to adduce any evidence of intentional copying or plagiarism of its Asserted Name at trial and contends Plaintiff's failure in this regard cautions against finding secondary meaning.  The Court agrees.  <u>See Bobcar Media, LLC v. Aardvark Event Logistics, Inc.</u>, 554 F. Supp. 3d 606, 619 (S.D.N.Y. 2020) ("Here, [plaintiff] presents no evidence of any third-party copying.  That alone may be enough for this factor to weigh against [plaintiff].") (citing <u>Metrokane, Inc.</u>, 160 F. Supp. 2d at 637); <u>Nulux, Inc.</u>, 2008 WL 11411300, at *7 ("[T]he absence of previous instances of plagiarism by third parties weighs against a finding of secondary meaning.").  To the extent Plaintiff

adduced evidence it had sent a cease-and-desist letter to a company in the Hamptons that was using the Asserted Name (see Tr. 400:8-25), "this alone falls short of demonstrating that [the] business[] [was] intentionally copying or plagiarizing" Plaintiff's Asserted Name. Kelly-Brown v. Winfrey, 95 F. Supp. 3d 350, 359 n.6 (S.D.N.Y. 2016), aff'd, 659 F. App'x 55 (2d Cir. 2016).

### F. The Length and Exclusivity of Use Factor Weighs in Plaintiff's Favor

While "'there is no magic time span that confers secondary meaning' . . . 'the longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning'". Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J., 894 F. Supp. 2d 288, 322-23 (S.D.N.Y. 2012) (first quoting Jewish Sephardic Yellow Pages, Ltd., 478 F. Supp. 2d at 346; then quoting BigStar Ent., Inc. 105 F. Supp. 2d at 203). Generally, "[c]ourts often point to five years of exclusive use of a mark as evidence of secondary meaning." RVC Floor Decor, Ltd., 527 F. Supp. 3d at 318 (alteration in original) (quoting Hello I Am Elliot, Inc. v. Sine, No. 19-CV-6905, 2020 WL 3619505, at *10 (S.D.N.Y. July 2, 2020)). However, "whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's strength and is a factor weighing against a finding of

exclusivity." Rockland Exposition, Inc., 894 F. Supp. 2d at 323 (collecting cases).

The record evidence establishes that from 1974 until approximately 1996, Plaintiff operated, and consistently marketed itself under, the Asserted Name, notwithstanding that it did so through various variations in design. Approximately twenty years of continuous use of the Asserted Name certainly weighs in Plaintiff's favor. Nevertheless, the significance of this length of time is tempered by Plaintiff's unsubstantiated historical sales record, and the limited effect of its advertising efforts. Moreover, Plaintiff's inclusion of the Carpet One brand name on an indeterminate number of its advertisements from 1996-2014, and its transition in 2014 to the Floor Decor & Design Mark, further denigrates the level of significance the Court places on this factor, since such inclusion may have stymied and/or weakened any secondary meaning the Asserted Name may have had with the relevant consuming public.[17]

In sum, the "Length & Exclusivity of Use" factor is the only factor the Court finds weighs, though slightly, in Plaintiff's favor. Given the remainder of the relevant factors are neutral or cut against Plaintiff, the Court concludes Plaintiff has not met

---

[17] While there was evidence of potential third-party use of Plaintiff's Asserted Name (see Tr. 398:2-401:4), Defendant did not fully develop this part of the record in a meaningful way; hence, the Court attributes little weight to this evidence.

its burden in establishing its Asserted Name attained Secondary Meaning by July 2015.

II.  **Even if Plaintiff's Mark had Achieved Secondary Meaning, Plaintiff Failed to Prove a Likelihood of Confusion**

"To prevail in a trademark infringement action under the Lanham Act, a plaintiff must prove, in addition to protectability of the mark, 'a probability of confusion, not a mere possibility,' affecting 'numerous ordinary prudent purchasers.'" Star Indus., Inc., 412 F.3d at 383 (quoting Gruner + Jahr, 991 F.2d at 1077); see also Hamilton Int'l Ltd. v. Vortic LLC, 13 F.4th 264, 274 (2d Cir. 2021) ("[I]mportantly, in a trademark infringement case, the plaintiff bears the burden of proving a likelihood of consumer confusion in the alleged infringer's use of the mark."). To determine whether there is a likelihood of confusion, courts in this Circuit "apply the eight-factor Polaroid balancing test introduced by Judge Friendly in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961)" (the "Polaroid Factors"). Id. at 384.  The eight Polaroid Factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

RVC Floor Decor, Ltd., 527 F. Supp. 3d at 323.  "The 'analysis is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused.'"  Id. (quoting Star Indus., Inc., 412 F.3d at 384).  In applying the Polaroid Factors, "[t]he proper approach is to weigh each factor in the context of the others to determine if, on balance, a likelihood of confusion exists."  W.W.W. Pharm. Co., Inc. v. Gillette Co. 984 F.2d 567, 572 (2d Cir. 1993).  "The court 'generally should not treat any single factor as dispositive; nor should [it] treat the inquiry as a mechanical process by which the party with the greatest number of factors wins.'"  LVL XIII Brands, Inc., 209 F. Supp. 3d at 667 (quoting Playtex Prods., Inc. v. Ga.-Pacific Corp., 390 F.3d 158, 162 (2d Cir. 2004)).  "Instead, the court should focus on the ultimate question of whether consumers are likely to be confused."  Id.

### A. Strength of Mark

As highlighted above, Plaintiff has conceded its Asserted Name is not inherently distinctive; consequently, it can only be deemed worthy of trademark protection through the acquisition of secondary meaning.  The Court has already found Plaintiff has not met its burden in proving the Asserted Name achieved secondary meaning; thus, the Court concludes, this factor "strongly militates against a finding of a likelihood of confusion."  LVL XIII Brands, Inc., 209 F. Supp. 3d at 668.

B. Similarity of the Marks

"In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." Capri Sun GmbH, 595 F. Supp. 3d at 162-63 (quoting Gruner + Jahr, 991 F.2d at 1078) (alteration in original).

Judge Hurley previously determined, "[t]he marks at issue—'Floor Decor' and 'Floor & Decor'—are 'strikingly similar," that they "possess[ed] a strong visual and phonetic resemblance and . . . are almost identically named.'" RVC Floor Decor, Ltd., 527 F. Supp. 3d at 323 (quoting Syntex Labs., Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 569 (2d Cir. 1971)); see also Reply All Corp. v. Gimlet Media, LLC, 843 F. App'x 392, 396 (2d Cir. 2021) (observing "that using two identical words in sequence to form a mark is 'extremely unusual' and therefore weighs in favor of finding confusing similarity"). The record evidence did little to change the Court's view on this factor; consequently, the Court adheres to Judge Hurley's previous determination and concludes the similarity factor weighs in favor of confusion.

C. Competitive Proximity

Competitive proximity examines both "market proximity" and "geographic proximity." See Guthrie Healthcare Sys. v.

47

ContextMedia, Inc., 826 F.3d 27, 39-40 (2d Cir. 2016). Market proximity measures "'whether and to what extent the two products compete with each other,' considering 'the nature of the products themselves and the structure of the relevant market.'" RVC Floor Decor, Ltd., 527 F. Supp. 3d at 324 (first quoting Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996); then quoting Vitarroz v. Borden, Inc., 644 F.2d 960, 967 (2d Cir. 1981)). Geographic proximity measures "the 'geographic separation of the products.'" Id. (quoting Brennan's Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 134 (2d Cir. 2004)).[18]

While the parties' catalog of products is not coextensive, Judge Hurley previously found them to be in competitive proximity since their products, generally, "serve the same purpose [and] fall within the same general class." Id. (quoting W.W.W. Pharm. Co., Inc., 984 F.2d at 575) (alteration in original). The Court agrees. While Defendant highlights the parties' target customers are diverse in that Plaintiff targets homeowners and interior designers, whereas Defendant predominantly targets "Pros", the record evidence shows homeowners, whether individually or through a Pro, do transact business at Defendant's

---

[18] The parties' geographic proximity is undisputed since they occupy the same geographic market, i.e., the Four-County Area. See RVC Floor Decor, Ltd., 527 F. Supp. 3d at 324. Defendant does not contend otherwise. (See Def. Proposed Findings of Fact and Conclusions of Law, in toto.)

store; hence there is a certain degree of overlap in the parties' customer base. Brennan's Inc., 360 F.3d at 134 (stating competitive proximity seeks "to determine whether the two products have an overlapping client base that creates a potential for confusion"). Accordingly, the Court concludes this Polaroid Factor favors Plaintiff.

D. Bridging the Gap

"This factor inquires whether a plaintiff is likely to enter defendant's market, or 'bridge the gap.'" Morningside Grp. Ltd. v. Morningside Cap. Grp., L.L.C., 182 F.3d 133, 141 (2d Cir. 1999).

Since the Court finds Plaintiff and Defendant occupy the same market (see supra-Part II.C.), this factor is neutral. See Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743 (2d Cir. 1998) ("The [fourth] factor—bridging the gap—is not relevant because, in assessing this factor, we consider the likelihood that the plaintiff will enter the market occupied by the defendant's product to compete against the defendant. Since plaintiff and defendants already occupy the same market of simplified, laminated street maps, the gap has been bridged. In addition, this factor is subsumed by one to be discussed in a moment, that is, the competitive proximity of the products, and thus is not relevant as an individual factor." (internal citation omitted)).

E. Actual Customer Confusion

This factor concerns whether "there was confusion that could lead to 'a diversion of sales, damage to goodwill, or loss of control over reputation.'" RVC Floor Decor, Ltd., 527 F. Supp. 3d at 325-26 (quoting Reply All Corp., 843 F. App'x at 397).  While evidence of actual consumer confusion "is not necessary to establish a likelihood of confusion" it "can often provide highly probative evidence of this likelihood." Akiro LLC v. House of Cheatham, Inc., 946 F. Supp. 2d 324, 336 (S.D.N.Y. 2013) (quoting Henegan Const. Co., Inc v. Heneghan Contracting Corp., No. 00-CV-9077, 2002 WL 1300252, at *7 (S.D.N.Y. June 12, 2002)); see also Morningside Grp. Ltd., 182 F.3d at 141 ("Evidence that confusion has actually occurred is of course convincing evidence that confusion is likely to occur.")  Evidence of actual confusion can be "anecdotal or survey-based." RVC Floor Decor, Ltd., 527 F. Supp. 3d at 325 (citing Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000)).

The Court concludes this Polaroid Factor favors Defendant.  As an initial matter, Plaintiff presented no survey-based evidence tending to establish actual confusion; this is significant since "the absence of surveys is evidence that actual confusion cannot be shown." Reply All Corp., 843 F. App'x at 397 (quoting The Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 964 (2d Cir. 1996)).  The evidence of confusion Plaintiff

did adduce was limited to a handful of anecdotal instances; this
strikes the Court as de minimis in light of the parties' sales
histories. See Nora Beverages, Inc. v. Perrier Grp. Of Am., Inc.,
269 F.3d 114, 124 (2d Cir. 2001) ("[T]wo anecdotes of confusion
over the entire course of competition constituted de minimis
evidence.");

As to Cosgrove's anecdotal testimony that two to four
out of every ten customers exhibit confusion as to the ownership
of the Farmingdale Location, the Court finds it to be unpersuasive.
Indeed, record evidence is unclear as to whether these customers
were "confused" consumers, as opposed to consumers who knowingly
opted to purchase product elsewhere.[19]

Likewise, the Court affords Korner's testimony little
evidentiary weight because Plaintiff failed to prove that, at the
point of confusion, Korner was aware of Plaintiff's business,
products, or how its Asserted Name appeared to consumers in the
market. See, e.g., Therma-Scan, Inc. v. Thermoscan, Inc., 295
F.3d 623, 634 (6th Cir. 2002) ("[C]onfusion that . . . occurs

---

[19] This conclusion is further based upon Cosgrove's testimony that
he has been reprimanded for giving out samples to customers
because, when customers have samples, they can use said samples to
shop at other stores.  While Cosgrove contends customers returning
Plaintiff's samples told him they ended up purchasing product as
Plaintiff's "other location", that does not compel a conclusion of
confusion.  It is as likely these customers were simply shopping
the competition and, when questioned, offered this as an excuse as
to why they did not follow through with Plaintiff.

among individuals who are not familiar with the products in question is entitled to considerably less weight." (citation omitted)).  As highlighted by Korner herself, she was unaware of Defendant's existence prior to seeing the Farmingdale store; likewise, all she knew about Plaintiff was the name she had been given by her parents and that it sold flooring; it was the name that stuck when she saw Defendant's store and mistook it for Plaintiff's.  Therefore, Korner's confusion had nothing to do with how Defendant's and Plaintiff's marks were presented in the marketplace.[20]  See Alzheimer's Disease and Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., 307 F. Supp. 3d 260, 293 (S.D.N.Y. 2018) ("However, not all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks and it swayed consumer purchase." (quoting Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc., 851 F.3d 440, 457 (5th Cir. 2017)) (emphasis added)); see also id. ("We have rejected anecdotal evidence of actual confusion when the proponent did not show that a misleading representation by the defendant, as opposed to some other source, caused a likelihood of confusion." (quoting Streamline Prod. Sys., Inc., 851 F.3d at 457)).

---

[20] Similarly, Cosgrove's anecdotal account concerning his roommate is afforded little weight for the same reason.

Therefore, upon the evidence presented, the Court concludes Plaintiff has not established the actual-customer-confusion Polaroid Factor weighs in its favor.

F. Bad Faith

"The sixth Polaroid factor is bad faith, which concerns 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" Akiro LLC, 946 F. Supp. 2d at 339 (quoting Lang v. Ret. Living Pub. Co., Inc., 949 F.2d 576, 583 (2d Cir. 1991)). "[T]he only relevant intent is intent to confuse." Starbucks Corp. v. Wolfe Borough Coffee, Inc., 588 F.3d 97, 117 (2d Cir. 2009) (quotation omitted). "In order to establish that a defendant acted with the relevant intent to confuse in adopting its mark, the plaintiff must show, among other things, that the defendant had knowledge—be it actual or constructive—of the plaintiff's 'prior similar mark'". Kohler Co. v. Bold Int'l FZCO, 422 F. Supp. 3d 681, 726 (E.D.N.Y. 2018) (quoting Star Indus., 412 F.3d at 388-89).

The Court previously determined Plaintiff failed to adduce any evidence of bad faith during its case-in-chief. (See Reconsideration Order at 8-16.) Indeed, the record evidence shows Defendant has owned a valid trademark for its Mark since 2006, that this Mark was adopted long before Defendant had any knowledge

of Plaintiff's existence, and Defendant has been consistent in its use of its Mark.  See LVL XIII Brands, Inc., 209 F. Supp. 3d at 675 ("[T]he Second Circuit 'has never held adoption of a mark with no knowledge of a prior similar mark to be in bad faith[.]'" (quoting Star Indus., 412 F.3d at 388)).[21]

Likewise, as to Defendant's decision to bid on keywords as part of its Google Adwords campaign, including the term "floor decor", the record evidence establishes such practice was not motivated by Plaintiff's presence in the market, rather this is Defendant's ordinary practice nationally, and is motivated by the way consumers behave when they type words into the Google search engine.  See Alzheimer's Disease & Related Disorders Ass'n, Inc., 307 F. Supp. 3d at 287 ("The sine qua non of trademark infringement is consumer confusion caused by the infringing behavior, and behavior meant to harm a competitor does not necessarily entail infringement if a consumer is unlikely to be confused. For this reason, courts have repeatedly found that the purchase of a competitor's marks as keywords alone, without additional behavior that confuses consumers, is not actionable.").

---

[21] The Court credits Martin's testimony that Defendant was not worried about potential consumer confusion when it entered the Four-County Area because it was using its registered Mark, which had been used consistently nationwide across approximately 100 stores, in a market which Defendant, and its Mark, had been present in, through its website, since 2009.

Therefore, the Court concludes the record evidence does not weigh in Plaintiff's favor as to the bad-faith <u>Polaroid</u> Factor.

### Quality of the Products

In analyzing this factor "the court must determine 'whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two'". <u>Capri Sun GmbH</u>, 595 F. Supp. 3d at 175 (quoting <u>Akiro LLC</u>, 946 F. Supp. 2d at 340).

Plaintiff adduced no evidence at trial tending to show that Defendant's products were of inferior quality. Consequently, the Court finds this factor is neutral. <u>See</u> <u>LVL XIII Brands, Inc.</u>, 209 F. Supp. 3d at 676 (finding, where "there is insufficient evidence in the record indicating the superiority or inferiority of the products at issue . . . this factor is neutral") (citation omitted)).

### G. Sophistication of Consumers

"The final <u>Polaroid</u> factor, consumer sophistication, 'consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.'" <u>LVL XIII Brands, Inc.</u>, 209 F. Supp. 3d at 676 (quoting <u>Star Indus.</u>, 412 F.3d at 390). "In a reverse confusion case, 'the consumers relevant to [this] inquiry are those who

purchase [the plaintiff's] products.'" Id. (quoting Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 742 (2d Cir. 1994) (alterations in original)). "In general, '[t]he greater the value of an article the more careful the typical consumer can be expected to be.'" Id. (quoting McGregor-Doniger, Inc v. Drizzle Inc., 599 F.2d 1126, 1137 (2d Cir. 1979)); see also Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 627 F.2d 628, 631 (2d Cir. 1980) ("The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining the different products and determining their manufacturer or source than will the average purchaser of a ball of twine." (citation omitted)). "The Second Circuit has noted one possible exception to this principle: where the parties' marks are identical and their goods are in very close competitive proximity, a highly sophisticated consumer may be the most vulnerable to confusion." Kohler Co., 422 F. Supp. 3d at 730 n.20 (collecting cases).

Here, the record evidence establishes both parties' customers are highly sophisticated. This is reasonably inferred from, inter alia: (1) the high price point of both parties' products; (2) the extremely personal nature of the customer service that Plaintiff offers clients; and (3) the research that customers who purchase the products at issue will typically engage in, prior to committing to a purchase.

Additionally, while the parties' marks are similar, they are not identical.[22] Compare Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 868-69 (2d Cir. 1986) (Applying exception where appellee jeans manufacturer owned federal trademark for "a distinct back pocket stitching pattern . . . consist[ing] of two intersecting arcs which roughly bisect[ed] both pockets of appellee's jeans" and appellant's jeans bore "a back pocket stitching pattern substantially similar to appellee's trademark stitching pattern", and observing, "it is a sophisticated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattern on appellants' jeans indicates some sort of association between the two manufacturers. Presumably it is these sophisticated jeans buyers who pay the most attention to back pocket stitching patterns and their 'meanings'.").

Here, Plaintiff's Asserted Name is presented in lower-case font and includes a design logo, originally the "fd" design and, post 2014, the "FD&D" design; comparatively, Defendant's Mark is presented as two words in uppercase-font stacked atop each other with a large ampersand to the right of

---

[22] While Judge Hurley previously determined that the Parties' Marks were similar enough to trigger the exception, Judge Hurley's conclusion was formed based upon the parties' framing of the issue at summary judgment. This Court's conclusion is formed based upon its review of the fully developed record at trial.

Defendant's name.   These differences, in conjunction with the carefulness with which purchasers of the parties' products exhibit prior to committing to purchase, warrants the conclusion that this factor does not support a likelihood of confusion.

      H. <u>Weighing the Factors</u>

      In sum, when viewed in their totality, the Court finds the <u>Polaroid</u> Factors do not support a likelihood of confusion. While the similarity and the proximity factors weigh in Plaintiff's favor, the strength of Plaintiff's mark, <u>i.e.</u>, the Asserted Name, is extremely weak; indeed, Plaintiff failed to meet its burden of proving that its mark was entitled to protection through secondary meaning.   Further, the bridging-the-gap, and quality factors are neutral.   Conversely, the remaining factors weigh in Defendant's favor.   <u>RiseandShine Corp. v. PespiCo, Inc.</u>, 41 F.4th 112, 124 (2d Cir. 2022) ("Weak marks are entitled to only an 'extremely narrow scope' of protection, 'unless a convincing combination of other <u>Polaroid</u> factors militates strongly in favor of likelihood of confusion.'" (quoting <u>Plus Prod. V. Plus Discount Foods, Inc.</u>, 722 F.2d 999, 1006 (2d Cir. 1983))).   Accordingly, in the absence of a convincing combination of other <u>Polaroid</u> Factors militating strongly in favor of likelihood of confusion, the Court concludes Plaintiff has failed to prove likelihood of confusion.

III.  <u>N.Y. GBL § 360-l</u>

"New York General Business Law § 360-l requires plaintiff to prove '(1) that it possess[es] a strong mark—one which has a distinctive quality or has acquired a secondary meaning . . . and (2) a likelihood of dilution by either blurring or tarnishment.'" <u>RVC Floor Decor, Ltd.</u>, 527 F. Supp. 3d at 330 (quoting <u>Fireman's Ass'n of State of N.Y. v. French Am. School of N.Y.</u>, 839 N.Y.S.2d 238, 241-42 (2007)). "The same factors relevant to secondary meaning under the Lanham Act are relevant to secondary meaning under New York General Business Law § 360-l" <u>Id.</u> (citing <u>DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.</u>, 440 F. Supp. 2d 249, 280 (S.D.N.Y. 2006) (collecting cases)).

Plaintiff's Asserted Name is not inherently distinctive, and as this Court has found in its conclusions of law, Plaintiff has failed to meet its burden in proving its Asserted Name acquired secondary meaning.  (<u>See</u> <u>supra</u>-Part I.A-F.)  Consequently, Plaintiff's dilution claim falls at the first hurdle, and the Court need not address the second element of Plaintiff's dilution claim. <u>Cf.</u> <u>Shandong Shinho Food Indus. Co., Ltd. v. May Flower Int'l, Inc.</u>, 521 F. Supp. 3d 222, 262 (E.D.N.Y. 2021) (dismissing dilution claim pursuant to N.Y. GBL § 360-l where plaintiff had not shown its trade dress was protectible); <u>Therapy Prods., Inc. v. Bissoon</u>, 623 F. Supp. 2d 485, 495 (S.D.N.Y. 2009) (granting summary judgment in favor of defendant because, in interpreting N.Y. GBL § 360-l,

the Second Circuit has stated "New York law accords protection against dilution to marks that are distinctive as a result of acquired secondary meaning as well as to those that are inherently distinctive" and plaintiff's mark was neither (quoting <u>N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC</u>, 293 F.3d 550, 557 (2d Cir. 2002))).

<u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Court finds in favor of Defendant on all of Plaintiff's remaining claims.  The Clerk of the Court is directed to enter judgment consistent with these Findings of Fact and Conclusions of Law, and thereafter to mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: June 5, 2024
        Central Islip, New York